No. 17-1252, 17-1253

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

RICHARD GRAMM,

Patent Owner–Appellant

v.

DEERE & COMPANY,

Petitioner–Appellee.

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2015-00898 & IPR2015-00899, Judges Gerstenblith, Kim and Goodson

# OPENING BRIEF OF APPELLANT RICHARD GRAMM

John A. Cotter
Thomas J. Oppold
Glenna L. Gilbert
Katherine E. Muller
**Larkin Hoffman Daly & Lindgren Ltd.**
8300 Norman Center Drive
Suite 1000
Minneapolis, MN 55437
Tel. (952) 896-8300

*Attorneys for Appellant Richard Gramm* March 6, 2017

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel of record for Patent Owner-Appellant Richard Gramm certify as follows:

1. The full name of every party represented by us is:

   Richard Gramm

2. The names of the real parties in interest represented by us are:

   Richard Gramm and Headsight, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by use are:

   None.

4. The names of all law firms and the partners or associates that appeared for the parties represented by us at the Board, or are expected to appear in this Court, are:

   John A. Cotter, Thomas J. Oppold, Glenna L. Gilbert and Katherine E. Muller of Larkin Hoffman Daly & Lindgren, Ltd.

Dated: March 6, 2017

/s/ John A. Cotter
John A. Cotter

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ ii

TABLE OF CONTENTS ........ iii

TABLE OF AUTHORITIES ........ vii

STATEMENT OF RELATED CASES ........ x

JURISDICTIONAL STATEMENT ........ 1

STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 2

I. PROCEDUREAL HISTORY ........ 2

II. TECHNICAL BACKGROUND ........ 3

A. Field Of The Invention And Technical Background ........ 3

B. Gramm's Invention ........ 6

1. Farmers' concerns and problems. ........ 6

2. Gramm's communications with Deere about farmers' concerns and problems. ........ 7

3. The lack of corn header height control systems for Deere corn headers. ........ 8

4. The harsh environment of corn harvesting. ........ 9

5. Gramm invents his own header height control system for Deere corn headers with plastic dividers. ........ 9

III. THE PRIOR ART REFERENCES IN THE *INTER PARTES* REVIEW PROCEEDINGS. ........ 12

A. Cleveland ........ 13

B. Chmielewski ........ 17

C. The DA, DPC And Lofquist....................................................18

IV. DEERE'S OBVIOUSNESS ARGUMENTS CHANGED FROM ITS PETITIONS TO ITS REPLIES. ....................................................19

A. Deere's Petition Arguments With Respect To The Combination Of Cleveland And Chmielewski. ....................................................19

B. Deere's Reply Arguments With Respect To The Combination Of Cleveland And Chmielewski. ....................................................20

SUMMARY OF ARGUMENT ....................................................21

ARGUMENT ....................................................22

I. STANDARD OF REVIEW....................................................22

II. THE LAW ON OBVIOUSNESS. ....................................................23

A. Motivation To Combine ....................................................24

B. References That Teach Away. ....................................................25

C. Reasonable Expectation Of Success ....................................................26

III. THE BOARD ERRED IN CONCLUDING THAT CLAIMS 1 AND 27 ARE OBVIOUS OVER THE COMBINATION OF CHMIELEWSKI, CLEVELAND AND LOFQUIST/DPC. ....................................................27

A. The Board Incorrectly Found A POSITA Would Have Reason To Combine The Cleveland Probe Assembly With The Chmielewski Potentiometers By Rotating The Cleveland Probe Assembly 90 Degrees; Such Rotation Would Render The Cleveland Probe Assembly Unfit For Its Intended Purpose As A Lateral Position Sensor....................................................28

1. The Board found incorrectly that Cleveland teaches that the purpose of the Cleveland probe assembly is to detect elevation changes and that purpose remains unchanged when the probe is rotated 90 degrees when combined with Chmielewski. ....................................................30

2. The Board erred when it concluded that the purpose and intended use of the Cleveland sensor are not a focus of the inquiry when considering the rotation of the sensor and that it does not matter if the Cleveland probe assembly would be unfit for its intended purpose. ....................34

3. The Board incorrectly found that the combination of Cleveland and Chmielewski meets the second element of claim 27. ........................................................................39

B. The Board Incorrectly Found That A POSITA Would Have Had Reason To Combine The Cleveland Probe Assembly With The Chmielewski Potentiometers When The Flexibility Of The Cleveland Spring Would Not Permit The Combination To Operate As A Height Sensor. ............................................................40

1. The Board incorrectly found that Chmielewski teaches calibration of a spring. ............................................................42

2. The Board incorrectly found that it would have been within a POSITA's skill to perform appropriate calibration of the Cleveland spring. .........................................46

C. The Board Erred When It Concluded The Claims At Issue Are Obvious When Deere Did Not Argue Or Carry Its Burden, And The Board Did Not Find, That A POSITA Would Perceive A Reasonable Expectation Of Success In Making The Invention Of The '395 Patent In Light Of Cleveland, Chmielewski, And DPC/Lofquist Prior Art References. ..................................................48

1. The only evidence of record demonstrates that the proposed combination of prior art would have been incapable of accurate height detection. ....................................51

2. The evidence of record demonstrates that the proposed combination of prior art would have been unable to successfully operate in the harsh corn harvesting environment. ....................................................................55

IV. THE BOARD ENGAGED IN SUBSTANTIAL HINDSIGHT RECONSTRUCTION. ......................................................................61

CONCLUSION ........................................................................................................62

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) .......... 41, 52

*Allergan, Inc. v. Apotex, Inc.*,
754 F.3d 952 (Fed. Cir. 2014) .......... 23

*Amgen Inc. v. F. Hoffman-LaRoche Ltd.*,
580 F.3d 1340 (Fed. Cir. 2009) .......... 26

*Arendi S.A.R.L. v. Apple Inc.*,
832 F.3d 1355 (Fed. Cir. 2016) .......... 50

*Cumberland Pharms. Inc. v. Mylan Institutional LLC*,
846 F.3d 1213 (Fed. Cir. 2017) .......... 25

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
567 F.3d 1314 (Fed. Cir. 2009) .......... 26

*Dome Patent L.P. v. Lee*,
799 F.3d 1372 (Fed. Cir. 2015) .......... 23, 27

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*,
655 F.3d 1291 (Fed. Cir. 2011) .......... 56

*In re Chu*,
66 F.3d 292 (Fed. Cir. 1995) .......... 25

*In re Fine*,
837 F.2d 1071 (Fed. Cir. 1988) .......... 61

*In re Fritch*,
972 F.2d 1260 (Fed. Cir. 1992) .......... 35, 36

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) .......... 23

*In re Gordon*,
733 F.2d 900 (Fed. Cir. 1984) .......... passim

*In re Kahn*,
441 F.3d 977 (Fed. Cir. 2006) ........................................................................24

*In re Magnum Oil Tools Int'l*,
829 F.3d 1364 (Fed. Cir. 2016) ....................................................... 41, 49, 50, 52

*In re Rambus*,
753 F.3d 1253 (Fed. Cir. 2014) ........................................................................23

*In re Ratti*,
270 F.2d 810 (CCPA 1959) ........................................................................ 25, 36

*Innogenetics, N.V. v. Abbott Labs.*,
512 F.3d 1363 (Fed. Cir. 2008) ........................................................................25

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ....................................................... 23, 26, 27, 50

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012) ........................................................................25

*KSR Int'l Co. v. Teleflex, Inc.*,
550 U.S. 398 (2007) ....................................................................... 24, 25, 26

*McGinley v. Franklin Sports, Inc.*,
262 F.3d 1339 (Fed. Cir. 2001) ....................................................... 26, 40, 55, 61

*Noelle v. Lederman*,
355 F.3d 1343 (Fed. Cir. 2004) ........................................................................26

*Par Pharm., Inc. v. TWI Pharms., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014.) ........................................................................23

*Redline Detection, LLC v. Star Envirotech, Inc.*,
811 F.3d 435 (Fed. Cir. 2015) ........................................................................23

*Sanofi-Synthelabo v. Apotex, Inc.*,
550 F.3d 1075 (Fed. Cir. 2008) ........................................................................24

*Whitserve, LLC v. Computer Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012) ........................................................................ 41, 52

**Statutes**

35 U.S.C. § 103(a) ....................................................................................................23

**STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule 47.5, counsel for Patent Owner-Appellant Richard Gramm certifies as follows:

(a) No appeal in this case was previously before this Court or any other appellate court.

(b) Counsel for Patent-Owner Appellant Richard Gramm knows of no case pending in this Court or any other court that may directly affect this Court's decision in this Appeal. The Court's decision in this Appeal may, however, affect *Gramm v. Deere & Company*, No. 3:14-cv-00575, pending in the United States District Court for the Northern District of Indiana in which Gramm alleges infringement of the patent at issue in this appeal. On November 30, 2016, Petitioner-Appellee Deere & Company filed an *ex parte* reexamination request against claims 12-16 of the patent at issue. The USPTO granted the request on January 26, 2017.

## **JURISDICTIONAL STATEMENT**

The Patent Trial and Appeal Board ("Board") had original jurisdiction for the two *inter partes* review proceedings at issue in this Appeal pursuant to 35 U.S.C. § 311. The Board entered final judgment in its Final Written Decisions on September 22, 2016. This Appeal was timely filed on November 22, 2016. This Court has jurisdiction under 35 U.S.C. § 141(c) and 28 U.S.C. § 1295(a)(4)(A).

## **STATEMENT OF THE ISSUES**

1. Whether the Board erred when it concluded the claims at issue of U.S. Patent No. 6,202,395 ("'395 patent") are obvious where it incorrectly found that a person of ordinary skill in the art ("POSITA") would have had a reason to combine the probe assembly of U.S. Patent No. 3,611,286 ("Cleveland") with the potentiometers disclosed in U.S. Patent No. 5,535,577 ("Chmielewski") by rotating the Cleveland probe assembly 90 degrees when the rotation would render the Cleveland probe assembly unfit for its intended purpose as a lateral position sensor?

2. Whether the Board erred when it concluded the claims at issue of the '395 patent are obvious where it incorrectly found a POSITA would have had reason to combine the Cleveland probe assembly with the Chmielewski potentiometers when the flexibility of the Cleveland spring would not permit the combination to operate as a height sensor?

3. Whether the Board erred when it concluded the claims at issue of the ’395 patent are obvious when Deere did not argue or carry its burden, and the Board did not find, that a POSITA would perceive a reasonable expectation of success in making the invention of the ’395 patent based on the combination of the Cleveland, Chmielewski, and the Deere Parts Catalog/Deere Advertisement or U.S. Patent No. 5,761,893 (“Lofquist”)?

## STATEMENT OF THE CASE

### I. PROCEDUREAL HISTORY

This Appeal from the Patent and Trial and Appeal Board (“Board”) involves one patent, U.S. Patent No. 6,202,395 (“’395 patent”), which is owned by the inventor, Richard Gramm, the Appellant in this case (“Gramm”). Gramm and his company Headsight, Inc. sued Appellee Deere & Company (“Deere”) in the United States District Court for the Northern District of Indiana for infringement of Gramm’s ’395 patent. Deere, in turn, petitioned for *inter partes* review of the ’395 patent in two separate Petitions. The Board instituted review of claims 1-11 and 27-34 in each of IPR2015-00898 and IPR2015-00899.[1] The Board did not institute review on claims 12-26 of the ’395 patent, finding that Deere had not established a

[1] Gramm’s arguments throughout this Appeal brief focus on independent claims 1 and 27. Claims 2-11 depend from claim 1, and claims 28-34 depend from claim 27. Therefore, Gramm’s arguments with respect to claims 1 and 27 apply equally to claims 2-11 and 28-34.

reasonable likelihood of prevailing with respect to those claims. (Appx427, Appx462.)

The Board instituted review in IPR2015-00898 on the grounds that the combination of U.S. Patent No. 5,535,577 ("Chmielewski"), U.S. Patent No. 3,611,286 ("Cleveland"), the Deere Parts Catalog ("DPC") and the Deere Advertisement ("DA") rendered the claims obvious under 35 U.S.C § 103. The Board instituted review in IPR2015-00899 on the grounds that the combination of Chmielewski, Cleveland and U.S. Patent No. 5,761,893 ("Lofquist") rendered the claims obvious. The Board ultimately returned judgment in both IPRs that the instituted claims were obvious in view of those references.

## II. TECHNICAL BACKGROUND

### A. Field Of The Invention And Technical Background

The '395 patent is directed to a non-cut crop height control apparatus for detecting and controlling the height of a "head" or "header" of an agricultural combine harvester ("combine") a designated height above the soil during harvesting operations, and, in particular, for a height sensor adapted for a corn header having plastic crop divider points. (Appx1085 at 1:63-65.) As the Board recognized in its Final Written Decisions, "the invention at issue in the '395 patent is not a 'header' or a 'combine' per se; rather, it is a header height control apparatus—an 'apparatus for detecting and controlling the height above the soil of

an agricultural machine as it traverses a field.'" (Appx23, Appx94.) The invention comprises of a height sensor arm which contacts the soil and attaches to the header via mounting brackets at the tips of the plastic crop divider points. (Appx1085 at 2:22-36.) The invention further comprises a rotation sensor that measures rotation when the arm is displaced by terrain elevation changes. (*Id.* at 2:27-31.) The rotation sensor sends a height control signal to the combine's controller to raise or lower the header. (*Id.*)




FIG. 1




FIG. 2

(Appx1801.)

As shown in Figures 1 and 2 of the '395 patent above, a header is a piece of equipment that mounts to the front of the combine and collects and feeds the crop into the combine for separation of unwanted plant material. A corn header, which is a "non-cut crop header," is shown in Photos 1-3 below. Photo 1 shows the corn header by itself; Photo 2 shows the corn header attached to the front end of the combine; and Photo 3 shows a corn header in use harvesting corn. (Appx2846 ¶ 62, Appx2896-97 ¶ 62.)




Photo 1



Photo 2



Photo 3

Non-cut crop headers do not cut the crop being harvested. Instead, the corn header pulls the corn stalks downward below the header and, in the process, strips the ears of corn from the stalks. (Appx2847-48 ¶ 64, Appx2898 ¶ 64.) Non-cut

crop headers have forwardly projecting crop divider points ("dividers") (referred to as "header housings" in the '395 patent) which extend between the crop rows to guide the stalks into the header. (Appx2847 ¶ 64, Appx2898 ¶ 64.) During harvesting, if the header is too low, it can run into the ground as the field terrain changes, resulting in damage to the header. (Appx1085 at 1:22-28, *see* Appx2782 ¶ 29, Appx2806 ¶ 29.) Moreover, a header that is too high can miss "down" crop that has fallen over. (Appx1085 at 1:28-30, Appx2782 ¶ 30, Appx2806 ¶ 30.)

At the time of the invention, Deere and other original equipment manufacturers ("OEMs") began making larger corn headers which could exceed forty feet from side to side ("width"). It is therefore difficult for the operator to manually control the height of the header to avoid running into the ground as the field terrain changes across the width of the header. (Appx1085 at 1:30-37.) It is even more difficult for farmers to monitor and adjust header height when operating speed increases. (*Id*. at 1:37-39.) Repairs to headers and combines are costly and time consuming. (*Id*. at 1:39.)

## B. Gramm's Invention

### 1. <u>Farmers' concerns and problems.</u>

Gramm perceived that farmers were encountering problems with their corn headers because the headers were becoming larger. (Appx2785 ¶ 42, Appx2786 ¶ 46, Appx2809 ¶ 42, Appx2810 ¶ 46.) In 1994, OEMs also began to make dividers

out of plastic instead of metal. (Appx2781 ¶ 28, Appx2782 ¶¶ 31-32, Appx2805 ¶ 28, Appx2806 ¶¶ 31-32.) Unlike metal dividers that can be repaired when damaged, plastic dividers require replacement resulting in more down time and cost. (Appx2785 ¶¶ 43-44, Appx2809 ¶¶ 43-44.) Moreover, because plastic dividers are more susceptible to damage from ground impact, farmers had to run their combines at slower speeds and remain more attentive to changes in ground elevation. (Appx2786 ¶¶ 45-46, Appx2810 ¶¶ 45-46.)

2. Gramm's communications with Deere about farmers' concerns and problems.

Before Gramm invented his header height control system, Gramm was a sales representative for a Deere dealership and knew that farmers were experiencing problems in the field. Gramm asked his Deere territory sales manager and Deere area service manager if there was a corn header height control system on the market or if Deere was developing one. (Appx2786-87 ¶ 48, Appx2810-11 ¶ 48.) The territory sales manager informed Gramm that Deere had no corn header height control system, that there was no such product in the Deere pipeline, and there was no need for a height control system for corn headers. (Appx2787 ¶ 49, Appx2811 ¶ 49.) According to Deere's expert Mr. James Lucas ("Lucas"), the former Director for combines for agricultural company CaseIH, there was no perceived need in the industry for a height sensor for Deere's corn headers with plastic dividers. (Appx1362 ¶ 184, Appx1572 ¶ 181.) Because

neither Deere nor any other OEM had a height control system for corn headers, Gramm set out to find if there were any other commercially available solutions. (Appx2787 ¶ 51, Appx2811 ¶ 51.)

3. The lack of corn header height control systems for Deere corn headers.

Gramm observed there were no corn header height control systems commercially available that were made for corn headers with plastic dividers. (*Id.*) Gramm attempted to retrofit a height control system made for a corn header with metal dividers for use on Deere's plastic dividers but found the retrofit unsatisfactory. (Appx2787-88 ¶¶ 51-52, Appx2811-12 ¶ 51-52.) These retrofitted systems had large, heavy brackets and had to be mounted near the middle of the plastic divider. (Appx2784 ¶ 39, Appx2808 ¶ 39.) The retrofitted systems were difficult to attach to the plastic dividers. (*See id.*) Additionally, as shown below, the double wall construction of Deere's plastic dividers provided limited space below the plastic dividers in which to fit a height sensor, whereas the metal dividers had a large open cavity within the divider. (Appx2784 ¶ 38, Appx2788 ¶ 53, Appx2808 ¶ 38, Appx2812 ¶ 53.)



(Appx1740.)

4. The harsh environment of corn harvesting.

The corn-harvesting environment is harsh. (Appx2783 ¶ 35, Appx2807 ¶ 35.) Any height sensor on a corn header must be able to withstand abuse from hard, abrasive corn stalks and debris and be designed to protect the rotation sensor and related parts as the header traverses the field. (*Id.*) Corn stalks can puncture tires on combines driving through corn stubble. (*Id.*) In addition, juices from the corn stalks make the environment sticky. (Appx2852 ¶ 74, Appx2902, ¶ 74.)

5. Gramm invents his own header height control system for Deere corn headers with plastic dividers.

Because no solution was available to address the problems and need recognized by Gramm, he invented his own corn header height control system that worked with Deere plastic crop dividers. (Appx2788 ¶ 52, Appx2812 ¶ 52.) Gramm recognized that his height sensor and the manner of attaching it to a plastic divider needed to be sufficiently robust to withstand the abuse from corn stalks during use. (Appx2788 ¶ 53, Appx2812 ¶ 53.) Gramm also wanted to make his inventive system as sensitive as possible to changes in elevation of the ground to maintain the header a designated height above the ground. (*Id.*) Gramm wanted a height sensor that was both rigid, to provide an accurate indication of changes in height, yet sufficiently flexible so it would not be damaged if the combine reverses while the sensor is still in contact with the ground. (*Id.*)

Gramm created and field tested numerous designs. (Appx2788 ¶ 54, Appx2812 ¶ 54.) One challenge he faced was the limited space available near the tip of the crop divider in which to place a height sensor due to the double wall construction as previously discussed. (Appx 2788 ¶ 53, Appx2812 ¶ 53.)

Gramm ultimately developed a workable prototype that addressed and solved these problems. He filed a provisional patent application covering his invention on December 31, 1997, and a non-provisional application on December 31, 1998. (Appx2788-89 ¶ 56, Appx2812-13 ¶ 56.) The ’395 patent, which covers Gramm’s invention, issued on March 20, 2001. (Appx1079.) Gramm’s height sensor is flexible to prevent damage to the height sensor when the combine is reversed and, as shown in Figure 3 of the ’395 patent, is small enough to mount in the small trapezoidal area at the tip of the plastic dividers. (Appx1082, Appx1085 at 2:33-36.)




FIG. 3

(Appx1082.)

No OEMs offered a corn header with height sensors as an option until after the priority date of the ’395 patent (i.e., December 31, 1997). (Appx2850 ¶ 70, Appx2900 ¶ 70.) Header height control systems are now available on all OEM corn headers.

Independent claims 1 and 27, which the Board found to be unpatentable, recite as follows:

> 1. Apparatus for maintaining a *non-cut crop header* disposed on a forward portion of a combine a designated height above the soil as the combine traverses a field, said apparatus comprising:
>
> *a pre-loaded, generally linear flexible arm coupled to a forward portion of the header* and having first and second opposed ends, wherein the first end of said flexible arm engages and is displaced over the soil as the header moves above the soil;
>
> angular deflection sensing means coupled to the second end of said flexible arm for measuring a deflection of said flexible arm when the first end of said flexible arm encounters irregularities in the soil as the header moves above the soil and for providing a first signal representing the extent of deflection of said flexible [arm]; and
>
> control means coupled to said header and said angular deflection sensing means and *responsive to said first signal for raising or lowering the header in accordance with said first signal in maintaining the header a designated height above the soil*, wherein said flexible arm and angular deflection sensing means are attached to a head housing disposed on a forward portion of said combine and *said head housing is comprised of polyurethane and includes a metal tip and a mounting bracket for attaching said metal tip to a forward end of said head housing, and wherein said mounting bracket further couples said flexible arm to a forward end of said head housing.*

27. For use on a <u>*plastic non-cut crop header*</u> housing disposed on a forward portion of a combine used in the harvesting of crops, <u>*said header housing have a tip mounted to a forward end thereof by means of a mounting bracket*</u>, an arrangement for determining the height of the header housing above the soil as the combine traverses a field, said arrangement comprising:

a rotation sensor disposed in a lower, forward portion of the header;

an elongated, linear shaft having first and second opposed ends, wherein said first end is coupled to said rotation sensor and said second end engages the soil, and wherein said shaft rotationally displaces said rotation sensor as the second end of said shaft engages and passes over irregularities in the soil; and

<u>*a flange connecting said rotation sensor to the mounting bracket for mounting said rotation sensor on a lower portion of the forward end of the plastic header housing, wherein said mounting bracket includes a strap and a bracket respectively disposed on lower and upper surfaces of the header housing and connected together by at least one nut and bolt combination.*</u>

(Appx1088 at 7:29-56, Appx1089 at 10:1-22 (emphasis added).) Gramm began commercial sales of his invention in 1998. (Appx2789 ¶ 57, Appx2813 ¶ 57.) In June 2000, Gramm formed Headsight, Inc., the exclusive licensee of the ’395 patent, to commercialize the invention of the ’395 patent. (*Id*.) For the first four years of its existence, Headsight sold only the invention. (*Id*.)

## III. THE PRIOR ART REFERENCES IN THE *INTER PARTES* REVIEW PROCEEDINGS.

The Board instituted review in IPR2015-00898 on the ground that the combination of Chmielewski, Cleveland, the DPC and the DA rendered the claims obvious under 35 U.S.C § 103. The Board instituted review in IPR2015-00899 on the ground that the combination of Chmielewski, Cleveland and Lofquist rendered

the claims obvious. Deere's arguments with respect to obviousness of independent claims 1 and 27 based on the combination of Chmielewski and Cleveland are substantially identical in the '898 Petition and '899 Petition.

**A. Cleveland**

While Gramm's invention detects changes in height, Cleveland discloses a lateral position sensor. Cleveland is directed toward a "device for sensing the relative position of a moving vehicle [10] with respect to a furrow [78] in the ground." (Appx1905 at 1:4-6.) Cleveland discloses among its several objects "a device which will *indicate the lateral position of a vehicle with respect to a furrow* as the vehicle moves across the field; *the provision of a device will permit accurate positioning of the vehicle a predetermined distance from the furrow*." (*Id.* at 1:61-66 (emphasis added).)

Cleveland achieves its ability to detect lateral position through a "probe which aligns with and senses a furrow" in the soil. (*Id.* at 1:46-49.) The sensing probe contains several parts that must work together to achieve Cleveland's intended purpose of sensing lateral position.



(Appx1903.) As Cleveland discloses, the sensing probe 14 includes:

> mounting plate 18 adapted to be mounted rigidly with respect to boom 16. Pivotally mounted on plate 18 is a swing member 20 including a collarlike hub 22, a downwardly extending stub 24 and an upwardly extending swing lever 26, all of which are welded together so that swing member 20 is a rigid member. An elongated slot 28 is provided in the upper end of swing lever 26. Hub 22 is rotatably mounted upon a hinge bolt 30 by means of bearings (not shown).

(Appx1905 at 2:44-52.) Switch link 62 includes "a slot pin 64 which extends within slot 28 of swing lever 26." (Appx1906 at 3:13-15.) Also included in the assembly is spring 38 that extends downward from stub 24 and attaches to bearing member 44. (Appx1905 at 2:58-59, 65-71.)



FIG. 2

(Appx1904.)

Spring 38 is sized so that it is forced to bend or deflect "in the manner shown in FIG. 7" (below) causing "bearing member 44 to be dragged rearwardly with respect to the vehicle 10" when traveling in the direction indicated by arrow 80 in FIG. 7. (Appx1906 at 3:67-4:1.)

FIG. 7




(Appx1904.) This "leaves bearing member 44 free to roll laterally within the furrow." (Appx1906 at 4:1-4.) However, the downward force "should not be so great that bearing member 44 plows into the soil and makes a furrow of its own." (*Id.* at 4:24-26.)

As shown in Figure 6 of Cleveland (below), when "vehicle 10 [] move[s] laterally with respect to furrow 78, bearing member 44 will always seek the deepest portion of the furrow." (*Id.* at 4:16-18.)

FIG.6




(Appx1904.) The probe assembly starts out in a vertical position. (Appx1906 at 4:39-41.)

Because bearing member 44 stays in the deepest part of the furrow, "spring 38 and swing lever 26 [] swing about hinge bolt 30 so that the longitudinal axes of spring 38 and swing lever 26 are displaced from a vertical position." (*Id.* at 4:41-46.)

Cleveland specifically discloses that "[t]he pivotal axis of swing member 20 about hinge bolt 30 should preferably extend in a direction which is approximately *parallel* to the direction of movement of vehicle 10. Thus the direction of swinging movement of sensing probe 14 is *lateral* with respect to vehicle 10." (Appx1907 at 5:17-21 (emphasis added).) Accordingly, swing member 20 and spring 38 can only pivot laterally, i.e. *perpendicularly*, with respect to the direction of travel 80 of the vehicle to detect when the spring 38 is out of vertical alignment with the furrow. (*See* Appx2857, Appx2907-08.) Cleveland does not detect

ground elevation changes in the direction of travel 80 of the vehicle 10. (*See* Appx2858 ¶ 80, Appx2908 ¶ 80.)

### B. Chmielewski

Chmielewski is directed to a height control system for a cut crop header[2] of the type used for harvesting soybeans, oats, wheat and barley. (Appx2830-31 ¶ 32, Appx2879-80 ¶ 32.)



FIG. 1A



FIG. 10

[2] Cut crop headers and non-cut crop headers, like corn headers, are structurally and functionally different. (Appx2848 ¶ 65, Appx2898 ¶ 65.) Cut crop headers have dividers at either end but do not have them across the width of the header. (Appx2847 ¶ 63, Appx2898 ¶ 63.) Height sensors used on cut crop headers are placed behind the cutter bar rather than at the front of the plastic dividers where Gramm's inventive height sensors mount. (Appx2848 ¶ 65, Appx2898 ¶ 65.)

(Appx1846, Appx1858.) Chmielewski identifies contact sensors as 236 and 237 in Figures 1A and 10 above (Appx1879 at 10:12-17, Appx1892 at 36:1-8), but does not provide a detailed disclosure of the sensor arm used in its height control system. Figures 1A and 10 of Chmielewski show an arm without a spring. Further Chmielewski states that "[t]he position signal may represent the position of the header relative to the ground, as measured by devices such as contact sensors 236, 237." (Appx1878 at 7:54-57.) Chmielewski does not disclose how the contact sensors 236 and 237 are attached to the header except that they have "hoops connected to respective potentiometers 235a and 235b." (Appx1892 at 35:37-38.)

Chmielewski discloses a method of calibration of the operating ranges of various headers. Chmielewski states that the "calibration sequence collects values from each sensor 236 and 237 for maximum working height and minimum working height, which are the extreme ranges of their sensing capabilities." (Appx1894 at 40:3-7.) These measurements tell the system the vertical range of the sensor as it relates to the voltage output. (Appx1894 at 40:66 – Appx1895 at 41:3.)

### C. The DA, DPC And Lofquist.

The DA is a 1995 advertisement introducing Deere's 90 Series corn header to the market. (Appx1708, Appx1740.) The DA discloses corn headers with plastic dividers. (Appx1740.) The DPC is the September 1994 parts catalog for

Deere's 90 Series corn headers. (Appx1748.) The catalog's diagrams show a plastic divider with a tip mounted on the forward end by a bracket and at least one nut and bolt combination. (Appx1754, Appx1758.) Lofquist discloses an attachment to deflect corn stalks inward. (Appx1843 at 2:11-24.) The deflector attaches to the top of the divider with a bracket that mounts to the top side of the tip. (*Id.*, Appx1839-40.)

None of these references discloses a height sensor or rotation sensor.

## IV. DEERE'S OBVIOUSNESS ARGUMENTS CHANGED FROM ITS PETITIONS TO ITS REPLIES.

In its Replies, Deere changed its arguments and contended that the Cleveland reference needed to be modified in significant ways. Herein, the '898 Petition and the '899 Petition are referred to collectively as the "Petitions" unless otherwise noted. Gramm's Responses from each IPR and Deere's Replies from each IPR will also be referred to collectively unless otherwise noted.

### A. Deere's Petition Arguments With Respect To The Combination Of Cleveland And Chmielewski.

In its Petitions, Deere did not identify that any modification to the Cleveland probe assembly was necessary to make it function as a height sensor arm when it replaced the Chmielewski contact sensors. (*See* Appx216-18, Appx282-83.) Rather, Deere asserted that the Chmielewski potentiometers would be attached to the Cleveland "sensor arm" using hinge bolt 30 disclosed in Cleveland. (Appx216-

17, Appx282-83.)

### B. Deere's Reply Arguments With Respect To The Combination Of Cleveland And Chmielewski.

In his Responses, Gramm identified several grounds for lack of motivation to combine and lack of a reasonable expectation of success of Deere's asserted combination of Chmielewski and Cleveland. In its Replies, Deere acknowledged the need for several modifications but did not provide any additional evidentiary support to rebut the expert opinions of Gramm's expert, Mr. Robert A. Matousek ("Matousek").

First, Deere acknowledged that the Cleveland probe would need to be re-oriented by rotating it 90 degrees so that it would be capable of swinging in the direction of travel. (Appx812, Appx838.)

Second, Deere then argued that "to the extent the flexibility of the spring impacted the height calculations, the height control system would simply be calibrated to account for that impact," and stated that "Chmielewski discloses a detailed calibration process." (Appx820, Appx846.)

Third, Deere argued that a POSITA would resize the Cleveland probe assembly to fit the DPC/DA/Lofquist and "simply ma[k]e the device stronger, such as by making the components thicker or using stronger materials, or adding a guard plate." (Appx817-18, Appx843-44.)

## **SUMMARY OF ARGUMENT**

The Board erred in finding that claims 1-11 and 27-34 are obvious over the prior art of Cleveland, Chmielewski, and DPC/Lofquist. The Board made both factual and legal errors with respect to motivation to combine these references and legally erred by not making any finding with respect to reasonable expectation of success where Deere did not argue or marshal evidence of reasonable expectation of success.

First, the Board incorrectly found that a POSITA would have had a reason to combine the Cleveland probe assembly with the Chmielewski potentiometers by rotating the Cleveland probe assembly 90 degrees when the rotation would render the Cleveland probe assembly unfit for its intended purpose as a lateral position sensor. A POSITA would not be motivated to combine these references because the combination would not work. An unmodified Cleveland probe assembly would operate perpendicular to the direction of travel of the combine. When the Cleveland probe is attached to the DPC/Lofquist by rotating it 90 degrees, as it must be to detect ground elevation changes in the direction of travel of the combine, it would no longer perform its intended purpose of detecting the lateral position of a moving vehicle with respect to a furrow in the ground.

Second, the Board incorrectly found a POSITA would have had reason to combine the Cleveland probe assembly with the Chmielewski potentiometers when

the flexibility of the Cleveland spring would not permit the combination to operate as a height sensor. An unmodified Cleveland probe assembly could not function as a height sensor. It is incapable of accurate height detection because the variation in the bend of the Cleveland spring would change the amount of rotation detected by the Chmielewski potentiometers. The Board incorrectly found that Chmielewski teaches calibration of a spring and that it would have been within a POSITA's skill to calibrate the flexible Cleveland spring.

Third, the Board erred when it concluded the claims at issue of the '395 patent are obvious when Deere did not argue or carry its burden, and the Board did not find, that a POSITA would perceive a reasonable expectation of success in making the invention of the '395 patent in light of the Cleveland, Chmielewski, and DPC/Lofquist prior art references. Deere had both the burden of proof and burden of persuasion as the Petitioner. Deere did not meet either of its burdens. A POSITA would not perceive a reasonable expectation of success when the proposed combination under applicable law concerning modification of prior art would have been unable to accurately sense height or successfully operate in the harsh corn harvesting environment.

## ARGUMENT

## I. STANDARD OF REVIEW

The Board's ultimate determination of obviousness is a legal determination

which this Court reviews *de novo*. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). What the prior art teaches is a question of fact. *Par Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1196-97 (Fed. Cir. 2014.) "The presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact." *Id.* at 1196. "The presence or absence of a reasonable expectation of success is also a question of fact." *Id.* This Court reviews the Board's factual findings for substantial evidence. *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 449 (Fed. Cir. 2015). "Substantial evidence" requires more than a mere scintilla of evidence. *In re Rambus*, 753 F.3d 1253, 1256 (Fed. Cir. 2014). However, this Court reviews de novo whether the Board failed to consider the proper scope of the claimed invention in determining reasonable expectation of success. *Allergan, Inc. v. Apotex, Inc.*, 754 F.3d 952, 965-66 (Fed. Cir. 2014).

## II. THE LAW ON OBVIOUSNESS.

In order for claims to be obvious, a POSITA "must have a motivation to combine *accompanied by* a reasonable expectation of achieving what is claimed." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016) (emphasis added); *Dome Patent L.P. v. Lee*, 799 F.3d 1372, 1380 (Fed. Cir. 2015). Subject matter is unpatentable under 103(a) only if "the subject matter as a whole" would have been obvious to a POSITA. 35 U.S.C. § 103(a). "The

determination of obviousness is made with respect to the subject matter as a whole, not separate pieces of the claim." *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1086 (Fed. Cir. 2008). To facilitate review of a conclusion of obviousness, the analysis should be made explicit. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 418 (2007) (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.")).

### A. Motivation To Combine

The Board may not find claims obvious merely because all of their elements are independently known in the prior art. *KSR*, 550 U.S. at 418. In *KSR*, the Supreme Court stated that a claim is likely to be obvious if it is merely a "combination of familiar elements according to known methods" that "yield[s] predictable results." *Id.* at 416. Claims are similarly likely to be obvious if the claims are made up of old elements performing their usual functions yielding "no more than one would expect from such an arrangement." *Id.* at 417. Likewise, a claim is obvious if a POSITA can implement a predictable variation. *Id.* However, it is not obvious to use a technique used to improve one device on another device if that technique is beyond a POSITA's skill. *Id.*

A finding of obviousness requires a demonstration that a POSITA would

have been "motivated to combine the teachings of the prior art references to achieve the claimed invention." *Cumberland Pharms. Inc. v. Mylan Institutional LLC*, 846 F.3d 1213, 1221–22 (Fed. Cir. 2017) (quoting *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012)). "This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *KSR*, 550 U.S. at 418-19. "However, knowledge of a problem and motivation to solve it are entirely different from motivation to combine particular references to reach the particular claimed [invention]." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008). Without an explanation as to how or why a POSITA would combine references to arrive at the claimed invention, a court is left with only hindsight bias. *See Kinetic Concepts*, 688 F.3d at 1368.

**B. References That Teach Away.**

If a modification would render a prior art reference unfit for its intended purpose, there is no motivation for a POSITA to make the modification and such modification cannot support a case of obviousness. *See In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984); *see also In re Ratti*, 270 F.2d 810, 813 (CCPA 1959). This is true even of seemingly simple changes. *In re Chu*, 66 F.3d 292, 298 (Fed. Cir. 1995).

A combination is not obvious if the prior art teaches away from the combination of references or otherwise indicates that the combination would not have worked for its intended purpose. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009) ("An inference of nonobviousness is especially strong where the prior art's teachings undermine the very reason being proffered as to why a person of ordinary skill would have combined the known elements."). The prior art teaches away from a combination that would produce an inoperative device and such a combination cannot support a prima facie case of obviousness. *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001) (citing *In re Gordon*, 733 F.2d at 902); *see also KSR*, 550 U.S. at 416 ("[W]hen the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious.").

### C. Reasonable Expectation Of Success

"An obviousness determination [also] requires that a skilled artisan would have perceived a reasonable expectation of success in making the invention in light of the prior art." *Amgen Inc. v. F. Hoffman-LaRoche Ltd.*, 580 F.3d 1340, 1362 (Fed. Cir. 2009); *Intelligent Bio-Sys.*, 821 F.3d at 1367-68. It is improper to look to the patent's disclosure to find a "reasonable expectation of success"; rather, it must be derived from the prior art references. *Noelle v. Lederman*, 355 F.3d 1343,

1352 (Fed. Cir. 2004); *see also Dome Patent,* 799 F.3d at 1380 (The factfinder "must further consider the factual questions of whether a person of ordinary skill in the art would be motivated to combine [the prior art] references, and whether in making that combination, a person of ordinary skill would have had a reasonable expectation of success."). Thus, Deere bore the burden of demonstrating both that a POSITA would have been motivated to combine the references *and* that the POSITA would have had a reasonable expectation of success in combining the references to make the claimed invention. *Intelligent Bio-Sys.*, 821 F.3d at 1367-68.

## III. THE BOARD ERRED IN CONCLUDING THAT CLAIMS 1 AND 27 ARE OBVIOUS OVER THE COMBINATION OF CHMIELEWSKI, CLEVELAND AND LOFQUIST/DPC.

The Board's finding of a motivation to combine rests on two incorrect findings of fact. First, the Board incorrectly concluded that a POSITA would rotate the Cleveland probe assembly. The Board misapprehended Cleveland's purpose, and failed to apply case law stating that a POSITA would not be motivated to make any modification rendering Cleveland unfit for that purpose. Second, the Board concluded incorrectly that the Cleveland probe assembly could be used to accurately sense height changes. The probe assembly's flexibility inherently leads to inaccurate height measurements.

In addition, a review of the record demonstrates that Deere never made any argument that a POSITA would have had a reasonable expectation of success in combining the references to make the claimed invention. Gramm repeatedly argued to the Board that a POSITA did not have a reasonable expectation of success. (*See generally* Appx669-76, Appx740-47.) Because Deere did not argue that a POSITA would have had a reasonable expectation of success in combining the references to make the claimed invention, the Board made no findings that a POSITA would have perceived a reasonable expectation of success in making Gramm's invention.

### A. The Board Incorrectly Found A POSITA Would Have Reason To Combine The Cleveland Probe Assembly With The Chmielewski Potentiometers By Rotating The Cleveland Probe Assembly 90 Degrees; Such Rotation Would Render The Cleveland Probe Assembly Unfit For Its Intended Purpose As A Lateral Position Sensor.

In the Petitions, Deere contended that a POSITA would replace the Chmielewski contact sensors with an unmodified Cleveland probe assembly. (*See* Appx189-90, Appx254-56.) Deere did not identify any modification that would be necessary in order for a POSITA to combine Cleveland and Chmielewski to create a height sensor. (*See id.*)

Gramm responded that the Cleveland probe assembly could not be combined with Chmielewski without modification because it measures lateral position and only pivots perpendicularly to the direction of the vehicle's travel. (Appx670-72,

Appx678, Appx741-43, Appx748-50, Appx1907 at 5:17-21.) Matousek testified (*see* FIG. 7 of Cleveland below with a divider or "header housing" drawn in to provide reference to the direction of travel), that where the Cleveland probe is not rotated 90 degrees from its position in the Cleveland patent, the swing member 20 would only be capable of swinging perpendicularly or laterally with respect to the direction of travel. (Appx2857-58 ¶ 81, Appx2907-08 ¶ 81.)




(Appx2857, Appx2907.)

In his declaration, Lucas did not assert that any rotation or modification of the Cleveland probe assembly was necessary when combining it with Cleveland. At his deposition, however, Lucas admitted that Cleveland's mounting plate 18 would need to be rotated 90 degrees in order to allow the Cleveland probe assembly to rotate parallel to the direction of travel of the combine header. (Appx2256 l.13–Appx2258 l.14.)

A height sensor, unlike a lateral position sensor, needs to pivot parallel to the direction of travel in order to sense a change in ground height. (Appx678,

Appx748-49.) Thus, as both Lucas and Matousek testified, it would be necessary to rotate the Cleveland assembly 90 degrees in order for the assembly to pivot in the proper direction of a height sensor. (Appx678, Appx748-49, Appx2256 l.13–Appx2258 l.14, Appx2857-58 ¶ 81, Appx2907-08 ¶ 81.)

Matousek testified that a POSITA would not have been motivated to combine Chmielewski with Cleveland for purposes of creating a height sensor because this rotation would destroy the intended purpose of Cleveland. (Appx679, Appx749, Appx2859 ¶ 81, Appx2909 ¶ 81.)

The Board found that a POSITA would have rotated the Cleveland probe assembly 90 degrees when combining it with the Chmielewski potentiometers to make it function as a height sensor. The Board made four incorrect determinations in doing so, which are addressed below.

1. The Board found incorrectly that Cleveland teaches that the purpose of the Cleveland probe assembly is to detect elevation changes and that purpose remains unchanged when the probe is rotated 90 degrees when combined with Chmielewski.

In its Final Written Decisions, the Board initially determined that Cleveland is directed to "'a device for sensing the relative position of a moving vehicle with respect to a furrow in the ground.'" (Appx15 (quoting Appx1905 at 1:4-6), Appx87 (citing same).) Altering its initial description of the purpose of Cleveland, the Board later found that the purpose of the probe assembly in Cleveland is to "detect elevation changes," i.e., that Cleveland teaches a height sensor. (Appx41

n.20, Appx112 n.19.) This finding is not supported by substantial evidence and is factually incorrect.

The Board misconstrues the teachings of Cleveland. Nothing in Cleveland's disclosure relates to detecting elevation changes. Cleveland teaches that the arm is designed to stay at the lowest part of the furrow. (Appx1906 at 4:5-18, 4:39-43, *see also* Appx18, Appx89, Appx643-44, Appx672, Appx714, Appx743.) The Board noted that in Cleveland the arm is vertically disposed in the furrow and is displaced from vertical, i.e. swings left or right, when the vehicle moves laterally. (Appx18 (citing Appx1906 at 4:39-53), Appx98 (citing same), *see also* Appx35 ("We agree with Patent Owner that Cleveland detects the lateral position of the probe…."), Appx106(same).) Figure 6 of Cleveland demonstrates the displacement from the vertical plane of the Cleveland probe. (Appx1904.)

FIG.6




As one passage quoted by the Board recites, the indicator lights turn on as a

result of the assembly being displaced from this vertical position while the bearing member 44 remains in the bottom of the furrow. (Appx18 (citing Appx1906 at 4:39-53), Appx98 (citing same).) Even if bearing member 44 begins to ride up the side of the furrow, Cleveland emphasizes that the side of the furrow gives the downward force on bearing member 44 "*a lateral component*" causing bearing member 44 to seek the bottom of the furrow and causing a change in the vertical alignment of the probe assembly. (Appx1906 at 4:5-17, 4:39-46.) Even with this language, there is no indication that the purpose of the sensor assembly is to detect a change in elevation if bearing member 44 rides up the side of the furrow.

Significantly, Deere never argued in any of its papers that Cleveland teaches a sensor capable of detecting elevation changes. Deere's counsel agreed at oral argument that Cleveland only detects lateral motion with respect to the furrow. (Appx1011.)

Nevertheless, and opposite to its initial determinations, the Board ultimately found that the purpose of the probe assembly in Cleveland is to "detect elevation changes." (Appx41 n.20, Appx46-47, Appx112 n.19, Appx117-18.) At oral argument, the Board incorrectly summarized Cleveland's teaching saying that Cleveland's signal indicates "elevation of terrain differences" because

> once it comes out of the trough and comes up the side, it is measuring the fact that I just changed terrain elevation and that causes the arm to move, hence the mechanism that is no longer in the combination, but it still sends a light—triggers a light that hey, we're not—the elevation

has changed, we may not be in the trough.

(Appx1042 ll.13-20.) This position lacks any support from Cleveland's specification.

The Board points to a paragraph in Cleveland to support its incorrect finding. (Appx41 n.20 (citing Appx1906 at 4:39-54), Appx46-47 (citing same), Appx112 n.19 (citing same), Appx117-18 (citing same).) This paragraph does not show that the Cleveland probe assembly detects changes in elevation. (*See* Appx1906 at 4:39-54.) The paragraph clearly states that bearing member 44, at the bottom of the probe assembly, stays within the deepest portion of the furrow when the vehicle moves laterally. (*Id.* at 4:41-43.) No change in elevation is being detected because bearing member 44 is generally not intended to leave the bottom of the furrow before the indicator lights are activated. (*Id.*) Because bearing member 44 stays at the bottom of the furrow, the vehicle's lateral movement causes the spring and the swing lever of the assembly to be displaced. (*Id.* at 4:43-46.) That is, the bearing member 44 does not move while the top of the probe assembly shifts to the left or right. This displacement from the vertical position of the probe actuates the indicator lights to tell the driver he or she is out of alignment and needs to correct his or her course. (*Id.* at 4:46-53.) Thus, the system can indicate lateral movement without bearing member 44 ever leaving the bottom of the furrow. Indeed, the fundamental purpose and teaching of Cleveland is that the

probe assembly indicates the lateral position of the vehicle and, contrary to the Board's position, does not "detect elevation changes." (Appx41 n.20, Appx46-47, Appx112 n.19, Appx117-18.)

The Board's determination that Cleveland teaches detection of elevation changes is wholly unsupported by Cleveland's specification. Because the Board's determination of what Cleveland discloses lacks substantial supporting evidence, so too does the Board's finding that the purpose of Cleveland is not changed when it is modified to detect an elevation change. Accordingly, the Board's findings as to the purpose and teaching regarding the Cleveland probe assembly are incorrect. (*Id.*)

2. The Board erred when it concluded that the purpose and intended use of the Cleveland sensor are not a focus of the inquiry when considering the rotation of the sensor and that it does not matter if the Cleveland probe assembly would be unfit for its intended purpose.

The Board committed legal error when it concluded that the purpose and intended use of the sensor in Cleveland are not a focus of the inquiry when considering the rotation of the sensor. It further concluded that rendering Cleveland unfit for its intended purpose would not dissuade a POSITA from combining the Cleveland probe assembly with Chmielewski and the DPC/Lofquist. (Appx41 n.20, Appx46-47, Appx112 n.19, Appx117-18.) Contrary to the Board's positions, this Court's decisions hold that the prior art does not provide, and a

POSITA does not have, a motivation to modify or combine references if that modification or combination would render the prior art reference unfit for its intended purpose.

In *In re Gordon*, this Court concluded that the prior art reference at issue could not render obvious the proposed claims for a blood filter because the prior art reference would have to be rotated to meet the claim limitations, rendering it inoperable. 733 F.2d at 902. The claims were directed to a blood filter with both its inlet and outlet points at the bottom of the filter assembly. *Id.* at 901. The sole prior art reference was directed to a gasoline filter that had its inlet and outlet points at the top of the filter assembly and which used gravity to separate out debris at the bottom of the filter. *Id.* at 901-902. The PTO Board of Appeals argued that it would have been obvious to a POSITA to rotate the gasoline filter so that its inlet and outlet points were at the bottom of the filter assembly. *Id.* at 902.

This Court rejected the Board's conclusion, stating the correct inquiry was "whether it would have been obvious from a fair reading of the prior art reference as a whole to turn the prior art apparatus upside down." *Id.* "The mere fact that the prior art could be so modified would not have made the modification obvious unless the prior art suggested the desirability of the modification." *Id.*; *see also In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992). Because the reference used gravity to separate debris, and turning the filter upside down would have made it

unfit for that purpose, this Court concluded that the reference did not provide any motivation to rotate the filter. *In re Gordon*, 733 F.2d at 902 ("In effect, [the prior art reference] teaches away from the board's proposed modification.").

Similarly, the Court in *In re Ratti* rejected the contention that a combination would have rendered a claim obvious where the "combination of references would require a substantial reconstruction and redesign of the elements shown in [one of the references] as well as a change in the basic principles under which the [reference] construction was designed to operate." 270 F.2d 810, 813 (CCPA 1959). The *In re Fritch* Court found that a prior art reference used to arrest grass growth and water plants did not suggest use of the reference as the claimed landscape retainer "since this would arguably result in clogged sprinkler heads." 972 F.2d at 1265. The reference was not flexible and conformable over the full length as required by the claims. *Id.* Further, the reference did not teach or suggest removing part of the apparatus to achieve universal flexibility and conformability. *Id.* at 1265-66. The additional reference did not suggest "simply by virtue of its flexible nature" that a POSITA make the "extensive changes which the Board states are obvious." *Id.* at 1266.

Matousek testified that the rotation of the Cleveland probe assembly when combined with Chmielewski would render the Cleveland probe unfit for its intended purpose. (Appx678-79, Appx748-49, Appx2858-59 ¶ 81, Appx2909.)

Specifically, Matousek testified that "a POSITA would not have been motivated to combine Chmielewski with Cleveland for purposes of creating a height sensor probe because it would destroy the intended purpose of Cleveland." (Appx2859, Appx2909.) The Board nevertheless summarily rejected Matousek's testimony that rotation would render Cleveland unfit for its intended purpose and concluded this unfitness did not undermine either the motivation to combine or the modification, stating that:

> the purpose and intended use of the sensor in Cleveland, however, are not the focus of the inquiry where the teachings thereof are being applied in combination to the teachings of other prior art references. In other words, [Deere] does not propose modifying Cleveland in and of itself; rather, the proposed modification is with respect to incorporating Cleveland's teachings into the header of DPC and header height control system of Chmielewski.

(Appx41 n.20, Appx112 n.19.) The Board reiterated this conclusion:

> [T]he inquiry isn't whether applying a modification of Cleveland's teachings (by rotating the probe assembly 90 degrees) when combining with those of Chmielewski renders Cleveland inoperable for its intended purpose, because the structure being modified is being added to the teachings of Chmielewski, not Cleveland.

(Appx46, Appx117.) According to the Board, as long as the combination is fit for Chmielewski's height control purpose, it is irrelevant whether Cleveland would be rendered unfit for its own intended purpose.

This conclusion is inconsistent with this Court's decisions regarding combinations which modify a prior art reference and make it unfit for its intended

purpose. The purpose and intended use of the Cleveland probe assembly are highly relevant to the obviousness analysis. The inquiry of whether a POSITA would have been motivated to combine the references is informed by whether the modification would render the modified reference inoperable for its intended purpose.

The gasoline filter in *In re Gordon* did not suggest rotation of the filter because rotation would have rendered the filter inoperable for its original gasoline-filtering purpose. 733 F.2d at 902. The same is true here. Cleveland does not teach or suggest rotation of the probe assembly because it would render the Cleveland probe assembly unfit for its purpose of detecting lateral position. Like *In re Ratti*, a POSITA would have to change the basic principles of Cleveland's operation in the proposed combination.

The Board ignored this case law in reaching its conclusion that:

> even if rotating the probe assembly of Cleveland would negate Cleveland's purpose . . . , we disagree that such result [rendering Cleveland unfit] would have led one of ordinary skill in the art *not* to rotate Cleveland's probe assembly when combining those teachings with the teachings of DPC and Chmielewski.

(Appx41 n.20, Appx47, Appx112 n.19, Appx118.) The Board's conclusions are directly contrary to this Court's decisions in *In re Gordon, Ratti,* and *Fritch.* The Board, therefore, committed legal error in failing to apply the correct law to the facts of this case.

3. <u>The Board incorrectly found that the combination of Cleveland and Chmielewski meets the second element of claim 27.</u>

In finding that the combination of the Cleveland probe assembly and the Chmielewski potentiometers meets the second element of claim 27, the Board assumed that the Cleveland assembly probe was rotated 90 degrees when combined with the Chmielewski potentiometers. (Appx59, Appx130.) If the Cleveland probe assembly is not rotated 90 degrees, as Deere originally asserted, the combination cannot meet claim 27's requirement that the shaft "rotationally displace[] said rotation sensor." Because *In re Gordon*, *In re Fritch* and *In re Ratti* do not allow references to be modified to destroy their intended purpose as described above, the Cleveland probe assembly, when combined with Chmielewski, moves laterally with respect to the direction of travel. Consequently, Cleveland is configured to detect lateral position only and in the combination would not rotationally displace the rotation sensor as the second end of the Cleveland arm engages and passes over irregularities in the soil as the combine traverses the field. A POSITA would, therefore, not be motivated to combine the Cleveland probe assembly with the Chmielewski potentiometers. Accordingly, the Board's finding with respect to claim 27 is incorrect.

For the reasons stated above, a POSITA would have no motivation to combine the Cleveland probe assembly with the Chmielewski potentiometers. Such a combination would render the Cleveland probe assembly unfit for its

intended purpose of lateral position detection. The Board's findings are therefore incorrect with respect to this combination. Accordingly, this Court should reverse the Board's finding of obviousness.

### B. The Board Incorrectly Found That A POSITA Would Have Had Reason To Combine The Cleveland Probe Assembly With The Chmielewski Potentiometers When The Flexibility Of The Cleveland Spring Would Not Permit The Combination To Operate As A Height Sensor.

This Court has stated that combinations that would produce a "seemingly inoperative device" "teach away from the combination and thus cannot serve as predicates for a prima facie case of obviousness." *McGinley*, 262 F.3d at 1354-55 (finding substantial evidence that a POSITA would not be motivated to modify prior art instructional baseball with additional markings from the same or an additional reference because doing so would obscure the instructional baseball's original markings used to indicate proper pitching technique).

In its Petitions, Deere asserted that a POSITA would have replaced the sensors in Chmielewski with Cleveland's probe assembly to achieve "a sensor arm that had improved flexibility, due to the helical spring, yet would have still been sufficiently rigid so as to allow for the accurate measurement of header height." (Appx217, Appx282.) In support of this proposition, Deere cited Lucas's declaration using precisely the same conclusory language. (Appx217 (citing Appx1344 ¶ 138), Appx282 (citing Appx1555 ¶ 136).)

Conclusory expert testimony that is not supported by an articulation of the factual basis for the opinion does not constitute substantial evidence of invalidity. *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 24 (Fed. Cir. 2012) (stating that general, conclusory testimony does not constitute substantial evidence); *see also In re Magnum Oil Tools Int'l*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) (stating that "to satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements. [A] petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness"); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327-28 (Fed. Cir. 2012) (finding expert's conclusory statement on obviousness unsupported by factual basis insufficient to support a finding of obviousness and "fraught with hindsight bias"). Neither Deere nor Lucas raised any need for a modification of any aspect of the Cleveland probe assembly when combined with Chmielewski or further addressed the impact of the arm's flexibility on the combination. (*See* Appx216-17, Appx282, Appx1343-44 ¶ 138, Appx1554-55 ¶ 136.)

Even assuming the probe in Cleveland could be modified by re-orienting the probe 90 degrees, Gramm introduced testimony that the Cleveland probe assembly would introduce inherent inaccuracies into any attempt to maintain the header housing a designated height above the soil. Matousek testified that the Cleveland

spring when combined with Chmielewski "would be incapable of accurate height detection because of the variation in the bend of the spring 38 would change the amount of rotation detected by the potentiometer." (Appx2861 ¶ 83, Appx2911 ¶ 83, *see also* Appx1047 l.10-Appx1051 l. 6.) Cleveland discloses that the spring 38 is sized so that spring 38 will be deflected "in the manner shown in FIG. 7" (i.e., bent rearward with respect to the direction of travel 80). (Appx643-44 (citing Appx1906 at 3:70-4:1), Appx714 (citing same).) The bent spring creates a "downforce" that ensures "bearing member 44 will always seek the deepest portion of the furrow." (Appx672 (citing Appx1906 at 4:16-18), Appx743 (citing same).) Matousek further testified:

> Thus, if the probe 14 is designed to be bent rearwardly in operation, the potentiometer would be incapable of accurate height detection because the variation in the bend of the spring 38 would change the amount of rotation detected by the potentiometer. Due to this inaccuracy introduced by the bent spring, the operator would not know how much the spring is bending versus how much rotation the potentiometer is sensing.

(Appx2860-61 ¶ 83, Appx2911 ¶ 83; *see also* Appx672-73, Appx743.)

Accordingly, the only substantial evidence in the record is that the Cleveland probe assembly would be incapable of accurate height detection, render it unfit for its intended purpose. Therefore, no motivation to combine exists.

1. <u>The Board incorrectly found that Chmielewski teaches calibration of a spring</u>.

In its Replies, Deere contended "Chmielewski's height control system

would be *enhanced* with Cleveland's arm given the significant advantages of having a flexible arm," without offering any additional evidence. (Appx812, Appx838.) Deere further asserted that neither claim 1 nor claim 27 required "any particular level of accuracy of 'height calculations.'" (Appx819, Appx845-46.)

Deere, however, did not contest Matousek's testimony that the combination would be incapable of accurate height detection. Instead, Deere argued for the first time in its Replies that "to the extent the flexibility of the spring impacted the height calculations, the height control system would simply be calibrated to account for that impact," and that Chmielewski disclosed a calibration process. (Appx820, Appx846.) Deere made this argument because it recognized, in the face of Matousek's testimony, that an unmodified Cleveland spring could not function as a height control sensor and thus does not provide motivation to replace the Chmielewski contact sensors with the Cleveland probe assembly. To support its calibration argument, Deere did not provide any evidence, but simply cited several columns of Chmielewski which it characterized as referring to "routine calibration." (Appx820 (citing Appx 1879 at 9:34-47, Appx1894 at 39:35-Appx1895 at 41:5), Appx846 (citing same).) Deere's position regarding calibration of the Cleveland spring is no more than attorney argument with no accompanying expert testimony. (*See* Appx820, Appx846.)

Significantly, the Board "agreed" with Deere, and found "that Chmielewski

teaches calibrating the height control system." (Appx42, Appx113.) In addition, the Board further "agree[d] that it was within the level of ordinary skill in the art to perform such calibrations, and one of ordinary skill in the art would have been aware that such calibrations would include consideration of the degree of flexibility of the spring employed in Cleveland's flexible arm." (Appx42, Appx113-14.)

Matousek testified that "the operator would not know how much the spring is bending versus how much rotation the potentiometer is sensing." (Appx2861 ¶ 83, Appx2911 ¶ 83.) The Board nevertheless found that the replacement of Chmielewski's contact sensors with the Cleveland sensor arm "was known to be a simple substitution of one known element for another" to "achieve the predictable result of improve flexibility provided by Cleveland's sensor arm, the benefits of which permit traversing foreign objects without breaking or being damaged." (Appx48, Appx119.)

The Board incorrectly found that Chmielewski teaches a POSITA to calibrate the Cleveland spring in order to account for the measurement inaccuracies necessarily introduced by the flexibility of the spring. (Appx42, Appx113.) The Board concluded that "to the extent that different degrees of flexibility impact calculating the height, we agree with Petitioner that Chmielewski teaches calibrating the height control system." (*Id.*) However, Chmielewski's calibration

teaching is directed to calibration of a height system without a spring. Chmielewski's calibration is for calibrating for differences in measurement due to different types of headers and varying mounting positions and in the event the rigid contact sensors 236, 237 become permanently bent during use. (Appx1894 at 39:39-52.) The teaching is entirely unrelated to the calibration of a flexible spring and does not support the Board's finding.

Chmielewski's calibration process involves determining the minimum and maximum voltage outputs generated when the contact sensors 236, 237 (i.e., structures which are not flexible) are at their minimum and maximum working heights. (Appx1894 at 40:12-17, 40:30-62.) The combine lifts the header fully off the ground and then lowers it until the contact sensors 236, 237 just touch the ground. (*Id.* at 40:30-35.) The voltage signal at this height indicates the sensor's upper limit. (*Id.*) The combine then lowers the header towards the ground until the voltage signal no longer changes which defines the minimum working height of the contact sensor. (*Id.* at 40:51-58.) This calibration process only tells the system what the voltage output is when the contact sensors 236, 237 are at their maximum and minimum working heights. This discussion is thus insufficient to teach a POSITA that a system may be calibrated to account for the inaccuracies in height calculation introduced by the substituted flexible Cleveland spring. Determining the upper and lower thresholds for the voltage signal does not address

the inaccuracy and inconsistency of the flexible Cleveland spring due to variations in the amount of rotation of the rotation sensor versus the amount of bend in the spring. (*See* Appx2861 ¶ 83, Appx2911 ¶ 83.) The calibration process in Chmielewski simply does not teach a POSITA to calibrate the Cleveland spring or how much rotation is being sensed due to actual height as opposed to a bend in the spring on a continual basis as the combine is harvesting. The Board's finding that Chmielewski teaches calibrating the Cleveland sensor arm of a header height control system is not supported by Chmielewski or any other substantial evidence and cannot support a finding of a motivation to combine. Accordingly, the Board's findings that the Cleveland spring could be substituted for the Chmielewski contact sensors and that Chmielewski teaches calibration of such a substituted spring is incorrect and not supported by substantial evidence.

2. <u>The Board incorrectly found that it would have been within a POSITA's skill to perform appropriate calibration of the Cleveland spring</u>.

The Board found that it is within the ordinary skill in the art for a POSITA to be aware of and consider the calibrations necessary to account for the degree of flexibility of the spring employed in Cleveland's arm. (Appx42, Appx113-14.) It stated that it agrees with Deere concerning this position. (*Id*.) Deere raised the issue of calibration for the first time in its Replies and asserted only that "the height control system would simply be calibrated to account for th[e] impact" of

the flexibility of the spring. (Appx820, Appx846.) Deere did not provide any evidence of how this would be accomplished or that it in fact could be accomplished.

In its Replies, Deere also did not contend that such calibration was within a POSITA's skill set. (*See id.*) Nor did Deere supply any evidence to support a finding that the alleged calibration was within the level of ordinary skill in the art. Indeed, Lucas did not provide any testimony to this effect even after Gramm asserted that a spring would be unusable in the combination. At oral argument, Deere also did not argue that calibration was within the level of ordinary skill.[3]

Deere has not provided evidence that anyone, let alone a POSITA, can calibrate the spring or the height control system to account for the inherent variability in measurement due to the flexibility of the Cleveland spring. Deere's bases concerning calibration consists of three sentences in Deere's Replies, a single misstatement at oral argument, and no testimony from Mr. Lucas. Thus, none of Deere's statements addresses whether calibration was within the level of ordinary skill. There is no evidence on which the Board could rely to find that

[3] The record at oral argument consists of only one statement by Deere's counsel that touches on calibration. Deere's counsel mischaracterized Chmielewski's disclosure, saying "Chmielewski says if you need to calibrate – this is slide 71 – you can calibrate this spring sensor in the field." (Appx1018 ll.22-24.) This is simply incorrect because, as described *supra*, Chmielewski teaches nothing about calibration of a spring.

calibration was within the level of ordinary skill in the art.

Consequently, the Board's findings that Chmielewski teaches the calibration of the Cleveland spring in a height control system and that it is within the ordinary level of skill in the art to perform such calibrations are not supported by substantial evidence. (Appx42, Appx113-14.) To reach these findings, the Board improperly attributed its assertion to Deere and then agreed with Deere's alleged assertion, all without any supporting evidence and in conflict with Matousek's testimony. (*Id.*, Appx672 (citing Appx2860-61 ¶ 83), Appx743 (citing Appx2911 ¶ 83.) The Board thus agreed with an argument Deere never made. (Appx42, Appx113-14.)

Thus, for all the reasons set forth in this Section III.B., a POSITA would not have been motivated to combine the Cleveland, Chmielewski and the DPC/Lofquist references and the Board's decisions that claims 1 and 27, and their dependent claims, are obvious should be reversed.

### C. The Board Erred When It Concluded The Claims At Issue Are Obvious When Deere Did Not Argue Or Carry Its Burden, And The Board Did Not Find, That A POSITA Would Perceive A Reasonable Expectation Of Success In Making The Invention Of The '395 Patent In Light Of Cleveland, Chmielewski, And DPC/Lofquist Prior Art References.

Deere failed to carry its burden to argue and prove, by a preponderance of the evidence, that a POSITA would have a reasonable expectation of success to make Gramm's claimed invention in claims 1 and 27 in light of Cleveland, Chmielewski, and the DPC/Lofquist. In an *inter partes* review, the burden of

proof remains on the petitioner throughout the proceeding. *In re Magnum Oil Tools*, 829 F.3d at 1375. Deere did not argue, let alone prove by substantial evidence, that a POSITA would have a reasonable expectation of success in combining Cleveland with Chmielewski and Lofquist/DPC to make a height control system placed at the tip of a plastic divider to maintain a non-cut crop header a designated height above the soil. In particular, Deere did not marshal evidence to demonstrate that a POSITA would perceive a reasonable expectation of success of making the claimed invention by (1) using the Cleveland spring as a height sensor arm; (2) "calibrating" the Cleveland spring and the height control system to account for the variability and inaccuracy in measurement which the flexibility of the Cleveland spring would introduce; (3) incorporating the Cleveland probe assembly into Chmielewski without rotating it so that the modification would not make Cleveland unfit for its intended purpose; and (4) miniaturizing the Cleveland probe assembly in a manner that would successfully operate in the violent corn harvesting environment. Because Deere did not argue or marshal evidence to prove a reasonable expectation of success, the Board did not make any finding that a POSITA would perceive a reasonable expectation of success in achieving the invention claimed. (Appx61, Appx63, Appx65-66, Appx132, Appx134-35, Appx137.)

The Board, therefore, erred in concluding that Deere carried its burden under *KSR* and *Intelligent Bio-Systems* to demonstrate that the ’395 patent was obvious over the prior art. Where the record provides no evidence by which the Board would be capable of providing a more reasoned explanation, reversal of the Board’s finding on obviousness is appropriate. *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1366-67 (Fed. Cir. 2016) (reversing Board’s finding of obviousness where the Board’s conclusions were conclusory and unsupported by substantial evidence, and nothing in the record existed to support the Board’s conclusion on obviousness). Indeed, where it is clear that the Board did not require a petitioner to support its claim of obviousness by a preponderance of the evidence, the Court must reverse. *In re Magnum Oil Tools*, 829 F.3d at 1378-79.

The Board is also required to “base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond.” *Id*. at 1381 (finding that the Board is not “free to adopt arguments on behalf of petitioners that could have been, but were not, raised by the petitioner during an IPR”); *Intelligent Bio-Sys.*, 821 F.3d at 1369 (“Unlike district court litigation—where parties have greater freedom to revise and develop their arguments over time and in response to newly discovered material—the expedited nature of IPRs bring with it an obligation for petitioners to make their case in their petition to institute.”). Here, Deere did not meet its burden of proof in showing

that a POSITA would have a reasonable expectation of success in making the claimed corn header height control system in light of Cleveland, Chmielewski, and the DPC/Lofquist. Moreover, and because of Deere's failure, the Board made no findings with respect to reasonable expectation of success.

In addition, in Gramm's Responses, he argued no reasonable expectation of success. Deere did not address Gramm's arguments with respect to this issue in its Replies. Gramm again raised no reasonable expectation of success at the oral argument. Deere again did not respond to Gramm's position.

Accordingly, for all these reasons, the Court should reverse the Board's decisions.

1. <u>The only evidence of record demonstrates that the proposed combination of prior art would have been incapable of accurate height detection</u>.

Not only did Deere fail to meet its burden of proof, but the evidence of record demonstrates that the proposed combination of Cleveland, Chmielewski, and the DPC/Lofquist would have been unable to accurately detect elevation changes, and therefore no reasonable expectation of success exists.

The Board correctly identified the invention and its goal: "[The invention] is a header height control apparatus—an 'apparatus for detecting and controlling the height above the soil of an agricultural machine as it traverses a field.'" (Appx23 (citing Appx1085 at 1:11-13), Appx94 (citing same).) Moreover, Deere

recognized this goal because it contended that an objective of the combination of Cleveland, Chmielewski and the DPC/Lofquist was "to allow for the accurate measurement of the header height." (Appx217, Appx282.)

Deere presented only conclusory evidence about the ability of the Cleveland spring to operate accurately as a sensor arm for a height control system. Lucas simply asserted that the extreme flexibility, length and bend built into the Cleveland spring would provide "improved flexibility." (Appx1344 ¶ 138, Appx1555 ¶ 136.) Without any supporting rationale, he further claimed in conclusory fashion that it "would have been sufficiently rigid so as to allow for the accurate measurement of the header height." (*Id.*) He offered no support or rationale for this position.

Conclusory expert testimony that is not supported by an articulation of the factual basis for the opinion does not constitute substantial evidence of invalidity. *Whitserve*, 694 F.3d at 24 (stating that general, conclusory testimony does not constitute substantial evidence); *see also In re Magnum Oil Tools,* 829 F.3d at 1380 (stating that "to satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements; [A] petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness"); *ActiveVideo Networks*, 694 F.3d at 1327-28 (finding that an expert's conclusory statement on obviousness unsupported by factual basis was

insufficient to support a finding of obviousness and was "fraught with hindsight bias").

Matousek explained that the spring is incapable of functioning as a height sensor with sufficient accuracy to protect the combine header because the spring is intended to be bent so that the downward force of the bearing member causes the spring "to always seek the deepest portion of the furrow." (Appx2860-61 ¶¶ 82-83, Appx 2910-11 ¶¶ 82-83.) He quoted the Cleveland specification in part: "*Because spring 38 is bent*, the pivotal axis of bearing member 44 is moved out of vertical attitude." (Appx2860 ¶ 82 (emphasis added), Appx2910 ¶ 82; *see also supra* at Section III.B pp. 41-42.) Matousek concluded that the Cleveland probe assembly "is only capable of detecting lateral position with respect to a furrow and thus incapable of functioning as a vertical height sensor with respect to the direction of travel" unless it is modified in a manner which destroys its intended purpose. (Appx2855-59 ¶¶ 77-81, Appx2903-10 ¶¶ 77-81.) As a result, he testified that the combination of Chmielewski and Cleveland "would not yield predictable results and a POSITA would not have a reasonable expectation of success in creating a height sensor that could be mounted at the tip mounting bracket of a corn head crop divider." (*Id.*, Appx2865 ¶ 89, Appx2915 ¶ 89.)

Deere, recognizing that Matousek had clearly shown that the Cleveland spring could not function as a height sensor, raised for the first time in its Replies

that the height control system would be calibrated to account for the impact the flexibility of the spring had on height calculations. (Appx820, Appx846.) This statement was not supported by any evidence, despite the opportunity for Deere to do so, and is simply attorney argument. (*See id.*) Consequently, the only testimony in the record is that the Cleveland probe assembly could not accurately measure height. Moreover, there is no evidence in the record that calibration of the Cleveland spring is even possible or that a POSITA as defined in this case would have the capability of performing the necessary calibration if Deere could show it were possible.

It would be an injustice for Gramm, the inventor of a height control system that was never before put at the tip of a plastic divider of a non-cut crop header, to have his patent invalidated by an unsupported "calibration" proposition that it would be impossible for a POSITA to undertake. Deere was required to prove it is possible to calibrate the system to account for the flexibility of the Cleveland spring. This injustice is compounded because Deere never argued reasonable expectation of success; the Board rather provided out of whole cloth the assertion that "one of ordinary skill in the art would have been aware that such calibrations would include consideration of the degree of flexibility of the spring employed in Cleveland's flexible arm." (Appx42, Appx113-14.)

Accordingly, the Board erred in finding obviousness when the only evidence of record demonstrates that the proposed combination of prior art would have been unable to accurately sense height, and therefore that no reasonable expectation of success exists. The Court should therefore reverse the Board's findings of obviousness in its Final Written Decisions.

2. The evidence of record demonstrates that the proposed combination of prior art would have been unable to successfully operate in the harsh corn harvesting environment.

Claims 1-11 and 27-34 require that the apparatus be capable of functioning at the tip of a plastic divider of a non-cut crop header and maintaining the header a designated height above the soil. (Appx1088 at 7:29-31, 7:44-48, Appx1089 at 10:1-7.) To achieve this goal, a POSITA must perceive that the proposed combination would be successful, i.e. remain functional and undamaged, in the violent environment of corn harvesting. A POSITA would not have a reasonable expectation of success if the apparatus would cease to function shortly after being put to use. *McGinley*, 262 F.3d at 1354-55.

Deere and the Board recognized the goal of the combination remaining functional when they acknowledged that a POSITA would have been motivated to use existing hardware to "allow for early detection of the distance between the header and the ground." (Appx20-21, Appx91-92, Appx216, Appx 281-82.) Deere also recognized this goal in asserting that there was a motivation to use a

flexible arm in order to "have a sensor that can take . . . abuse and not transmit it up into the more delicate parts." (Appx811 (quoting Appx3106 l.20-Appx3111 l.3), Appx837 (quoting same).)

A prior art reference must be evaluated in its entirety. *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1305 (Fed. Cir. 2011). It is error to consider less than the reference in its entirety and instead pick and choose portions of the reference while disregarding portions of the disclosure that would discourage a POSITA. *See id.* Thus, the mechanism of the full Cleveland probe assembly must be considered in determining reasonable expectation of success. The Cleveland probe assembly, according to Lucas, includes bearing member 44, spring 38, swing member 20, collarlike hub 22, stub 24, swing lever 26, slot 28, switch link 62 and slot pin 64. (Appx1905 at 2:44-51, Appx1906 at 3:13-17, Appx1313 ¶ 49, Appx1320-21 ¶¶ 72-73, Appx1339 ¶ 128, Appx 1345-46 ¶ 141, Appx1525 ¶ 48, Appx1532 ¶¶ 70-71, Appx1550 ¶ 126, Appx1556-57 ¶ 139.) These elements are necessary to allow the probe assembly to rotate. (*Id.*, Appx2864 ¶ 87, Appx2914 ¶ 87.) The linkages (26, 62), pin (64) and slot (28) included in Cleveland's probe assembly are relevant because those elements are necessary for the assembly to accurately detect changes in height and provide stop means.

Matousek testified that corn heads, and by extension any apparatus attached thereto, must withstand heavy abuse from corn stalks, which have been known to puncture tires. (Appx674, Appx744-45, Appx2863 ¶ 87, Appx2913 ¶ 87.) Sugars, sharp stalks, and other debris from the harvested crop stick to the header components as the combine travels forward. (Appx674, Appx745, Appx2863 ¶ 87, Appx2913 ¶ 87.) Matousek, therefore, opined that a POSITA would recognize that the linkages, pin and slot which are part of Cleveland's probe assembly would rapidly bend or collect sufficient debris, and that therefore the sensor would be rendered inoperable after a short distance of use. (Appx674-75, Appx745, Appx2863 ¶ 87, Appx2914 ¶ 87.)

Matousek also testified that the Cleveland probe assembly would have to be miniaturized in order to fit within the small trapezoidal area at the tip of the divider where hardware is located. (Appx675, Appx746, Appx2864 ¶ 88, Appx2914 ¶ 88.) Figure 1 of Cleveland demonstrates the approximate size of the probe assembly. (Appx1903.) Figure 2 of Cleveland (below) shows all the elements of the probe assembly that would be required to fit underneath the divider. (Appx1904.)





FIG. 2



(Appx1740.)

Matousek concluded that the miniaturized versions of the combination would be even more susceptible to the rough harvesting environment. (Appx675, Appx746, Appx2864 ¶ 88, Appx2914-15 ¶ 88.) Thus, Matousek testified that a POSITA at the time of the invention would have failed in any attempts to miniaturize a height sensor that could withstand harvest conditions. (Appx686, Appx756, Appx2852-53 ¶ 74, Appx2865 ¶ 89, Appx2903 ¶ 74, Appx2915 ¶ 89.)

Deere also mischaracterized Gramm's testimony by only quoting Gramm's statement that the Cleveland assembly could survive in the field for "perhaps a week." (Appx817, Appx843.) Deere and the Board both omitted the portion of his answer in which he testified the apparatus may last "perhaps a day" and "most likely much shorter than that." (*Id.*, Appx30, Appx101, Appx3131 l.12-Appx3132 l.3.) Neither Deere nor the Board, however, contended that even were the

Cleveland assembly to survive in the field for a week, a POSITA would perceive this as a reasonable expectation of success in making the ’395 patent invention in light of the combination of Cleveland, Chmielewski, and the DPC/Lofquist.

Regardless of the precise time until failure, an assembly that would be rendered unusable in such a very short time hardly establishes a reasonable expectation of success. Thus, two persons of at least ordinary skill in the art testified that the combination would rapidly break down, while Deere and Lucas did not argue or present any contrary evidence that a POSITA would perceive a reasonable expectation of success of making the claimed invention of the ’395 patent in light of the asserted prior art.

Deere did not argue or present evidence to support the conclusion, and the Board did not find, that a POSITA would have a reasonable expectation of success in miniaturizing Cleveland’s probe assembly in such a way that the assembly would fit in the small trapezoidal space at the tip of a plastic divider and withstand the environment in which it would operate. Deere made the unsupported attorney argument that a POSITA would simply have made the device stronger and the components thicker. (Appx817, Appx43-44.) Deere did not cite to any testimony from Lucas or other record evidence to support this proposition. While Lucas had the opportunity to provide testimony, he was silent.

The Board found that it was persuaded by Deere's "argument and evidence" regarding modifying the size of the Cleveland plate and linkages. (Appx45, Appx116.) The Board further found that it would have been within the level of ordinary skill to miniaturize the Cleveland linkages. (*Id.*) But, the Board cited to paragraphs of Lucas's declaration that bear no relationship to whether a POSITA would be capable of miniaturizing Cleveland, let alone that there is a reasonable expectation of success in doing so in a way that would operate in the violent corn harvesting environment. (Appx45 (citing Appx1342-43 ¶¶ 134-36), Appx116 (citing Appx1553-54 ¶¶ 132-35).)

Nevertheless, the Board did not find that a POSITA would have a reasonable expectation of success in making a height sensor from the combination of prior art that a POSITA would perceive to be capable of successfully operating in the corn harvesting environment. (Appx61, Appx63, Appx65-66, Appx132, Appx134, Appx137.) The only evidence in the record of the POSITA's expectation of success in creating a sufficiently robust apparatus actually demonstrates an expectation of failure.

Consequently, for all the reasons stated in this Section, Deere failed to carry its burden under *Amgen, Intelligent Bio-Systems* and other cases cited above to establish that a POSITA would perceive a reasonable expectation of success of making the claimed inventions of the '395 patent in light of the asserted prior art.

Moreover, the evidence of record shows no reasonable expectation of success. As a result, the Board erred when it concluded that claims 1 and 27 of the ’395 patent were obvious over the combination of Cleveland, Chmielewski, and DPC/Lofquist. This Court should therefore reverse the Board’s Final Written Decisions. Deere should not be permitted a “do over” when it failed to argue reasonable expectation of success.

Claims 2-11, which depend from claim 1, and claims 28-34, which depend from claim 27, are nonobvious for all of the foregoing reasons articulated with respect to claims 1 and 27. *In re Fine*, 837 F.2d 1071 (Fed. Cir. 1988) (“Dependent claims are nonobvious under section 103 if the independent claims from which they depend are non-obvious.”).

## IV. THE BOARD ENGAGED IN SUBSTANTIAL HINDSIGHT RECONSTRUCTION.

“When the art in question is relatively simple, as is the case here, the opportunity to judge by hindsight is particularly tempting. Consequently, the tests of whether to combine references need to be applied rigorously.” *McGinley*, 262 F.3d at 1351. Here, the Board did not rigorously apply the motivation to combine and reasonable expectation of success tests in reaching its conclusion of obviousness. Instead, the Board accepted Deere’s *post hoc* assembly of elements from the prior art and assumed that a POSITA would be motivated to combine them with a reasonable expectation of success based on Gramm’s invention. This

case is a classic example of hindsight reconstruction.

## CONCLUSION

For the foregoing reasons, Appellant Gramm respectfully requests that the Court reverse the PTAB's finding of obviousness as to claims 1-11 and 27-34 of the '395 patent as unsupported by substantial evidence and based on an erroneous application of the law.

Dated: March 6, 2017

Respectfully Submitted,

/s/ John A. Cotter

John A. Cotter
Thomas J. Oppold
Glenna L. Gilbert
Katherine E. Muller
**Larkin Hoffman Daly & Lindgren Ltd.**
8300 Norman Center Drive, Suite 1000
Minneapolis, Minnesota 55437-1060
(952) 835-3800
Email: jcotter@larkinhoffman.com
toppold@larkinhoffman.com
ggilbert@larkinhoffman.com
kmuller@larkinhoffman.com

***Attorneys for Appellant Richard Gramm***

# ADDENDUM

[*intentionally left blank – documents begin on next page*]

Trials@uspto.gov
571.272.7822

Paper No. 40
Entered: September 22, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

DEERE & COMPANY,
Petitioner,

v.

RICHARD GRAMM,
Patent Owner.

---

Case IPR2015-00898
Patent 6,202,395 B1

---

Before MICHAEL W. KIM, BART A. GERSTENBLITH, and TIMOTHY J. GOODSON, *Administrative Patent Judges.*

GERSTENBLITH, *Administrative Patent Judge*.

# FINAL WRITTEN DECISION
*35 U.S.C. § 318(a); 37 C.F.R. § 42.73*

## I. INTRODUCTION

### *A. Background*

Deere & Company ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting institution of *inter partes* review of claims 1–34 of U.S. Patent No. 6,202,395 B1 (Ex. 1001, "the '395 patent"). Richard Gramm ("Patent Owner") timely filed a Preliminary Response (Paper 6, "Prelim. Resp.").

Pursuant to 35 U.S.C. § 314, in our Decision to Institute, we instituted this proceeding as to claims 1–11 and 27–34 of the ’395 patent. Paper 7 (“Dec.”).

After the Decision to Institute, Patent Owner filed a Patent Owner Response (Paper 20, “Resp.”), and Petitioner filed a Reply to the Patent Owner Response (Paper 25, “Reply”). A consolidated oral hearing was held on May 17, 2016, in this matter and *Deere & Co. v. Richard Gramm*, IPR2015-00899. Paper 39 (“Tr.”).

Petitioner relies on the testimony of James Lucas (Ex. 1003, “Lucas Declaration”) in support of its contentions.[1] Patent Owner relies on the testimony of named inventor and Patent Owner, Richard D. Gramm (Ex. 2015, “Gramm Declaration”),[2] and Robert A. Matousek (Ex. 2016, “Matousek Declaration”) in support of its contentions.

We have jurisdiction under 35 U.S.C. § 6(b). This Decision is a final written decision under 35 U.S.C. § 318(a) as to the patentability of the challenged claims. We determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–11 and 27–34 of the ’395 patent are unpatentable.

### *B. Related Proceedings*

The parties represent that the ’395 patent is asserted in the United States District Court for the Northern District of Illinois in *Gramm v. Deere*

---

[1] Petitioner also relies on the testimony of Alton E. Miller (Ex. 1014) and Thomas A. Sizemore (Ex. 1015).

[2] Patent Owner relies upon the Gramm Declaration to discuss the technology background, field of invention, and what led Mr. Gramm to develop the combine header height control disclosed in the ’395 patent. *See* Resp. 2–10.

*& Co.*, No. 3:14-cv-00575. Pet. 1; Paper 5, 1. The ’395 patent is also the subject of a petition for *inter partes* review in IPR2015-00899. Paper 5, 1. In that proceeding, we instituted an *inter partes* review of the ’395 patent as to the same claims, claims 1–11 and 27–34. *Deere & Co. v. Gramm*, IPR2015-00899 (PTAB Sept. 23, 2015) (Paper 7).

### *C. Real Parties-in-Interest*

The Petition identifies Petitioner, Deere & Company, as the real party-in-interest. Pet. 1. Patent Owner’s Mandatory Disclosures identify Patent Owner, Richard Gramm, and Headsight, Inc. as the real parties-in-interest. Paper 5, 1.

### *D. The References*

The references upon which we instituted review consist of the following:

Deere 90 Series Corn Head Advertisement, 100 (6) THE FURROW 33 (Corn Belt Edition, Summer 1995) (“DA,” Ex. 1004);

Deere 90 Series Corn Head Parts Catalog (John Deere Harvester Works PC2404 (Sept. 1994) (“DPC,” Ex. 1005);

U.S. Patent No. 5,535,577, issued July 16, 1996 (“Chmielewski,” Ex. 1006);

U.S. Patent No. 3,611,286, issued Oct. 5, 1971 (“Cleveland,” Ex. 1007);

U.S. Patent No. 3,851,451, issued Dec. 3, 1974 (“Agness,” Ex. 1008); and

U.S. Patent No. 5,189,806, issued Mar. 2, 1993 (“McMurtry,” Ex. 1009).

*E. The Asserted Grounds of Unpatentability*

We instituted this proceeding based on the following grounds of unpatentability:

| References | Basis | Claim(s) challenged |
|---|---|---|
| DPC, Chmielewski, Cleveland, and DA | § 103(a) | 1–7, 10, 27, 28, and 34 |
| DPC, Chmielewski, Cleveland, DA, and Agness | § 103(a) | 8, 9, and 29–33 |
| DPC, Chmielewski, Cleveland, DA, and McMurtry | § 103(a) | 11 |

*F. The '395 Patent*

The '395 patent is directed to an "apparatus for detecting and controlling the height above the soil of an agricultural machine as it traverses a field." Ex. 1001, 1:11–13. In general, a "height sensor provides a control signal to a conventional height controller in [a] combine for controlling header height above the soil to prevent impact damage to the header, while maintaining the header a predetermined height above the soil." *Id.* at 2:18–22. Figure 1 of the '395 patent is shown below:




FIG. 1

Figure 1 of the '395 patent shows "a simplified combined schematic and block diagram of a combine [10] illustrating the location of the height sensor [14] in the combine header [12]." *Id.* at 2:65–67.

Figure 2 of the ’395 patent is shown below:




FIG. 2

Figure 2 of the ’395 patent shows “a side elevation view shown partially in phantom of a height sensor mounted to a corn head.” *Id.* at 3:1–2.

The ’395 patent provides a general description of the invention as follows:

> The height sensor includes a pre-loaded flexible arm [generally shown by reference numeral 40] attached to a forward end of the head housing [22] . . . . The distal end of the flexible arm is provided with a ball-like member [46] which engages the soil, while the proximal end of the arm is coupled to an angular displacement detector. The detector determines the angular displacement of the arm as it is pivotally displaced upon encountering terrain irregularities or an obstacle in the field for providing the height control signal to the combine’s height controller. A coil spring [42] in the sensor arm provides the arm with the flexibility necessary to avoid damage or breakage to the sensor upon impact with obstructions during operation or when the combine is reversed in direction. The height sensor is particularly adapted for use with head housings comprised of polyurethane and may be retrofit on existing header assemblies by mounting it to existing structure on the head housing.

*Id.* at 6:65–7:17.

*G. Illustrative Claims*

Claims 1 and 27 are the independent claims challenged in this proceeding. Independent claims 1 and 27 are illustrative of the claimed subject matter and are reproduced below:

> 1. Apparatus for maintaining a non-cut crop header disposed on a forward portion of a combine a designated height above the soil as the combine traverses a field, said apparatus comprising:
>
> a pre-loaded, generally linear flexible arm coupled to a forward portion of the header and having first and second opposed ends, wherein the first end of said flexible arm engages and is displaced over the soil as the header moves above the soil;
>
> angular deflection sensing means coupled to the second end of said flexible arm for measuring a deflection of said flexible arm when the first end of said flexible arm encounters irregularities in the soil as the header moves above the soil and for providing a first signal representing the extent of deflection of said flexible and [sic]; and
>
> control means coupled to said header and said angular deflection sensing means and responsive to said first signal for raising or lowering the header in accordance with said first signal in maintaining the header a designated height above the soil, wherein said flexible arm and angular deflection sensing means are attached to a head housing disposed on a forward portion of said combine and said head housing is comprised of polyurethane and includes a metal tip and a mounting bracket for attaching said metal tip to a forward end of said head housing, and wherein said mounting bracket further couples said flexible arm to a forward end of said head housing.

Ex. 1001, 7:29–56.[3]

> 27. For use on a plastic non-cut crop header housing disposed on a forward portion of a combine used in the harvesting of crops, said header housing have a tip mounted to a forward end

[3] A Certificate of Correction at page 12 of Exhibit 1001 made a change to claim 1, which is reflected in the claim language quoted above.

> thereof by means of a mounting bracket, an arrangement for determining the height of the header housing above the soil as the combine traverses a field, said arrangement comprising:
>
> a rotation sensor disposed in a lower, forward portion of the header;
>
> an elongated, linear shaft having first and second opposed ends, wherein said first end is coupled to said rotation sensor and said second end engages the soil, and wherein said shaft rotationally displaces said rotation sensor as the second end of said shaft engages and passes over irregularities in the soil; and
>
> a flange connecting said rotation sensor to the mounting bracket for mounting said rotation sensor on a lower portion of the forward end of the plastic header housing, wherein said mounting bracket includes a strap and a bracket respectively disposed on lower and upper surfaces of the header housing and connected together by at least one nut and bolt combination.

*Id.* at 10:1–22.

## II. CLAIM CONSTRUCTION

We interpret claims of an unexpired patent using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[]." 37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016). Claim terms are generally given their ordinary and customary meaning as would be understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007); *SAS Institute, Inc. v. ComplementSoft, LLC*, 825 F.3d 1341, 1347 (Fed. Cir. 2016) (citation omitted). We apply this standard to the claims of the '395 patent. *See* Pet. 11 (proposing to construe the claims of the '395 patent in accordance with the broadest reasonable interpretation standard); Resp. 17–18 (same). Only terms that are in controversy need to

be construed, and these need be construed only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

### *A. Claim Terms*

#### *1. "flexible"*

Claim 1 recites "a pre-loaded, generally linear flexible arm." Ex. 1001, 7:33. Claim 32, which depends indirectly from claim 27 and directly from claim 30, recites "[t]he arrangement of claim 30 wherein said elongated, linear shaft includes a rigid shaft coupled to a flexible coiled spring." *Id.* at 10:37–39.

Patent Owner proposes that we construe the term "flexible" to mean "able to bend, deflect, or reverse in direction." Resp. 21–23. Petitioner proposes that we construe "flexible" to mean "not rigid, made to bend." Reply 15 n.3.

Petitioner's challenges rely on Cleveland as teaching a flexible arm or a flexible spring for the claims that recite those features. Petitioner asserts that Cleveland discloses a flexible arm regardless of which construction is adopted, but disagrees with Patent Owner's construction "because it improperly includes *rigid* arms that can simply rotate relative to other components." *Id.* at 16 n.3.

We agree with Petitioner that under either party's proposed construction, Cleveland's sensor arm, including spring 38, is flexible. *See infra* pages 41–42 (Section III.B.5.a.ii.b)2.b.). Accordingly, we need not choose between either party's proposed constructions.

*2. Other Claim Terms*

The parties propose constructions for several additional claim terms, including “pre-loaded,” “angular deflection sensing means,” “control means,” “biasing means,” “first stop means,” “second stop means,” “guard means,” and “flange.” Pet. 11–15; Resp. 19–23. Although the parties have some disagreement as to the meaning of several of these terms, there is no dispute that the references upon which we instituted review disclose these elements of the claims.[4] Accordingly, there is no controversy as to these terms that requires our resolution in order to ascertain whether the claims would have been obvious to one of ordinary skill in the art as of the time of the invention in light of the references and arguments before us.

## III. ANALYSIS

### *A. Obviousness Overview*

Under 35 U.S.C. § 103(a), an invention is not patentable if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *See KSR Int’l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art;

---

[4] Counsel for Patent Owner clarified, at the oral argument, that Patent Owner’s argument, as it pertains to Cleveland’s spring 38, is not “a claim construction issue” (Tr. 48:19–49:5); rather, the issue for Patent Owner is whether Cleveland’s spring would function in a height control system (*id.* at 49:5–18). We address Patent Owner’s arguments regarding the functionality of the combination *infra*.

(3) the level of skill in the art; and, (4) where in evidence, so-called secondary considerations, including commercial success, long-felt but unsolved needs, failure of others, and unexpected results. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

*1. Level of Ordinary Skill in the Art*

The parties' proposals for the level of ordinary skill in the art are similar. Petitioner proposes the following:

> (1) a Bachelor of Science degree in engineering, such as mechanical or agricultural engineering, whose course of study would have included mechanical design, mechanical analysis, material selection and properties, and in addition, would have had approximately three years of experience in combine or agricultural equipment design, including components thereof, such as headers and header height control systems; or (2) five or more years of hands-on experience in combine or agricultural equipment design, including components thereof, such as headers and header height control systems.

Pet. 5 (citing Ex. 1003 ¶ 17). Patent Owner proposes the following: "(1) a mechanical engineer having familiarity with hydraulic systems and sensors; or (2) a person having 10 or more years of experience working with combines." Resp. 24 (citing Ex. 2016 ¶ 16). Patent Owner asserts that Petitioner's proposed level of skill exceeds the educational background and experience of Richard Gramm, the named inventor on the '395 patent. *Id.*

During the oral argument, counsel for Patent Owner clarified that, in Patent Owner's proposed second option for the level of ordinary skill in the art, the "experience working with combines" was intended to include working with combines, sensors, and hydraulic systems. Tr. 37:4–20. Patent Owner's counsel explained that Petitioner's inclusion of the term "design" in each of Petitioner's options for the level of ordinary skill would

exclude Mr. Gramm and "literally eliminate farmers." *Id.* at 36:11–23. Additionally, during the oral argument, Petitioner's counsel indicated that Patent Owner's ten or more years of experience was "fine." *Id.* at 66:9–10.

The parties' statements of the level of ordinary skill are not significantly different, and the differences between their proposed levels of ordinary skill would not affect the outcome of this proceeding.[5] In light of our review of the record, including the '395 patent, the competing expert testimony, and the issues discussed during the oral argument, we agree with different aspects of the parties' proposals. First, as Petitioner notes in its Reply, a mechanical engineer having familiarity with hydraulic systems and sensors, as Patent Owner proposes, does not have experience necessarily with agricultural equipment or combines. Reply 2, n.1. Thus, Patent Owner's educational prong is overly broad. Second, Petitioner's educational prong, on the other hand, is too narrow, requiring "design" of combines or agricultural equipment. Third, we find that Petitioner's experience prong also is too narrow, because it requires experience specifically in the "design" of agricultural equipment or combines. Accordingly, we find that the level of ordinary skill in the art is "a mechanical engineer having familiarity[6] with agricultural equipment, such as combines, and hydraulic systems and

[5] Indeed, neither party argues that any difference between the proposed levels of ordinary skill would affect the outcome of this proceeding.

[6] The familiarity may have been gained, as proposed by Petitioner, by "approximately three years of experience in combine or agricultural equipment design, including components thereof, such as headers and header height control systems" (Pet. 5 (citation omitted)), but also may have been gained through other experience.

sensors" or "a person having 10 or more years of experience[7] working with combines."[8]

### 2. *Objective Indicia of Nonobviousness*

Patent Owner's Response does not set forth any objective indicia of nonobviousness, and during oral argument, counsel for Patent Owner explained that it did not rely upon any secondary considerations or objective indicia of nonobviousness. Tr. 35:13–19. Accordingly, there is no argument regarding secondary indicia of nonobviousness before us.

## B. *Obviousness of Claims 1–7, 10, 27, 28, and 34 over DPC, Chmielewski, Cleveland, and DA*

Petitioner asserts that the combination of the teachings of DPC, Chmielewski, Cleveland, and DA would have rendered obvious the subject matter of claims 1–7, 10, 27, 28, and 34 to one of ordinary skill in the art at the time of the invention. Pet. 15–49.

---

[7] As argued by Patent Owner, we find that a person with 10 or more years of experience working with combines also would have experience working with sensors and hydraulic systems.

[8] As noted in the text *supra*, the difference in the parties' proposed levels of ordinary skill in the art does not affect the outcome of the proceeding. Accordingly, even if we were to adopt Patent Owner's proposal as to the level of ordinary skill in the art, we would reach the same findings and conclusions as discussed herein.

*1. DPC*

DPC is a parts catalogue for John Deere's 90 Series Corn Heads. Ex. 1005. A non-cut crop header[9] from DPC is shown below:




Page 10 of DPC illustrates a non-cut crop header and page 11 of the exhibit identifies the part numbers that correspond to the numbers shown in the figure. *Id.* at 10–11.

Petitioner provides an annotated version of a portion of the above figure that includes the names of the parts, as shown below:




[9] Patent Owner explains that a corn header is a "non-cut crop" header, whereas a "cut crop" header is the type of header "used for harvesting soybean, oats, wheat, barley, and other cereal grains." Resp. 3.

Pet. 16. Petitioner's version of DPC's non-cut crop header is annotated to identify a gatherer point (11), bolt (10), strip (9), shoe (8), flange nut (10)[10] and reinforcement (7). *Id.*

*2. Chmielewski*

Chmielewski is directed to "the use of hydraulic control systems for regulating agricultural harvester header position and/or applied force of the header on the ground." Ex. 1006, 1:25–27. Chmielewski's Figure 1A is shown below:




FIG. 1A

Chmielewski's Figure 1A shows a schematic diagram of one embodiment of the invention. *Id.* at 3:59–60.

Chmielewski teaches that automated header control system (AHCS) "216 receives . . . a position signal 236, 237 representing the position of header 202 relative to ground 220." *Id.* at 7:47–51. Chmielewski explains: "Position signal 208 may be provided by a variety of different types of sensors. The position signal may represent the position of the header relative to the ground, as measured by devices such as contact sensors 236, 237." *Id.* at 7:53–57.

[10] DPC uses "10" to reference both a bolt and flange nut. Ex. 1005, 11.

Chmielewski's Figure 10 is shown below:




FIG. 10

Chmielewski's Figure 10 shows a front elevation view of a harvester with header height and lateral tilt functions. *Id.* at 4:16–18.

Chmielewski explains that "[s]ensors 236 and 237 include hoops connected to respective potentiometers 235*a* and 235*b* (shown in FIG. 10). This type of sensor only provides information when contacting the ground . . . ." *Id.* at 35:37–40. Ground tracking sensors 236, 237, located on opposite ends of the headers, sample the height. *Id.* at 35:59–60. A header height function is used to maintain the position of header 202 relative to the average surface of ground 220. *See id.* at 35:54–58.

*3. Cleveland*

Cleveland is directed to "a device for sensing the relative position of a moving vehicle with respect to a furrow in the ground." Ex. 1007, 1:4–6. Cleveland's Figure 1 is shown below:




Cleveland's Figure 1 shows a "rear elevational view of a vehicle having the sensing probe mounted thereon." *Id.* at 2:19–20. Cleveland's Figure 2 is shown below:




FIG. 2

Cleveland's Figure 2 shows "an elevational view of the sensing probe showing the bearing member in section." *Id.* at 2:21–22.

Cleveland teaches:

> sensing probe 14 includes a mounting plate 18 adapted to be mounted rigidly with respect to boom 16. Pivotally mounted on plate 18 is a swing member 20 including a collarlike hub 22, a downwardly extending stub 24 and an upwardly extending swing lever 26, all of which are welded together so that swing member 20 is a rigid member.

*Id.* at 2:44–49. Cleveland explains the following:

> After the farmer has completed one trip across the field, he aligns one probe 14 with the last furrow formed by his first trip across the field. Bearing member 44 is positioned within furrow 78 so that it is in the deepest portion thereof. The probe 14 on the opposite end of implement frame 12 is inoperative at this point, and helical spring 38 of that probe is deflected due to the fact that there is no furrow in which bearing member 44 can ride. . . . One probe 14 will be switched on during the first trip across the field and the other will be switched on during the return trip.

*Id.* at 3:54–66.

Cleveland's Figure 6 is shown below:

FIG.6




Cleveland's Figure 6 shows "a rear elevational view . . . [of] the sensing probe in the bottom of a furrow." *Id.* at 2:27–28. Cleveland teaches that "[i]f vehicle 10 moves to the left from its position shown in FIG. 1, a result is obtained such as shown in FIG. 6." *Id.* at 4:5–6. Cleveland further explains:

> As vehicle 10 begins moving across the field, sensing probe 14 is aligned so that it is vertically disposed within furrow 78. If vehicle 10 moves laterally with respect to furrow 78, bearing member 44 remains within the deepest portion of furrow 78 as described above. This causes spring 38 and swing lever 26 to swing about hinge bolt 30 so that the longitudinal axes of spring 38 and swing lever 26 are displaced from a vertical position. Swinging of swing lever 26 causes cam shaft 58 to be rotated by means of switch link 62, thereby causing several microswitches 66 to actuate indicator lights 76 on instrument panel 74. Thus the moment that sensing probe 14 moves out of a vertically disposed attitude, the vehicle operator knows immediately from the indicator lights that he has deviated from a parallel path with respect to furrow 78. He is therefore able to take corrective steering measures.

*Id.* at 4:39–54.

### *4. DA*

DA is a John Deere 90-Series Corn Head advertisement, which discloses an “all-new PermaGlide.” Ex. 1004, 33. DA describes the PermaGlide as a “slick polyethylene material” that “allows crop to feed smoother, faster — especially in wet conditions.” *Id.*

### *5. Discussion*

Petitioner asserts that the combination of DPC, Chmielewski, Cleveland, and DA would have rendered obvious the subject matter of claims 1–7, 10, 27, 28, and 34 of the ’395 patent to one of ordinary skill in the art at the time of the invention. Pet. 15–49.

*a. Claim 1*

*i. "Apparatus for maintaining a non-cut crop header disposed on a forward portion of a combine a designated height above the soil as the combine traverses a field, said apparatus comprising"*

Petitioner contends that DPC in combination with Chmielewski meets the preamble of claim 1. Pet. 15. Petitioner begins with the non-cut crop header of DPC, which Petitioner contends is "disposed on a forward portion of a combine" (*id.*) and discloses a "metal tip (i.e., shoe (8)) mounted to a forward end of the header housing (i.e., point (11)) by means of a mounting bracket (i.e., reinforcement (7), strip (9), and bolt and flange nut (10))" (*id.* at 15 (citing Ex. 1003 ¶ 44; Ex. 1005, 10–11)). Petitioner asserts that Chmielewski "discloses an apparatus for maintaining a cut crop header disposed on a forward portion of a combine at a designated height above the soil as the combine traverses a field." *Id.* at 16 (citing Ex. 1006, 1:24–26; Ex. 1003 ¶ 45). Petitioner explains that Chmielewski's header height system "generally includes left and right ground contact sensors 236 and 237, potentiometers 235a and 235b, and an . . . ('AHCS') 216." *Id.* (citing Ex. 1006, 12:22–33, Figs. 1A, 1B, 10; Ex. 1003 ¶ 45).

Additionally, Petitioner asserts it would have been obvious to one of ordinary skill in the art to modify DPC's header with the automated header height system of Chmielewski for several reasons. *Id.* at 41. First, Petitioner contends that one of ordinary skill in the art would have recognized the importance of controlling the height of a header for the benefit of avoiding damage caused by uneven ground and would have been

motivated to automate the process. *Id.* at 41–42 (citing Ex. 1003 ¶ 132)).[11] Second, Petitioner asserts that "[t]he incorporation of the automated header height system of Chmielewski with . . . DPC's header is mechanical in nature and would have been accomplished according to known methods to yield the predictable result of determining and adjusting the height of a non-cut crop header." *Id.* at 43 (citing Ex. 1003 ¶ 134). Petitioner explains that it would have been within the "technical grasp" of a person of ordinary skill "to modify Chmielewski's automated header height system to fit with . . . DPC's header and a conventional combine." *Id.* (citing Ex. 1003 ¶ 135). In so doing, Petitioner further explains that one of ordinary skill

> would have been motivated to utilize the existing hardware found on the DPC header when attaching the potentiometers 235a and 235b of left and right ground contact sensors 236 and 237 of Chmielewski to avoid forming additional holes, which would have been understood to have an adverse effect on the structural integrity of the header housing.

*Id.* at 44 (citing Ex. 1003 ¶ 136; Ex. 1001, 4:23–30). Further, Petitioner asserts that "adding other attachment fasteners would make the . . . header . . . more bulky and heavier, . . . le[ading] to undesirable performance characteristics." *Id.* (citing Ex. 1003 ¶ 136). Finally, Petitioner contends that DPC's preexisting hardware is "located at a forward portion of the header housing, which would have allowed for mounting the sensor on a

[11] Petitioner explains that even the background of the invention section of the '395 patent "recognizes that at the time of the alleged invention '[t]here [were] various approaches to maintaining the header [at] a predetermined height above the soil.'" Pet. 42 (quoting Ex. 1001, 1:40–41) (citing Ex. 1003 ¶ 132) (alterations added by Petitioner).

forward portion of the header to allow for an early detection of the distance between the header and the ground." *Id.* (citing Ex. 1003 ¶ 137).

Patent Owner raises several arguments with respect to the preamble of claim 1 and Petitioner's reliance upon the combination of DPC and Chmielewski. First, Patent Owner contends that the preamble is limiting, *inter alia*, because it recites "a non-cut crop head[er]" and "a combine" and the body of claim 1 refers back to those elements by reciting "said header" and "said combine." Resp. 33. Patent Owner relatedly contends that the patentee amended the claim to include the non-cut crop header language to distinguish the claims from Chmielewski. *Id.* (citing Ex. 1002, 142). Second, Patent Owner asserts that the preamble requires two elements, neither of which is disclosed by the combination of DPC and Chmielewski: "(1) a non-cut crop head and (2) maintaining the non-cut crop head a designated height above the ground." *Id.* Patent Owner asserts that "Chmielewski is specifically directed to a height control system for a cut crop and **not** a non-cut crop head" and "therefore does not disclose a non-cut crop head or maintaining such a head a designated height above the ground." *Id.* at 33–34. Patent Owner contends that "[w]hile . . . DPC does disclose a non-cut crop head, it does not disclose anything regarding maintaining the head a designated height above the ground." *Id.* at 34 (citing Ex. 2016 ¶ 33).

In the Reply, Petitioner contends that the preamble of claim 1[12] is not limiting and that the "non-cut crop header" language is an intended use, not a claim limitation. Reply 2. Petitioner contends that the use of the term "for" in the preamble phrase "apparatus for maintaining" confirms that the

---

[12] Petitioner also contends that the preamble of claim 27 is not limiting. Reply 2.

preambles are an intended use. *Id.* at 2–3. Petitioner also relies upon the prosecution history of the ’395 patent, noting that the examiner found that the intended use is for a non-cut crop header and that the “crop header is not [] part of the claimed invention.” Reply 3 (quoting Ex. 1002, 153) (emphasis omitted) (alteration added by Petitioner). Additionally, Petitioner asserts that even if the preamble is limiting with respect to the two elements argued by Patent Owner above, the combination of DPC and Chmielewski teaches each of the elements. *Id.* at 4.

We first address the question of whether any elements recited in the preamble of claim 1 are limiting. Second, even if the preamble is limiting, we determine that Petitioner has shown that the combination of DPC and Chmielewski meets each of the elements recited in the preamble.

*a) Whether and to What Extent the Preamble of Claim 1 Is Limiting*

“In general, a preamble limits the invention if it recites essential structure or steps, or if it is ‘necessary to give life, meaning, and vitality’ to the claim.” *Catalina Mkt’g Int’l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)). “Conversely, a preamble is not limiting ‘where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.’” *Id.* (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)). “[C]lear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention.” *Id.* at 808–09 (citing *Bristol-Myers*

*Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001)). If a phrase in the preamble provides necessary structure for a claim, that "does not necessarily convert the entire preamble into a limitation, particularly one that only states the intended use of the invention." *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015).

There is no dispute that the invention at issue in the '395 patent is not a "header" or a "combine" per se; rather, it is a header height control apparatus—an "apparatus for detecting and controlling the height above the soil of an agricultural machine as it traverses a field." Ex. 1001, 1:11–13. Nonetheless, there is no prohibition on a patentee drafting his or her claim in a manner that further limits the invention if additional structure is recited in the claim. As argued by Patent Owner, the recitation of "a non-cut crop header" and "a combine" in the preamble of claim 1, provide antecedent basis for at least two terms recited in the body of the claim—"the header" and "said combine." The body of the claim reflects that the patentee chose to claim the header control apparatus in terms not limited to said apparatus standing alone, but rather the apparatus as attached (coupled) to the header of a combine. *See, e.g.*, Ex. 1001, 7:33–34 ("a pre-loaded, generally linear flexible arm *coupled to a forward portion of the header*" (emphasis added)); 7:44–45 ("control means *coupled to said header*" (emphasis added)); 7:48–51 ("wherein said flexible arm and angular deflection sensing means *are attached to a head housing* disposed on a forward portion of *said combine*" (emphases added)); 7:54–56 ("wherein said mounting bracket *further couples said flexible arm to a forward end of said head housing*" (emphasis added)).

The prosecution history reflects that the patentee at first desired the recitation of "header" in the claim to be limited to "non-cut crop" headers, in an attempt to distinguish cut crop headers. Ex. 1002, 142 (Amendment filed June 19, 2000). The examiner, however, did not accept such argument (*id.* at 152–53 (Office Action mailed Aug. 24, 2000)), and the patentee did not reiterate or maintain the argument in amending the claims following the August 24, 2000, final rejection. *Id.* at 158–63 (Amendment filed Nov. 22, 2000). Nonetheless, the prosecution history is informative on this issue.

In light of our discussion above regarding the claim language, specification, and the prosecution history, we do not construe the entire preamble as limiting. In particular, the preamble recites an apparatus *for* maintaining, and is presented clearly as reciting an intended use. That being said, we agree with the Patent Owner that the phrase "non-cut crop header" limits the terms "the header" and "said header" recited in the body of claim 1 such that "the header" and "said header" recited in the body of claim 1 are the same "non-cut crop header" recited in the preamble of the claim.[13]

---

[13] It is slightly less clear as to whether a combine is, in fact, a required element of claim 1. In particular, the claim body recites "wherein said flexible arm and angular deflection sensing means are attached to a head housing disposed on a forward portion of said combine," which suggests a combine is recited as a structural element of the claim. Even assuming a combine is a required element, we find that Chmielewski discloses a combine. Ex. 1006, 4:60–61 ("An agricultural harvester 200 is shown, which may be a combine . . . .").

*b) The Combination of DPC and Chmielewski Meets the Elements of the Preamble*

In a somewhat ironic manner, given the arguments regarding the preamble of claim 1 discussed above, Petitioner's challenge to claim 1 begins with a discussion of the preamble and identification of where the language of the preamble is disclosed or would have been obvious in light of the combination of the teachings of DPC and Chmielewski. Pet. 15–16. In particular, Petitioner argues (Pet. 15), and we find, that DPC teaches a non-cut crop header as recited in claim 1. Ex. 1005, 10. Additionally, Petitioner argues (Pet. 16), and we find, that Chmielewski teaches maintaining a header a designated height above the ground. Ex. 1006, 1:24–26, 12:22–33, Abstract, Figs. 1A, 1B, 10.

Although Patent Owner asserts that "[t]he combination of . . . DPC and Chmielewski does not disclose" "(1) a non-cut crop head and (2) maintaining the non-cut crop head a designated height above the ground," Patent Owner acknowledges that Chmielewski "is specifically directed to a height control system for a cut crop . . . head" and that "DPC does disclose a non-cut crop head." *Compare* Resp. 33 *with id.* at 34. Patent Owner's argument regarding the preamble of claim 1 is that DPC "does not disclose anything regarding maintaining the head a designated height above the ground" (*id.* at 34) and, because Chmielewski discloses "height control system for a cut crop . . . head" (*id.* at 33), "the combination of . . . DPC and Chmielewski does not satisfy the requirements of the preamble of claim 1" (*id.* at 34).

Patent Owner's position that "[t]he combination of . . . DPC and Chmielewski does not meet the preamble of claim 1" (Resp. 32 (emphasis

omitted)) is based entirely on arguing the references' teachings individually rather than as combined by Petitioner, and, thus, does not assist in our consideration of whether the combination of DPC and Chmielewski discloses a non-cut crop header and a header height control system. In other words, it is inapposite that Chmielewski fails to disclose a non-cut crop header because Petitioner relies upon DPC for that disclosure. *See In re Keller*, 642 F.2d 413, 426 (CCPA 1981) ("one cannot show non-obviousness by attacking references individually" where the claims are challenged based on combinations of references); *In re Young*, 927 F.2d 588, 591 (Fed. Cir. 1991) ("The test for obviousness is what the combined teachings of the references would have suggested to one of ordinary skill in the art."). Similarly, it is inapposite that DPC fails to disclose a system for maintaining the header a designated height above the ground because Petitioner relies upon Chmielewski for that disclosure. Accordingly, we find that the teachings of DPC and Chmielewski, collectively, disclose a non-cut crop header disposed on a forward potion of a combine and an automated system for maintaining a header a designated height above the soil as the combine traverses a field.

*c) Reason to Combine*

Petitioner contends that it would have been obvious to combine the elements of the height control system of Chmielewski with the header disclosed by DPC for the reasons explained above. *See supra* pages 19–21 (Section III.B.5.a.i.).

Patent Owner raises several arguments challenging Petitioner's arguments and evidence. We address each in turn. First, Patent Owner contends that one of ordinary skill in the art "would not be motivated to

combine sensors from Chmielewski with the tip of the divider disclosed in . . . DPC because the heads described in these references are substantially dissimilar in structure and function." Resp. 53. Patent Owner asserts that because of the structural and functional differences between the two types of headers, "height sensors are placed in a difference [sic] location for cut crops than where they must be positioned for non-cut crops." *Id.* at 54 (citing Ex. 2016 ¶ 65). Specifically, for cut crop headers, height sensors are positioned behind the cutting bar, whereas height sensors are positioned on the dividers of non-cut crop headers to prevent damage to the dividers during use. *Id.* at 54–55 (citing Ex. 2016 ¶ 65). Ultimately, Patent Owner argues that because Chmielewski does not disclose *how* the sensors are mounted to the header and because of the structural and functional differences between the header types, "Chmielewski would not suggest to a [person of ordinary skill in the art] a finite number of predictable solutions that would result in anticipated success for adapting the cut crop height sensor of Chmielewski to a height sensor for a non-cut crop head." *Id.* at 55 (citing Ex. 2016 ¶ 69). Patent Owner asserts that "Chmielewski certainly would not suggest to a [person of ordinary skill in the art] a finite number of predictable solutions with a reasonable expectation of success for mounting the height sensor to the forward tip of a cut crop head." *Id.* (citing Ex. 2016 ¶ 69).

Patent Owner's argument is based on an incorrect interpretation of the United States Supreme Court's decision in *KSR*. *See* Reply 11. In Patent Owner's presentation of the law pertaining to obviousness, Patent Owner states: "Moreover, an obviousness finding under *KSR* ***requires*** that there be a 'finite number' of solutions yielding predictable results, *i.e.* that there is

only a small or easily traversed number of options in the context of the art for resolving the issue." Resp. 29 (citing *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008) (emphasis added)). Patent Owner's argument above reflects the position that if there is not a finite number of predictable solutions, then a combination is not obvious. The Supreme Court's statement regarding a finite number of identified, predictable solutions, discussed further in *Ortho-McNeil*, pertains to *one* way in which to show obviousness, and that discussion was tied specifically to whether something that is "obvious to try" could ever be "obvious under § 103."[14] *KSR*, 550 U.S. at 421. *KSR*, however, is not limited to only this *one* way in which to show obviousness. The Court specifically addressed several of its past decisions and drew, from those cases, a variety of principles that are instructive in considering whether a patent claiming a combination of elements is obvious. Moreover, the test for obviousness is not limited to those examples. Rather, what we look for in light of *KSR* is whether "there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *Id.* at 418. In so doing, we review the arguments offered by Petitioner to determine whether Petitioner has "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Id.* (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). To that end, we determine that Petitioner has provided above sufficient articulated reasoning with rational underpinning

---

[14] Petitioner's position is not based on whether the proposed combination would have been obvious to try. *See* Reply 11 (noting that Petitioner's "articulated rationales regarding obviousness here go well beyond just 'obvious to try'").

supporting the legal conclusion of obviousness with respect to the preamble of independent claim 1.

Second, Patent Owner argues that even though cut crop height sensors were introduced in the early 1980s, and corn heads with metal dividers were available long before that, no corn head was commercially sold with a height sensor prior to 1999. Resp. 56 (citing Ex. 2016 ¶ 72). In other words, Patent Owner asserts that "[h]ad it been obvious to combine the height sensor of a cut crop head with a non-cut crop head, surely someone would have done so in the many years the height sensors and corn heads were available. Yet, no one did so." *Id.*

Although Patent Owner's argument regarding passage of time is more apropos to arguing an objective indicia of nonobviousness, and Patent Owner conceded during oral argument that there were no secondary considerations of nonobviousness presented in this case, we note that "absent a showing of long-felt need or the failure of others, the mere passage of time without the claimed invention is not evidence of nonobviousness." *In re Kahn*, 441 F.3d at 990. Further, even if the mere passage of time alone were reflective of long felt need, Patent Owner has not argued or put forth evidence to show that the claimed invention met such need.

Third, Patent Owner contends that Petitioner impermissibly uses hindsight to presume that a person of ordinary skill in the art could easily "create a sensor small enough to fit into the small trapezoidal area at the tip of a corn head and yet one that is sufficiently strong to withstand the abuse it would encounter during harvesting." Resp. 56–57 (citing Ex. 2016 ¶¶ 73–75). Patent Owner asserts that one of ordinary skill in the art "would have

failed in his or her attempts to design" such a sensor. *Id.* at 58 (citing Ex. 2016 ¶ 74).

Petitioner responds to Patent Owner's arguments regarding size and robustness in its Reply, contending that "claims 1 and 27 nowhere require any particular level of 'robustness' or 'size.'" Reply 13. Petitioner asserts that Mr. Gramm acknowledged during his deposition that the combination of Chmielewski and DPC would work for "*perhaps a week*," confirming that it would work, even if not very well. *Id.* at 14 (quoting Ex. 1021, 212:12–213:3). Petitioner also contends that it is within the level of ordinary skill in the art to size the components to fit a non-cut crop header as disclosed by DPC. *Id.* at 15.

We agree with Petitioner that claim 1 does not place explicit size or robustness limitations on the header height control system that Petitioner relies upon from Chmielewski. Further, we are persuaded by Petitioner's argument and evidence, and are persuaded, in particular, that modifying Chmielewski's header height control system to fit DPC's header is within the ordinary level of skill as defined above. *See KSR*, 550 U.S. at 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton); *see also* Ex. 1003 ¶¶ 134–136. In any case, "[i]t is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements." *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012).

Fourth, Patent Owner asserts that Petitioner's argument—that mounting a sensor in other places on a header by forming additional holes would have an adverse effect on the structural integrity of the header—is not

supported by the evidence presented and that there are other location options for mounting. Resp. 58–59.

We agree with Patent Owner that it is possible to mount a height control sensor to other areas of the header. Nonetheless, we are persuaded by Petitioner's argument and evidence showing that one of ordinary skill in the art would have considered, and found it attractive, to mount such sensor to the header's existing hardware, in a forward location on the header. That there may be other options for such mounting does not undermine our conclusion that it would have been obvious to mount to the existing hardware. We also are persuaded by Petitioner's argument that the existing hardware is located in a forward portion of the header and, thus, that one of ordinary skill would have mounted the height control sensor thereon because it provides an advantage for mounting in that it allows for early detection of the header height above the soil. Pet. 44 (citing Ex. 1003 ¶ 137).

*d) Summary*

In the context of the evidence and arguments before us, we conclude that Petitioner has set forth several reasons with rational underpinning to support the legal conclusion that it would have been obvious to one of ordinary skill in the art to combine Chmielewski's teachings of a header height control system on a combine with DPC's teaching of a non-cut crop header, to meet the preamble of independent claim 1. In other words, we are persuaded that one of ordinary skill in the art would have recognized the benefits of a header height control system as employed on a cut crop header of a combine, as taught by Chmielewski, and would have been prompted to apply such a header height control system to a non-cut crop header of a combine, as taught by DPC. Even though we agree with Patent Owner that

there are structural and functional differences between the two types of headers, the benefit of controlling either header's height above the soil when traversing a field is the same—protecting the header from damage caused by obstacles if the header is too low. *See supra* pages 19–21 (Section III.B.5.a.i.) (discussing Petitioner's arguments as to why one of ordinary skill in the art would have combined these elements of DPC and Chmielewski in this manner). Further, we find that it was well within the level of ordinary skill in the art to size a header height control system as disclosed by Chmielewski to fit the header and existing hardware of DPC at the time of the invention. Thus, on balance, Petitioner's evidence persuades us that it would have been obvious to one of ordinary skill in the art to combine Chmielewski's header height control system with the non-cut crop header of DPC to meet the preamble of independent claim 1.

*ii. "a pre-loaded, generally linear flexible arm coupled to a forward portion of the header and having first and second opposed ends, wherein the first end of said flexible arm engages and is displaced over the soil as the header moves above the soil"*

*a) Claim Limitations*

Petitioner contends that Chmielewski in combination with Cleveland meets the above-quoted limitation of claim 1. Pet. 17. In particular, Petitioner asserts that Cleveland discloses "a pre-loaded, generally linear arm that is flexible and having first and second opposed ends, wherein the first end of said flexible arm engages and is displaced over the soil as the header moves above the soil." *Id.* Petitioner relies upon Cleveland's "swing member 20, collarlike hub 22, stub 24, helical spring 38, and bearing member 44." *Id.* (citing Ex. 1003 ¶ 49; Ex. 1007). Petitioner asserts that the

"first end engages the soil, and the second end, which is opposed to the first end, is coupled to a sensor." *Id.* at 18 (citing Ex. 1007, 4:39–54; Ex. 1003 ¶ 49).

Petitioner contends that it would have been obvious to one of ordinary skill in the art at the time of the invention to "replace each of the contact sensors 236, 237 of Chmielewski with the sensor arm ["swing member 20, collarlike hub 22, stub 24, helical spring 38, and bearing member 44" (*id.* at 44–45)] of Cleveland." *Id.* at 18. Petitioner asserts that such replacement "would have amounted to nothing more than a simple substitution of one known element for another." *Id.* at 45 (citing Ex. 1003 ¶ 138). Petitioner contends that one of ordinary skill in the art would have understood that such replacement would predictably result in "improved flexibility, due to the helical spring, yet would have still been sufficiently rigid so as to allow for the accurate measurement of the header height" and have appreciated "the benefits of improved flexibility . . . for traversing over foreign objects without breaking or being damaged." *Id.* (citing Ex. 1003 ¶ 138).

Additionally, Petitioner argues that it would have been obvious to:

> utilize the hinge bolt 30 and nut 36 disclosed in Cleveland (Ex. 1007, 2:46–55) to attach the potentiometers 235a and 235b of Chmielewski to the swing member 20 of Cleveland such that the hinge bolt 30 extends through the potentiometers 235a and 235b, extends through an aperture formed within the mounting bracket 18, and is attached thereto by way of a nut 36.

Pet. 45 (citing Ex. 1003 ¶ 139). Petitioner contends that "[i]t would have been obvious to have the hinge bolt 30 and nut 36 disclosed in Cleveland secure the potentiometers 235a and 235b of Chmielewski so that the potentiometers could read the movement of Cleveland's swing member 20." *Id.* (citing Ex. 1003 ¶ 139). Petitioner asserts that "[t]his connection is

mechanical in nature and would have been accomplished according to known methods to yield the predictable result of sensing the angular deflection of an arm" and "within the technical grasp of a [person of ordinary skill in the art] to modify the potentiometers of Chmielewski to fit with the sensor arm of Cleveland." *Id.* at 46 (citing Ex. 1003 ¶¶ 139–40).

Patent Owner asserts that the above-recited limitation of claim 1 "refers to the arm being coupled to 'the header' which, referring to the antecedent basis, is the 'non-cut crop' head recited in the preamble." Resp. 34 (citing Ex. 2016 ¶ 39). Patent Owner contends that "Chmielewski does not meet the requirement that the arm be coupled to the non-cut crop head because, as noted above, Chmielewski does not disclose a non-cut crop head." *Id.* at 34–35 (citing Ex. 2016 ¶ 39). Patent Owner asserts that "Cleveland does not remedy the defect in Chmielewski because the Cleveland apparatus has nothing to do with a combine or any kind of head, non-cut or otherwise. The assembly in Cleveland is, thus, not coupled to a non-cut crop head." *Id.* at 35 (citing Ex. 2016 ¶ 39).

Patent Owner's above assertion is unpersuasive because Patent Owner, again, argues the references individually, failing to account for the fact that Petitioner relies on DPC as disclosing a non-cut crop header, not Chmielewski or Cleveland. This is essentially the same argument that we rejected in the context of considering Patent Owner's argument directed to the preamble of claim 1. Thus, even though we agree with Patent Owner that the recitation of "the header" in this limitation of claim 1 refers back to the non-cut crop header recited in the preamble, Patent Owner's argument fails to respond to the combination proposed by Petitioner, which relies on DPC as disclosing such a header.

Additionally, Patent Owner asserts that "the arm assembly of Cleveland does not meet the requirement that 'the first end of said flexible arm engages and is displaced over the soil as the header moves above the soil.'" Resp. 35 (citing Ex. 2016 ¶ 40). Specifically, Patent Owner contends that the Cleveland apparatus "detects the lateral position of the probe and therefore is not 'displaced over the soil as the header moves above the soil.'" *Id.* (citing Ex. 2016 ¶ 40; Ex. 1007, 1:61–66, 5:17–21). Thus, Patent Owner contends that the combination of Chmielewski and Cleveland does not "meet the requirement of a flexible arm coupled to a non-cut crop header." *Id.*

In its Reply, Petitioner asserts that "Cleveland's FIGS. 6 and 7 illustrate that the arm is 'displaced over the soil' during use, regardless of whether the arm is used to detect lateral movement or some other movement." Reply 5 (citing Ex. 1007, Figs. 6–7; Pet. 17–18).

We agree with Patent Owner that Cleveland detects the lateral position of the probe, but we find that, as presented by Petitioner, Cleveland's probe is displaced over the soil during use because it is

displaced (or moved out of position) over the soil during use.[15] Pet. 18; *see, e.g.*, Ex. 1007, 4:5–13 ("If vehicle 10 moves to the left from its position shown in FIG. 1, a result is obtained such as shown in FIG. 6. As the vehicle begins to move to the left, bearing member 44 begins to ride up on the slanted surface of furrow 78. Spring 38 exerts a downward force on bearing member 44, but the slanted side of furrow 78 causes this downward

---

[15] Neither party proposed a construction for the term "displaced" either before or after our Decision to Institute and we did not expressly construe the term in that Decision. We understood implicitly that Petitioner's argument and evidence relied upon the plain and ordinary meaning of "displaced" and Patent Owner agreed generally that claim terms are given their ordinary and customary meaning unless inconsistent with the specification. Resp. 17–18. The '395 patent's use of the term "displaced" (as well as the noun form—"displacement") is consistent with the term's plain and ordinary meaning of "moved out of position." *See* Ex. 3001, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (2011) *retrieved from* http://search.credoreference.com/content/entry/hmdictenglang/displace/0 (last visited Aug. 31, 2016) (defining "displace" as "[t]o move, shift, or force from the usual place or position") (Although this dictionary is dated after the '395 patent's priority date, there is no indication that the meaning of "displaced" changed during that time period.). For example, the '395 patent discloses an "angular displacement detector" that "detects angular displacement of the arm as it is pivotally *displaced* upon encountering terrain irregularities and obstacles in the soil." Ex. 1001, 2:27–30 (emphasis added); *see also id.* at 6:45–49 ("Because coiled spring 114 provides this protection for the sensor arm 96 in the event the combine is *displaced* rearwardly, elongated, linear coiled spring 98 is unnecessary in the embodiment shown in FIGS. 7 and 8 to provide this protection against damage to the sensor arm 96." (emphasis added)). Our additional explanation here does not "change theories in midstream;" rather, it explains our understanding of the term as applied in our Decision to Institute. *See SAS Institute*, 825 F.3d at 1351 ("What concerns us is not that the Board adopted a construction in its final written decision, as the Board is free to do, but that the Board 'change[d] theories in midstream.'" (quoting *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015)).

force to have a lateral component in the direction of the deepest portion of the furrow. *This lateral force causes bearing member 44 to roll towards the deepest portion of the furrow* . . . ." (emphasis added)).

In light of the evidence presented by Petitioner, we find that Cleveland discloses "a pre-loaded, generally linear flexible arm . . . having first and second opposed ends, wherein the first end of said flexible arm engages and is displaced over the soil as the . . . [vehicle] moves above the soil." With respect to the arm being "coupled to a forward portion of the header" and a "header mov[ing] above the soil," we are persuaded that the combination of DPC and Chmielewski, as modified by the addition of Cleveland's teachings, meets these elements of claim 1, as explained by Petitioner.

*b) Reason to Combine*

Petitioner's arguments and evidence as to why one of ordinary skill in the art would have been prompted to combine the teachings of DPC, Chmielewski, and Cleveland to meet the aforementioned limitation concerning "pre-loaded, generally linear flexible arm" are discussed above. *See supra* pages 33–34 (Section III.B.5.a.ii.a)). Patent Owner raises several arguments as to why one of ordinary skill in the art would not have been prompted to combine the teachings of Chmielewski and Cleveland as proposed by Petitioner. Resp. 40–52. We address each in turn.

*1. Application of KSR*

First, Patent Owner again argues that obviousness is limited to situations where elements can *only* be combined in a finite number of ways with a reasonable expectation of success. *Id.* at 41. Patent Owner contends that Petitioner "has provided no argument or evidence that there were only a

finite number of ways to devise a height sensor for a plastic corn head and that the combination of the Cleveland probe with Chmielewski was one such solution." *Id.* at 52. Rather, Patent Owner contends that Petitioner's expert, Mr. Lucas, testified that there are "many different ways" to attach the Cleveland arm to Chmielewski. *Id.* (citing Ex. 2014, 118–19). Thus, Patent Owner asserts that "[w]hen possible solutions are not limited to a small number in light of the art, a finding of obviousness is improper." *Id.* (citing *Ortho-McNeil*, 520 F.3d at 1364; *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1339 (Fed. Cir. 2010)).

We previously addressed Patent Owner's misinterpretation of *KSR* as applied to the evidence and arguments raised by Petitioner in the context of this case.[16] In short, Petitioner does not rely upon an "obvious to try" rationale as discussed in *KSR*, and for the additional reasons explained above, *see supra* pages 26–29 (Section III.B.5.a.i.c)), Patent Owner's interpretation and application of *KSR* is not persuasive.

*2. Operability*

Second, Patent Owner contends that one of ordinary skill in the art would not have had a reasonable expectation of success in combining the teachings of the references because

> the Cleveland probe 14 combined with the Chmielewski potentiometers 236, 237 could not function as 'a preloaded, generally linear flexible arm' (claim 1) or 'an elongated, linear shaft' (claim 27) coupled to a rotation sensor and mounted at the tip of a corn head crop divider using the existing hardware.

[16] As with *Ortho-McNeil*, *Rolls-Royce* addresses an argument based on an "obvious to try" rationale. *Rolls-Royce*, 603 F.3d at 1339.

Resp. 41–42. Specifically, Patent Owner contends that such combination would not be operable. Patent Owner provides four reasons as to why such combination would be inoperable.

*a. Cleveland as a Height Sensor*

Patent Owner contends that

> Cleveland is incapable of functioning as a vertical height sensor with respect to the direction of travel 80 because the hub 22 (to which the stub 24 and spring 38 are rigidly connected) can only pivot around the axis of bolt 30 and cannot pivot perpendicularly to the axis which it would need to do to indicate vertical position.

*Id.* at 43.

In its Reply, Petitioner agrees with Patent Owner that Cleveland's flexible arm rotates perpendicularly to the direction of travel, and that it "would need to rotate parallel to the direction of travel when combined with . . . DPC/DA/Chmielewski." Reply 9 (citation omitted). Nonetheless, Petitioner contends that this modification is "inconsequential" because it is within the level of skill possessed by one of ordinary skill in the art.[17] *Id.*

---

[17] Patent Owner asserts that we should not consider Petitioner's position with respect to rotating the probe assembly of Cleveland because such position should have been set forth in the Petition rather than Petitioner's Reply. Paper 33 (challenging portions of pages 9 and 10 of Petitioner's Reply). Petitioner contends that its argument responds to the position set forth in Patent Owner's Response and Mr. Matousek's Declaration. Paper 37. We discuss Patent Owner's position and Mr. Matousek's Declaration, in particular the same paragraph of which Patent Owner relies upon in its Response, *infra*. In short, Patent Owner and Mr. Matousek raised a possible concern with the combination and proposed a simple solution that we determine would have been obvious to one of ordinary level of skill in the art at the time of the invention.

The Matousek Declaration, submitted by Patent Owner, reflects that rotating the probe assembly of Cleveland 90 degrees such that the arm rotates parallel to the direction of travel would have been well within the level of ordinary skill in the art at the time of the invention. In particular, paragraph 81 of the Matousek Declaration explains, in detail, precisely how such modification would be accomplished. While Mr. Matousek's level of skill is above the level of ordinary skill in the art (*see* Ex. 2016 ¶¶ 4–11 (discussing Mr. Matousek's education and experience)), we determine that the modification he proposes is not.[18] It is of little import that it was Patent Owner's Declarant, and not Petitioner's, who put forth this evidence, showing how a simple modification could be made when combining the teachings of Cleveland and Chmielewski, into the record. Once Patent Owner put the evidence into the record, Petitioner was justified in relying upon it, as are we in reaching our Decision here.[19] Thus, based on Mr. Matousek's testimony, we determine that it was a simple adjustment that was within the ordinary level of skill in the art and would have been recognized as such and performed by one of ordinary skill in the art, at the

[18] Neither Patent Owner nor Mr. Matousek asserts that the modification he proposes is beyond the level of ordinary skill in the art at the time of the invention.

[19] Patent Owner argues that Petitioner improperly relies upon such modification in its Reply without presenting the position in its Petition or accompanying expert declaration. Paper 33. We disagree. Petitioner's argument was properly made in response to Mr. Matousek's testimony, as discussed above, and Patent Owner's argument based thereon, explaining a simple modification to rotate the probe assembly of Cleveland 90 degrees such that the arm rotates parallel to the direction of travel when combined with the teachings of Chmielewski.

time of the invention, to detect changes in elevation in the direction of a vehicle's movement.[20]

*b. Cleveland's Ability to Bend*

Next, Patent Owner contends that because Cleveland is designed to bend, it cannot function as a height sensing arm. Resp. 44. Specifically, Patent Owner asserts:

> If probe 14 is designed to be bent rearwardly, the variation in the bend of spring 38 would change the amount of rotation the potentiometer measured and prevent the potentiometer from accurately detecting the height of the implement above the ground. It would be impossible to tell how much of the rotation

[20] Although we address this issue *infra*, the reason Mr. Matousek gives as to why one of ordinary skill in the art would not have been motivated to make this modification is because it would "destroy the intended purpose of Cleveland"—to detect the lateral position of a vehicle with respect to a furrow. Ex. 2016 ¶ 81. First, the purpose and intended use of the sensor in Cleveland, however, are not the focus of the inquiry where the teachings thereof are being applied in combination to the teachings of other prior art references. In other words, Petitioner does not propose modifying Cleveland in and of itself; rather, the proposed modification is with respect to incorporating Cleveland's teachings into the header of DPC and header height control system of Chmielewski. Second, we disagree that Petitioner's proposed modification would defeat Cleveland's purpose because after modification Cleveland's probe assembly would still be used to detect relative motion in the plane in which it operates. In other words, the purpose of the probe assembly in Cleveland is to detect elevation changes (i.e., from the deepest portion of the furrow (*see* Ex. 1007, 4:39–54)), and that purpose remains unchanged when the teachings of Cleveland's probe assembly are combined with those of Chmielewski and DPC because the sensor arm/probe assembly still detects elevation changes. Third, even if rotating the probe assembly of Cleveland would negate Cleveland's purpose (which we find it would not), we disagree that such result would have led one of ordinary skill in the art *not* to rotate Cleveland's probe assembly when combining those teachings with the teachings of DPC and Chmielewski.

> perceived by the potentiometer was due to bend in the spring versus change in elevation.

*Id.* at 44–45 (citing Ex. 2016 ¶ 83).

In its Reply, Petitioner asserts that claim 1 recites a "flexible" arm and that Cleveland's arm is flexible.[21] Reply 15 (citing Pet. 17–18). Petitioner contends that "to the extent the flexibility of the spring impacted the height calculations, the height control system would simply be calibrated to account for that impact." *Id.* at 17 (pointing to Chmielewski's disclosure that "[r]outine calibration is extremely important due to . . . variations in the combine, header and sensors that occur during and after each use in the field" (quoting Ex. 1006, 9:34–47)).

First, as discussed above, under either party's construction of "flexible," Cleveland's spring 38 is flexible because it is "able to bend" (as proposed by Patent Owner) and "made to bend" (as proposed by Petitioner). *See supra* page 8 (Section II.A.1.). Patent Owner explicitly states that "Cleveland is designed to bend." Resp. 44. Accordingly, we find that Cleveland's spring 38 is "flexible."

Second, to the extent that different degrees of flexibility impact calculating the height, we agree with Petitioner that Chmielewski teaches calibrating the height control system. Ex. 1006, 9:34–47. Specifically, we agree that it was within the level of ordinary skill in the art to perform such calibrations, and one of ordinary skill in the art would have been aware that such calibrations would include consideration of the degree of flexibility of the spring employed in Cleveland's flexible arm. *See* Reply 17.

---

[21] Petitioner notes that claim 27 does not recite a "flexible" arm, but it does not exclude one either. Reply 15–16.

*c. Mounting to Bolt 30*

Patent Owner contends that it would not have been obvious to one of ordinary skill in the art to mount Cleveland's swing member 20 to Chmielewski's potentiometers 235a and 235b using Cleveland's bolt 30 and nut 36 "because the potentiometer needs to rotate and hinge bolt 30 does not rotate. Rather than bolt 30 rotating, the hub 22 attached to spring 38 rotates around bolt 30." Resp. 45 (citing Ex. 2016 ¶ 84; Ex. 1007, 2:52–53). Patent Owner relies upon Cleveland's teaching that bolt 30 is "rigidly secured to plate 18 by means of a nut 36." *Id.* (citing Ex. 1007, 2:54–56). Thus, because bolt 30 does not rotate, Patent Owner asserts that attaching potentiometers to it would not result in the generation of a rotation signal, resulting in an inoperable combination. *Id.* (citing Ex. 2016 ¶ 84). Patent Owner, however, states further that "[i]n order for bolt 30 to rotate, . . . Cleveland . . . would have to be modified to have a bushing through plate 18 or a pair of bearings to allow bolt 30 to rotate independently of plate 18." *Id.* (citing Ex. 2016 ¶ 84).

In its Reply, Petitioner points to Cleveland's teaching that "[t]he particular pivotal mechanism used for swing member 20 *may vary without detracting from the invention*, but it must be sturdily constructed." Reply 18 (quoting Ex. 1007, 2:56–58). Petitioner asserts that the combination, as proposed in the Petition, did not require that the attachment via bolt 30 must be rigid. *Id.* Rather, Petitioner contends that a person of ordinary skill in the art is not an "automaton" and would understand that additional modifications may need to be made, such as adding a bushing. *Id.*

Our consideration of this issue is very similar to our consideration of Patent Owner's argument that Cleveland's probe assembly would need to be

rotated 90 degrees to detect changes in height in a direction parallel to the direction of travel. Specifically, Patent Owner's Response relies upon the Matousek Declaration, as noted above. Mr. Matousek testifies that "the configuration of the Cleveland probe assembly would have to be modified to provide a bushing through the plate 18 or a pair of bearings at each end of the bolt 30 so the bolt could freely rotate with the swing member independent of the plate 18." Ex. 2016 ¶ 84. As with our discussion of rotating Cleveland's probe assembly, it is of little import that it was Patent Owner's Declarant, and not Petitioner's, who put forth this evidence, showing how a simple modification could be made when combining the teachings of Cleveland and Chmielewski, into the record.[22] Once Patent Owner put the evidence into the record, Petitioner was justified in relying upon it, as are we in reaching our Decision here. Additionally, neither Patent Owner nor Mr. Matousek asserts that this modification was outside the level of ordinary skill in the art, or that such modification posed some sort of difficulty in being performed. We determine that this modification is a simple adjustment that would have been recognized by one of ordinary skill in the art and would have been well within the level of ordinary skill in the art at the time of the invention.

[22] Patent Owner argues that Petitioner improperly relies upon such modification in its Reply without presenting the position in its Petition or accompanying expert declaration. Paper 33. We disagree. Petitioner's argument was properly made in response to Mr. Matousek's testimony, as discussed above, and Patent Owner's argument based thereon, explaining a simple modification to allow bolt 30 to freely rotate independent of plate 18.

*d. Robustness and Size of Cleveland's Plate and Linkages*

Patent Owner contends that "a height sensor for a corn head must withstand heavy abuse from corn stalks." Resp. 46 (citing Ex. 2016 ¶ 87). Similar to the argument we addressed above, *see supra* page 30 (Section III.B.5.a.i.c)), Patent Owner raises several arguments regarding the size and robustness of Cleveland's plates and linkages. *Id.* at 46–48. Petitioner raises the same arguments in response. *See* Reply 13–14.

As we previously concluded, Patent Owner has not identified any limitation in claim 1 that requires an explicit size or robustness for the plate and linkages. Further, we are persuaded by Petitioner's argument and evidence, and determine that modifying the size of Cleveland's plate and linkages to fit DPC's header was within the ordinary level of skill as defined above. *See KSR*, 550 U.S. at 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton); *see also* Ex. 1003 ¶¶ 134–36.

*3. The Combination of Chmielewski and Cleveland Would Render Each Reference Inoperable*

Patent Owner's third argument as to why one of ordinary skill in the art would not have been prompted to combine the teachings of Chmielewski and Cleveland is because each reference would be rendered inoperable for its intended purpose. Resp. 48–51. With respect to Cleveland, Patent Owner contends that the probe assembly "would need to be rotated 90 degrees . . . . [to] allow swing member 20 to rotate with change in elevation." *Id.* at 50 (citing Ex. 2016 ¶ 81; Ex. 2014, 130–32). Patent

Owner contends that, once rotated, Cleveland would be "unable to function for its intended purpose which is sensing lateral position." *Id.* at 50 (citing Ex. 2016 ¶ 81). With respect to Chmielewski, Patent Owner asserts that "[i]f Cleveland's probe 14 was attached to Chmielewski with plate 18 perpendicular to the direction of travel as intended by Cleveland, Chmielewski's sensors 236 and 237 would necessarily only detect the lateral position of the header instead of changes in elevation." *Id.* at 51 (citing Ex. 2016 ¶ 81). Patent Owner contends that this would "destroy the intent, purpose and function of Chmielewski which is to control head height in response to elevation changes." *Id.* (citing Ex. 2016 ¶ 81).

Patent Owner's arguments are inapposite. With respect to Cleveland, we addressed this argument, in footnote 20 *supra*, as raised in the context of Mr. Matousek's Declaration. We reiterate, first, that the inquiry isn't whether applying a modification of Cleveland's teachings (by rotating the probe assembly 90 degrees) when combining with those of Chmielewski renders Cleveland inoperable for its intended purpose, because the structure being modified is being added to the teachings of Chmielewski, not Cleveland. Petitioner does not propose removing Cleveland's probe assembly, rotating it, and then placing it back onto Cleveland's vehicle. Thus, Patent Owner's assertion is inapposite. Second, we disagree that Petitioner's proposed modification would defeat Cleveland's purpose because after modification Cleveland's probe assembly would still be used to detect relative motion in the plane in which it operates. In other words, the purpose of the probe assembly in Cleveland is to detect elevation changes (i.e., from the deepest portion of the furrow (*see* Ex. 1007, 4:39–54)), and that purpose remains unchanged when the teachings of Cleveland's

probe assembly are combined with those of Chmielewski and DPC because the sensor arm/probe assembly still detects elevation changes. Third, even if rotating the probe assembly of Cleveland would negate Cleveland's purpose (which we find it would not), we disagree that such result would have led one of ordinary skill in the art *not* to rotate Cleveland's probe assembly when combining those teachings with the teachings of DPC and Chmielewski.

With respect to Chmielewski, Patent Owner's argument directed to Chmielewski is also inapposite because Petitioner acknowledges that Cleveland's probe assembly would have been rotated by one of ordinary skill in the art when combining the teachings of these references, and Petitioner does not propose mounting Cleveland's probe assembly so that it detects the lateral position (as opposed to the height) of Chmielewski's header.

Accordingly, Patent Owner's arguments with respect to this issue are unpersuasive to show that one of ordinary skill in the art would not have been prompted to combine the teachings of Cleveland and Chmielewski, as proposed by Petitioner.

*c) Summary*

In the context of the evidence and arguments before us, we determine that the combination of Cleveland's teachings with those of the DPC/Chmielewski combination, discussed in considering the preamble of claim 1, discloses "a pre-loaded, generally linear flexible arm coupled to a forward portion of the header and having first and second opposed ends, wherein the first end of said flexible arm engages and is displaced over the soil as the header moves above the soil," as recited in claim 1. Further, we

are persuaded that one of ordinary skill in the art would have been prompted to modify the DPC/Chmielewski combination to incorporate the teachings of Cleveland for the reasons explained by Petitioner (*see supra* pages 33–34 (Section III.B.5.a.ii.a))), thus, meeting the aforementioned limitation of independent claim 1. In particular, we agree with Petitioner that one of ordinary skill in the art would have been prompted to replace each of Chmielewski's contact sensors with Cleveland's sensor arm (1) as it was known to be a simple substitution of one known element for another, and (2) to achieve the predictable result of improved flexibility provided by Cleveland's sensor arm, the benefits of which permit traversing foreign objects without breaking or being damaged. Additionally, we are persuaded by Petitioner's assertions that one of ordinary skill would have modified Cleveland's assembly by rotating it 90 degrees, when combining with DPC/Chmielewski, as well as modifying bolt 30 such that it would rotate with swing member 20, as explained by Mr. Matousek.

*iii. "angular deflection sensing means coupled to the second end of said flexible arm for measuring a deflection of said flexible arm when the first end of said flexible arm encounters irregularities in the soil as the header moves above the soil and for providing a first signal representing the extent of deflection of said flexible and" [sic]*[23]

Petitioner contends that Chmielewski's potentiometers 235a and 235b disclose an angular deflection sensing means. Pet. 18 (citing Ex. 1006,

[23] Patent Owner explains that "flexible and" is a typographical error that should read "flexible arm." Resp. 36 n.4. Petitioner agrees that "flexible and" is a typographical error. Pet. 18 n.3.

12:25–26; Ex. 1003 ¶ 52). In particular Petitioner explains that the potentiometers are a type of rotation sensor, and that they "measure the deflection of the ground contact sensors 236, 237 and send 'a position signal 236, 237 [sic] representing the position of header 202 relative to ground 220.'" *Id.* (citing Ex. 1003 ¶ 52) (quoting Ex. 1006, 7:46–50) (other citations omitted).

Patent Owner contends that "[t]his limitation requires an angular deflection sensing means coupled to a flexible arm. 'Flexible arm' is repeated four times. . . . [but] Chmielewski does not disclose the required flexible arm." Resp. 36 (citing Ex. 2016 ¶ 45).[24] Additionally, Patent Owner asserts that this limitation refers to "the header," which means the "non-cut crop header," and Chmielewski does not disclose a non-cut crop header. *Id.* (citations omitted). Accordingly, Patent Owner asserts that "Chmielewski therefore does not meet the requirement of an angular deflection sensing means coupled to a flexible arm that deflects as the non-cut crop head moves above the soil." *Id.* (citing Ex. 2016 ¶ 45).

Patent Owner's argument reflects a misunderstanding of Petitioner's position. The discussions above, and at pages 18 to 19 of the Petition, address Chmielewski's teaching of potentiometers, which Petitioner argues, and we agree, discloses an angular deflection sensing means. Patent Owner does not contest this point. As Patent Owner recognizes (*see* Resp. 36), Petitioner does not rely upon Chmielewski as disclosing a flexible arm.

---

[24] It is unclear why Patent Owner asserts that Chmielewski fails to disclose a flexible arm when Patent Owner recognizes that Petitioner relies explicitly on Cleveland, not Chmielewski, for such teaching. Resp. 36 (citing Ex. 1003 ¶ 49; Pet. 17–18).

Petitioner's combination proposes replacing Chmielewski's ground contact sensors 236, 237 with the flexible arm of Cleveland. Pet. 18. We are persuaded by those arguments and reasons to combine, as discussed previously. Specifically, Petitioner explained that with respect to Cleveland's flexible arm, the "first end engages the soil, and the second end, which is opposed to the first end, is coupled to a sensor." *Id.* The point here simply is that Petitioner was not arguing that Chmielewski discloses the flexible arm or an angular deflection sensing means *coupled to* a flexible arm; rather, Petitioner argues that Chmielewski discloses an angular deflection sensing means and that the *combination* of Cleveland and Chmielewski discloses an angular deflection sensing means *coupled to* a flexible arm. Patent Owner's arguments are not commensurate in scope with the combination as proposed by Petitioner and, therefore, are unpersuasive.

In light of the discussion above, we find that Chmielewski's potentiometers are a type of rotation sensor and disclose an angular deflection sensing means. Additionally, we are persuaded that one of ordinary skill in the art would have been prompted to combine the teachings of DPC, Chmielewski, and Cleveland for the reasons presented previously by Petitioner (*see supra* pages 33–34 (Section III.B.5.a.ii.a))), and as reiterated in our summary above (*see supra* page 47 (Section III.B.5.a.ii.c))). Further, we determine that the combination of the teachings of DPC, Chmielewski, and Cleveland, discussed *supra*, meets the

> angular deflection sensing means coupled to the second end of said flexible arm for measuring a deflection of said flexible arm when the first end of said flexible arm encounters irregularities in the soil as the header moves above the soil and for providing

a first signal representing the extent of deflection of said flexible [arm]

limitation of claim 1.

*iv. "control means coupled to said header and said angular deflection sensing means and responsive to said first signal for raising or lowering the header in accordance with said first signal in maintaining the header a designated height above the soil,"*

Petitioner contends that "Chmielewski's automated header height system includes a 'control means' by way of the AHCS 216 and a hydraulic system that includes a hydraulic cylinder 206 that is connected to a member 230 that is coupled to the header as shown in Figures 1A, 1B." Pet. 19 (citing Ex. 1003 ¶ 54; Ex. 1006, 1:24–26, 5:1–5). Petitioner explains the operation of AHCS 216 and its function to control the hydraulic system to maintain a desired header position. *Id.* at 20 (citations omitted). Petitioner asserts that "[t]he 'control means' includes the hydraulic cylinder 206, member 230, and AHCS 216, where the member 230 and hydraulic cylinder 206 are coupled to the header and the AHCS 216 is electronically coupled to the potentiometers 235a and 235b ('angular deflection sensing means')." *Id.* (citing Ex. 1003 ¶ 54; Ex. 1006, 7:46–50, 12:22–33).

Patent Owner argues that the above-quoted limitation of claim 1 "refers to 'said header'" and therefore "requires a control means coupled to a non-cut crop header as recited in the preamble." Resp. 36–37 (citing Ex. 2016 ¶ 47). Patent Owner contends that because Chmielewski discloses a cut crop header and not a non-cut crop header, "Chmielewski alone does not meet the requirement of a control means coupled to a non-cut crop

header." *Id.* (citing Ex. 2016 ¶ 47). Patent Owner does not assert that Chmielewski fails to disclose a "control means," as recited in claim 1.

We find that Chmielewski discloses a control means, as recited in claim 1, for the reasons explained by Petitioner. Additionally, as we discussed with previous limitations, Petitioner does not rely upon Chmielewski as disclosing a non-cut crop header; rather, Petitioner relies upon DPC. Thus, Patent Owner's argument that Chmielewski fails to disclose the above-quoted limitation, because Chmielewski does not disclose a non-cut crop header, is inapposite as it is not responsive to the combination of elements upon which Petitioner relies.

*v. "wherein said flexible arm and angular deflection sensing means are attached to a head housing disposed on a forward portion of said combine and said head housing is comprised of polyurethane and includes a metal tip and a mounting bracket for attaching said metal tip to a forward end of said head housing, and wherein said mounting bracket further couples said flexible arm to a forward end of said head housing"*

Petitioner asserts that DPC discloses a head housing disposed on a forward portion of a combine, said head housing including a metal tip and a mounting bracket for attaching said metal tip to a forward end of said head housing. Pet. 20. Petitioner contends that DA discloses that the head housing is made out of a polyethylene material.[25] *Id.* at 20–21. Petitioner

[25] Petitioner contends that DPC and DA describe the same header, "the 90 Series Corn Heads from John Deere," but that DA "has been added for clarity since it explicitly discloses that the header is made out of polyethylene." Pet. 49 (citing Ex. 1003 ¶ 145; Ex. 1004, 33).

asserts that "[a] person of ordinary skill in the art . . . would have understood that polyurethane and polyethylene are both plastics, and each would have provided the same structural characteristics to the head housing, and therefore would have been interchangeable based on design choice." *Id.* at 21 (citing Ex. 1003 ¶ 57).

Patent Owner contends that "[t]his limitation requires a flexible arm attached to a polyurethane divider ('head housing')." Resp. 37 (citing Ex. 2016 ¶ 49). Patent Owner "does not dispute that the combination of . . . DPC and . . . DA discloses dividers made of plastic and that polyethylene and polyurethane are types of plastic." *Id.* Patent Owner, however, contends that neither DPC nor DA "discloses a flexible arm of any kind and certainly not one that is coupled to a divider." *Id.* at 37–38 (citing Ex. 2016 ¶ 49). Patent Owner does not contest Petitioner's position that polyurethane and polyethylene would have been interchangeable based on design choice.

Petitioner does not rely upon DPC or DA as disclosing a flexible arm; Petitioner relies upon Cleveland for this teaching, as discussed *supra*. Thus, Patent Owner's argument is inapposite. With respect to the header housing material, Patent Owner does not contest Petitioner's position. We agree with Petitioner, and we are persuaded that it would have been an obvious matter of design choice to change the polyethylene housing of DPC/DA to polyurethane. Accordingly, we determine that the teachings of DPC, DA, Chmielewski, and Cleveland, combined for the reasons asserted by Petitioner (which we already have found persuasive), meet the above-recited limitation of claim 1.

*vi. Summary*

As reflected in the detailed discussion above, we have reviewed Petitioner's arguments and evidence and Patent Owner's arguments and evidence directed to claim 1. We are persuaded that the elements of the claim are met by the combination of the teachings of DPC, Chmielewski, Cleveland, and DA, and one of ordinary skill in the art would have been prompted to combine the teachings of these references in the manner recited in independent claim 1 at the time of the invention.

*b. Claims 2–7 and 10*

Petitioner contends that the combined teachings of DPC, Chmielewski, Cleveland, and DA disclose the elements of claims 2–7 and 10, and also contends that one of ordinary skill in the art would have been prompted to combine them in the manner claimed. *See* Pet. 21–26.

Patent Owner does not raise a separate argument contesting the obviousness of dependent claims 2–7 and 10. *See generally* Resp.

Claims 2–7 and 10 depend from claim 1. We have reviewed Petitioner's arguments and evidence directed to claims 2–7 and 10. We are persuaded that the elements of the claims are met by the combination of the teachings identified by Petitioner on pages 21 to 26 of the Petition, and, for the reasons articulated by and evidence presented by Petitioner (pages 41 to 49 of the Petition), that the combination of DPC, Chmielewski, Cleveland, and DA would have rendered the subject matter of these claims obvious to one of ordinary skill in the art at the time of the invention.

*c. Claim 27*

*i. "For use on a plastic non-cut crop header housing disposed on a forward portion of a combine used in the harvesting of crops, said header housing have a tip mounted to a forward end thereof by means of a mounting bracket, an arrangement for determining the height of the header housing above the soil as the combine traverses a field, said arrangement comprising"*

Petitioner contends that DPC, Chmielewski, and DA disclose the elements of claim 27's preamble "through the disclosure of a polyethylene header, metal tip, and mounting bracket disclosed in . . . DPC and . . . DA and the automated header height system disclosed in Chmielewski" and for the reasons explained at pages 15 to 16 and 20 to 21 of the Petition. Pet. 37–38 (citing Ex. 1003 ¶ 118).

Patent Owner contends that "there is no disclosure between the three references of an apparatus capable of determining the height of a non-cut crop head above the soil." Resp. 38 (citing Ex. 2016 ¶¶ 32–35, 52). In particular, Patent Owner argues that Chmielewski discloses a "cut crop head, not a non-cut crop head," DA and DPC "disclose a corn head, [but] neither discloses anything regarding determining the height of the divider above the soil." *Id.* (citations omitted).

In its Reply, Petitioner contends that the preamble of claim 27 is non-limiting, for the same reasons discussed in the context of addressing the preamble of claim 1. *See* Reply 2–4 (addressing claims 1 and 27). Petitioner asserts that even if the preamble is limiting, the elements recited therein are disclosed by the references relied upon. *Id.* at 4.

The same reasoning and analysis we discussed in the context of the preamble of claim 1 applies to the preamble of claim 27, and we incorporate our discussion thereof here. In summary, the preamble "[f]or use on" recites an intended use, albeit a very narrow intended use because of the structural details provided for the header. The body of claim 27, like the body of claim 1, recites "the header" in several instances. *See id.* at 10:1–22 (including the recitation of "the plastic header housing"). Each of these instances relies upon the "plastic non-cut crop header housing" recited in the preamble for antecedent basis. Accordingly, for the same reasons we explained in the context of considering the preamble of claim 1, the recitation of "the header," "the header housing," and "the plastic header housing" in the body of claim 27 each refer to the "plastic non-cut crop header housing" recited in the preamble of the claim, and are, thus, limited thereto.

Nonetheless, we determine that Petitioner has shown that each of the elements of the preamble are met by the proffered combination of the teachings of DPC, DA, and Chmielewski. Additionally, Patent Owner's argument that none of the three references teaches all of the elements *in combination* is essentially an argument that none of the references *anticipates* the claimed invention. The ground upon which we instituted, however, is obviousness in light of a combination of the teachings of three references. Thus, that none of the references *individually* discloses each of the elements is inapposite. *See In re Keller*, 642 F.2d at 426; *In re Young*, 927 F.2d at 591.

*ii. "a rotation sensor disposed in a lower, forward portion of the header;"*

Petitioner asserts that Chmielewski teaches a rotation sensor "through the disclosure of potentiometers 235a and 235b" and for the reasons explained at pages 18 to 19 of the Petition. Pet. 38. As discussed previously, Petitioner contends, and we find, that a potentiometer is a type of rotation sensor. Pet. 18 (citing Ex. 1003 ¶ 52).

Patent Owner asserts that Chmielewski alone does not disclose a rotation sensor coupled to a non-cut crop header and that Chmielewski's potentiometers are not "disposed in a 'lower, forward portion of the header.'" Resp. 39.

The arguments presented on this limitation are essentially the same as those presented with respect to the "angular deflection sensing means" limitation of claim 1. *See supra* pages 47–49 (Section III.B.5.a.iii.). The point we made there is that Petitioner relies upon a combination of the teachings of DPC, Chmielewski, and Cleveland for the entirety of this limitation, including the phrase "disposed in a lower, forward portion of the header."[26] Petitioner relies on Chmielewski specifically for the "rotation sensor" portion of this limitation. Thus, in light of the discussion with respect to "angular deflection sensing means" as recited in claim 1, and the arguments and evidence presented by Petitioner with respect to claim 27, we determine that Petitioner's combination of the teachings of DPC,

---

[26] Notably, the location proposed by Petitioner for mounting the sensor to Lofquist is "a lower, forward portion of the header." Pet. 16 (showing Petitioner's annotated version of Lofquist's Figure 8).

Chmielewski, and Cleveland corresponds properly to "a rotation sensor disposed in a lower, forward portion of the header," as recited in claim 27.

*iii. "an elongated, linear shaft having first and second opposed ends, wherein said first end is coupled to said rotation sensor and said second end engages the soil, and wherein said shaft rotationally displaces said rotation sensor as the second end of said shaft engages and passes over irregularities in the soil; and"*

Petitioner asserts that Cleveland discloses this limitation "by way of its swing member 20, collarlike hub 22, stub 24, helical spring 38, and bearing member 44." Pet. 38. Petitioner contends that

> "a [s]pring 38 and swing member 20 together form an elongated member," as shown in Figure 2. The elongated member is elongated, linear and has first and second ends. The second end of the elongated member is a bearing member 44. When combined with the potentiometers 235a and 235b of Chmielewski, the first end of the elongate member is coupled to the potentiometers 235a and 235b and the bearing member 44 end engages the soil. The elongate member rotationally displaces the potentiometers 235a and 235b of Chmielewski when the bearing member 44 of the elongate member passes over the irregularities in the soil.

*Id.* at 38–39 (citing Ex. 1007, 2:46–49, 2:62–63, 2:67–74, 4:39–54; Ex. 1003 ¶¶ 120–21). Petitioner further explains that it would have been obvious to replace each contact sensor 236, 237 of Chmielewski with the sensor arm of Cleveland, for the reasons discussed previously. *Id.* at 39.

Patent Owner asserts that this limitation requires "a linear shaft having a first end coupled to a rotation sensor which it rotationally displaces as the opposite end of the shaft engages the soil." Resp. 39–40. Patent Owner contends that because Cleveland is configured to detect lateral position only,

"the arm of Cleveland does not rotationally displace a rotation sensor to which it is coupled." *Id.* at 40 (citing Ex. 2016 ¶ 56).

We determine that the combination of teachings proposed by Petitioner meet this element as explained by Petitioner. Patent Owner's argument is directed toward Cleveland in an unmodified state and does not address the combination of Cleveland's teachings with those of Chmielewski. Accordingly, we determine that Petitioner's combination of the teachings of Chmielewski and Cleveland discloses

> an elongated, linear shaft having first and second opposed ends, wherein said first end is coupled to said rotation sensor and said second end engages the soil, and wherein said shaft rotationally displaces said rotation sensor as the second end of said shaft engages and passes over irregularities in the soil[,]

as recited in claim 27.

*iv.* *"a flange connecting said rotation sensor to the mounting bracket for mounting said rotation sensor on a lower portion of the forward end of the plastic header housing, wherein said mounting bracket includes a strap and a bracket respectively disposed on lower and upper surfaces of the header housing and connected together by at least one nut and bolt combination."*

Petitioner contends that DPC discloses a "mounting bracket including a strap and a bracket respectively disposed on lower and upper surfaces of the header housing and connected together by at least one nut and bolt combination through the disclosure of a mounting bracket (i.e., reinforcement 7, strip 9, and bolt and flange nut 10)" for the reasons explained at pages 15 to 16 of the Petition. Pet. 39. Petitioner asserts that

Cleveland "meets the limitation of a flange by way of a mounting plate 18" for the reasons explained at pages 30 to 31 of the Petition. *Id.* at 39–40.

Patent Owner contends that this limitation "requires that the flange connect 'said rotation sensor' to the mounting bracket" but "Cleveland does not disclose a rotation sensor, only an apparatus capable of detecting lateral position." Resp. 40 (citing Ex. 2016 ¶¶ 56, 78).

Petitioner's discussion of this limitation focuses on the "mounting bracket," and its components, as well as the "flange." Pertinent to Patent Owner's contention, however, Petitioner does not contend that DPC or Cleveland discloses a "rotation sensor." Rather, Petitioner relies upon Chmielewski for this teaching as explained repeatedly above. Thus, Patent Owner's argument that neither DPC nor Cleveland discloses a rotation sensor is inapposite. For the reasons explained by Petitioner, we determine that the proffered combination of DPC and Cleveland corresponds properly to a mounting bracket, and its components, as well as a flange, as recited in the above limitation of claim 27.

*d. Claims 28 and 34*

Petitioner contends that the combined teachings of DPC, Chmielewski, Cleveland, and DA meet the elements of claims 28 and 34, and also contends that one of ordinary skill in the art would have been prompted to combine them in the manner claimed. *See* Pet. 40–41.

Patent Owner does not raise a separate argument contesting the obviousness of dependent claims 28 and 34. *See generally* Resp.

Claims 28 and 34 depend from claim 27. We have reviewed Petitioner's arguments and evidence directed to claims 28 and 34 and determine, for the reasons articulated and evidence presented by Petitioner,

that the combination of DPC, Chmielewski, Cleveland, and DA would have rendered the subject matter of these claims obvious to one of ordinary skill in the art at the time of the invention.

*e. Conclusion of Obviousness*

We have considered Petitioner's evidence and argument and determine that the combination of DPC, Chmielewski, Cleveland, and DA meets the limitations of claims 1–7, 10, 27, 28, and 34, and that one of ordinary skill in the art would have had reason, with rational underpinning, for combining the teachings of these references. We have considered Patent Owner's arguments to the contrary and determine that they are unpersuasive. The parties do not introduce or rely on objective indicia of nonobviousness. After weighing the evidence, we conclude that Petitioner has shown, by a preponderance of the evidence, that claims 1–7, 10, 27, 28, and 34 would have been obvious over DPC, Chmielewski, Cleveland, and DA.

*C. Obviousness of Claims 8, 9, and 29–33 over DPC, Chmielewski, Cleveland, DA, and Agness*

Petitioner asserts that the combination of the teachings of DPC, Chmielewski, Cleveland, DA, and Agness would have rendered obvious the subject matter of claims 8, 9, and 29–33 to one of ordinary skill in the art at the time of the invention. Pet. 49–56.

*1. Agness*

Agness teaches "an automatic height control system for a crop harvester having a vertically moveable crop-gathering unit." Ex. 1008, 1:12–14. Agness explains that each of its height sensing units includes reed switches 70. *See id.* at 4:31–32. Agness's Figure 3 is reproduced below:




Agness's Figure 3 "is an enlarged side elevational view of a height sensor . . . attached to [a] crop-gathering unit of [a] combine[.]" *Id.* at 2:59–62. Agness teaches:

> Each of the height sensing units includes a short shaft 52 which is pivotally secured in a position directly below the horizontal leg of the right-angle member 44 by a pair of spaced straps 54 . . . . A plurality of reed switches 70 are clamped between the legs of an aluminum switch mounting clip 72 which is bolted to the bottom of the guard 48 . . . . [T]he reed switches 70 are each enclosed in an envelope which protects them from dust, moisture or any other elements which may affect their operation.

*Id.* at 3:59–4:30.

*2. Discussion*

Claims 8 and 9 each depend, directly or indirectly, from independent claim 1. Ex. 1001, 8:8–13. Claims 29–33 each depend, directly or indirectly, from independent claim 27. *Id.* at 10:28–42. Petitioner identifies where the elements of these claims are disclosed by the references, and why such elements would have been obvious to combine to one of ordinary skill in the art at the time of the invention. Pet. 49–56. In particular, Petitioner relies upon Agness for its teaching of switch mounting clip 72, which Agness describes, at least in-part, as an "envelope," that encloses reed switches 70 to protect the switches from elements that may affect their operation. *See, e.g.*, *id.* at 49–50. Petitioner asserts several reasons as to

why one of ordinary skill in the art would have sought to combine the teachings of Agness's switch mounting clip and plate for attaching said clip with the teachings of DPC, DA, Chmielewski, and Cleveland, including "to protect the sensors disclosed in Chmielewski from the dirt, dust, and other debris that may affect the performance of the sensor." *Id.* at 55.

Patent Owner does not raise a separate argument contesting the obviousness of dependent claims 8, 9, and 29–33. *See generally* Resp.

### *3. Conclusion of Obviousness*

We have considered Petitioner's evidence and argument and determine that the proffered combination of DPC, Chmielewski, Cleveland, DA, and Agness meets the limitations of claims 8, 9, and 29–33, and that one of ordinary skill in the art would have had reason, with rational underpinning, for combining the teachings of these references. Specifically, we agree with Petitioner's identification of the factual teachings of the references and reasons as to why one of ordinary skill in the art would have combined the teachings as proposed by Petitioner. Patent Owner has not raised any argument directed to these dependent claims, aside from the arguments directed to claims 1 and 27, which arguments we considered, and rejected as unpersuasive, above. The parties do not introduce or rely on objective indicia of nonobviousness. After weighing the evidence, we conclude that Petitioner has shown, by a preponderance of the evidence, that claims 8, 9, and 29–33 would have been obvious over DPC, Chmielewski, Cleveland, DA, and Agness.

### *D. Obviousness of Claim 11 over DPC, Chmielewski, Cleveland, DA, and McMurtry*

Petitioner asserts that the combination of the teachings of DPC, Chmielewski, Cleveland, DA, and McMurtry would have rendered obvious the subject matter of claim 11 to one of ordinary skill in the art at the time of the invention. Pet. 56–59.

#### *1. McMurtry*

McMurtry teaches "a method of and apparatus for scanning the surface of a workpiece." Ex. 1009, 1:9–10. McMurtry's Figure 15 is reproduced below:

Fig.15.




McMurtry's Figure 15 shows "a further scanning operation with a mechanical stylus in which strain gauges are used on the stylus to determine stylus bending." *Id.* at 6:1–4. McMurtry explains:

> the probe head PH is positioned so that point 28 lies on the axis of the bore 60, and the motors M1 and M2 are driven so as to bring the stylus 26 into contact with the surface of the bore 60. A force $F_D$ is determined as the desired resultant force on the stylus. The torque applied to the stylus by each of the motors M1 and M2, which will move the stylus around the surface of the bore, and will cause a force $F_D$ to act on the stylus, is estimated, and the current fed to the motors are then varied to as to [sic] generate this torque.

*Id.* at 14:12–22.

*2. Discussion*

Claim 11 depends from dependent claim 10, and further recites "wherein said calibration means includes an adjustable mounting arrangement for rotationally displacing said angular deflection sensing means so that said flexible arm engages the soil when in said full down position." Ex. 1001, 8:17–21.

Petitioner identifies where the elements of claim 11 are disclosed by the references or why such elements would have been obvious to one of ordinary skill in the art. Pet. 56–59. In particular, Petitioner asserts that Chmielewski teaches generally "calibration means." *Id.* at 57. Petitioner also relies upon McMurtry as teaching "an adjustable mounting relationship." *Id.* Petitioner asserts that one of ordinary skill in the art would have sought to combine McMurtry's teaching of an adjustable mounting arrangement with Chmielewski's "calibration means," because it "is an obvious design choice for calibration once a mounting bracket is used to couple a height sensor to a crop header." *Id.* at 58 (citing Ex. 1003 ¶ 182). Petitioner contends that "[a] sensing arm calibration means in a workpiece scanning device, as disclosed in McMurtry, would have led to the predictable variation of a sensing arm calibration means in a header height control system." *Id.* at 59 (citing Ex. 1003 ¶ 182).

Patent Owner's Response does not raise any argument directed to dependent claim 11. *See generally* Resp.

*3. Conclusion of Obviousness*

We have considered Petitioner's evidence and argument and determine that the combination of DPC, Chmielewski, Cleveland, DA, and McMurtry meets the limitations of claim 11, and that one of ordinary skill in

the art would have had reason, with rational underpinning, for combining the teachings of these references. Specifically, we agree with Petitioner's identification of the factual teachings of the references and reasons as to why one of ordinary skill in the art would have combined the teachings as proposed by Petitioner. Patent Owner has not raised any argument directed to dependent claim 11, aside from the arguments directed to claim 1, which arguments we considered, and rejected as unpersuasive, above. The parties do not introduce or rely on objective indicia of nonobviousness. After weighing the evidence, we conclude that Petitioner has shown, by a preponderance of the evidence, that claim 11 would have been obvious over DPC, Chmielewski, Cleveland, DA, and McMurtry.

### *E. Patent Owner's Motions to Exclude*

Patent Owner filed two motions to exclude. Patent Owner's first Motion to Exclude Evidence (Paper 14) seeks to exclude from the record the claim charts appended to Mr. Lucas's Declaration. Paper 14, 1. Patent Owner requested, in its Preliminary Response, that we exclude all of Mr. Lucas's claim charts. Prelim. Resp. 15. In our Decision to Institute we discussed Patent Owner's argument and "disregarded the claim charts for the purposes of [the Decision to Institute] to the extent that a position is taken in the claim charts that is not expressly reiterated in the Petition." Dec. 33. Additionally, we stated that "[i]f Patent Owner chooses to object to the claim charts . . . beyond this stage of the proceeding, Patent Owner should proceed in accordance with 37 C.F.R. § 42.64." *Id.* at 34.

37 C.F.R. § 42.64(b)(1) states: "Any objection to evidence submitted during a preliminary proceeding must be filed within ten business days of the institution of the trial." A "preliminary proceeding" "begins with the

filing of a petition for instituting a trial and ends with a written decision as to whether a trial will be instituted." 37 C.F.R. § 42.2.

Petitioner contends that any objection to Mr. Lucas's claim charts was waived because Patent Owner did not file and serve objections within ten business days of the institution of trial. Paper 19, 2–3.

In its Reply in support of its first Motion to Exclude Evidence, Patent Owner asserts that "Gramm did not waive his objection to the claim charts because he objected on the record in his Patent Owner Preliminary Response ("POPR") before the expiration of the period set forth in 37 C.F.R. § 42.64." Paper 21, 1.

The time period set forth in § 42.64(b)(1) is "within ten business days of the institution of the trial." An objection raised in a preliminary response nearly three months prior to the institution of the trial is not "within ten business days of the institution of the trial." Thus, we agree with Petitioner that Patent Owner did not object to Mr. Lucas's claim charts within the time period set forth in § 42.64(b)(1).

The parties raise additional arguments regarding potential prejudice. In particular, Patent Owner asserts, in its Reply in support of its first Motion to Exclude Evidence, that "[t]he Petition does not cite to the claim charts, the paragraphs of the Lucas Declaration cross referencing the claim charts, or the passages from the purported prior art references included solely in the claim charts (Paper 2)." Paper 21, 5.

We have considered the parties' arguments and find that Patent Owner waived any objection to the claim charts submitted with Mr. Lucas's Declaration by not filing such objection "within ten business days of the institution of the trial" in accordance with 37 C.F.R. § 42.64(b)(1).

Accordingly, we deny Patent Owner's first Motion to Exclude Evidence (Paper 14). Nonetheless, the parties do not rely to any great extent, if at all (according to Patent Owner's representation), on Mr. Lucas's claim charts, and, in rendering the factual findings and conclusions of law reached in this Decision, we do not rely on any argument or evidence raised in the claim charts that is not expressly reiterated in the Petition.

Patent Owner's second Motion to Exclude Evidence (Paper 31) seeks to exclude Exhibits 1022, 1023, 1025, and 1026 in their entirety, as well as portions of Exhibit 2014, the deposition transcript of Mr. Lucas. Petitioner opposes Patent Owner's Motion. Paper 36.

The parties agree that none of Exhibits 1022, 1023, 1025, and 1026 is relied upon in the Petition, Patent Owner's Response, or Petitioner's Reply. Paper 31, 1; Paper 36, 5–6; Tr. 78:9–15. Additionally, neither party relies upon the deposition testimony of Exhibit 2014 that is the subject of Patent Owner's second Motion. Paper 36, 11–12. Because neither party relies on the materials in dispute, and because we do not rely on any of those materials in reaching our Decision here, we deny as moot Patent Owner's second Motion to Exclude Evidence (Paper 31).

## IV. CONCLUSION

Petitioner has demonstrated, by a preponderance of the evidence, that: (1) claims 1–7, 10, 27, 28, and 34 would have been obvious over DPC, Chmielewski, Cleveland, and DA; (2) claims 8, 9, and 29–33 would have been obvious over DPC, Chmielewski, Cleveland, DA, and Agness; and (3) claim 11 would have been obvious over DPC, Chmielewski, Cleveland, DA, and McMurtry.

## V. ORDER

For the reasons given, it is:

ORDERED that, based on a preponderance of the evidence, claims 1–11 and 27–34 of U.S. Patent No. 6,202,395 B1 are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude Evidence (Paper 14) is *denied*;

FUTHER ORDERED that Patent Owner's Motion to Exclude Evidence (Paper 31) is *denied* as moot; and

FURTHER ORDERED, because this is a Final Written Decision, the parties to this proceeding seeking judicial review of it must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

Gary M. Ropski
Kelly J. Eberspecher
Manish K. Mehta
Joshua James
Jeffry Nichols
BRINKS GILSON & LIONE
gropski@brinksgilson.com
keberspecher@brinksgilson.com
mmehta@brinksgilson.com
jjames@brinksgilson.com
jnichols@brinksgilson.com

For PATENT OWNER:

Thomas J. Oppold
Glenna L. Gilbert
LARKIN HOFFMAN DALY & LINDGREN LTD.
toppold@larkinhoffman.com
ggilbert@larkinhoffman.com

Trials@uspto.gov
571.272.7822

Paper No. 40
Entered: September 22, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

DEERE & COMPANY,
Petitioner,

v.

RICHARD GRAMM,
Patent Owner.

---

Case IPR2015-00899
Patent 6,202,395 B1

---

Before MICHAEL W. KIM, BART A. GERSTENBLITH, and TIMOTHY J. GOODSON, *Administrative Patent Judges.*

GERSTENBLITH, *Administrative Patent Judge*.

# FINAL WRITTEN DECISION
*35 U.S.C. § 318(a); 37 C.F.R. § 42.73*

## I. INTRODUCTION

### *A. Background*

Deere & Company ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting institution of *inter partes* review of claims 1–34 of U.S. Patent No. 6,202,395 B1 (Ex. 1001, "the '395 patent"). Richard Gramm ("Patent Owner") timely filed a Preliminary Response (Paper 6, "Prelim. Resp.").

Pursuant to 35 U.S.C. § 314, in our Decision to Institute, we instituted this proceeding as to claims 1–11 and 27–34 of the ’395 patent. Paper 7 (“Dec.”).

After the Decision to Institute, Patent Owner filed a Patent Owner Response (Paper 20, “Resp.”), and Petitioner filed a Reply to the Patent Owner Response (Paper 25, “Reply”). A consolidated oral hearing was held on May 17, 2016, in this matter and *Deere & Co. v. Gramm*, IPR2015-00898. Paper 39 (“Tr.”).

Petitioner relies on the testimony of James Lucas (Ex. 1003, “Lucas Declaration”) in support of its contentions. Patent Owner relies on the testimony of named inventor and Patent Owner, Richard D. Gramm (Ex. 20116, “Gramm Declaration”),[1] and Robert A. Matousek (Ex. 2117, “Matousek Declaration”) in support of its contentions.

We have jurisdiction under 35 U.S.C. § 6(b). This Decision is a final written decision under 35 U.S.C. § 318(a) as to the patentability of the challenged claims. We determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–11 and 27–34 of the ’395 patent are unpatentable.

### *B. Related Proceedings*

The parties represent that the ’395 patent is asserted in the United States District Court for the Northern District of Illinois in *Gramm v. Deere & Co.*, No. 3:14-cv-00575. Pet. 1; Paper 5, 1. The ’395 patent is also the subject of a petition for *inter partes* review in IPR2015-00898. Paper 5, 1.

[1] Patent Owner relies upon the Gramm Declaration to discuss the technology background, field of invention, and what led Mr. Gramm to develop the combine header height control disclosed in the ’395 patent. *See* Resp. 2–10.

In that proceeding, we instituted an *inter partes* review of the '395 patent as to the same claims, claims 1–11 and 27–34. *Deere & Co. v. Gramm*, IPR2015-00898 (PTAB Sept. 23, 2015) (Paper 7).

### *C. Real Parties-in-Interest*

The Petition identifies Petitioner, Deere & Company, as the real party-in-interest. Pet. 1. Patent Owner's Mandatory Disclosures identify Patent Owner, Richard Gramm, and Headsight, Inc. as the real parties-in-interest. Paper 5, 1.

### *D. The References*

The references upon which we instituted review consist of the following:

U.S. Patent No. 5,761,893, issued June 9, 1998 ("Lofquist," Ex. 1005);

U.S. Patent No. 5,535,577, issued July 16, 1996 ("Chmielewski," Ex. 1006);

U.S. Patent No. 3,611,286, issued Oct. 5, 1971 ("Cleveland," Ex. 1007);

U.S. Patent No. 3,851,451, issued Dec. 3, 1974 ("Agness," Ex. 1008); and

U.S. Patent No. 5,189,806, issued Mar. 2, 1993 ("McMurtry," Ex. 1009).

### *E. The Asserted Grounds of Unpatentability*

We instituted this proceeding based on the following grounds of unpatentability:[2]

| References | Basis | Claim(s) challenged |
|---|---|---|
| Lofquist, Chmielewski, and Cleveland | § 103(a) | 1–7, 10, 27, 28, and 34 |
| Lofquist, Chmielewski, Cleveland, and Agness | § 103(a) | 8, 9, and 29–33 |
| Lofquist, Chmielewski, Cleveland, and McMurtry | § 103(a) | 11 |

### *F. The '395 Patent*

The '395 patent is directed to an "apparatus for detecting and controlling the height above the soil of an agricultural machine as it traverses a field." Ex. 1001, 1:11–13. In general, a "height sensor provides a control signal to a conventional height controller in [a] combine for controlling header height above the soil to prevent impact damage to the header, while maintaining the header a predetermined height above the soil." *Id.* at 2:18–22. Figure 1 of the '395 patent is shown below:

[2] The arguments and issues raised in this proceeding are very similar to those raised in IPR2015-00898. In particular, in IPR2015-00898, Petitioner relies upon references "DPC" and "DA" as disclosing the elements of the claims for which Petitioner relies upon Lofquist in the context of this proceeding. Aside from this difference in references, and the applicability of the parties' arguments to each, by and large the arguments raised by Patent Owner are nearly identical to those raised in IPR2015-00898. Because these cases have not been consolidated and to avoid the potential for confusion, we address each argument raised by the parties while avoiding or miminizing cross-references to our Final Written Decision in IPR2015-00898.




FIG. 1

Figure 1 of the ’395 patent shows “a simplified combined schematic and block diagram of a combine [10] illustrating the location of the height sensor [14] in the combine header [12].” *Id.* at 2:65–67.

Figure 2 of the ’395 patent is shown below:




FIG. 2

Figure 2 of the ’395 patent shows “a side elevation view shown partially in phantom of a height sensor mounted to a corn head.” *Id.* at 3:1–2.

The ’395 patent provides a general description of the invention as follows:

> The height sensor includes a pre-loaded flexible arm [generally shown by reference numeral 40] attached to a forward end of the head housing [22] . . . . The distal end of the flexible arm is provided with a ball-like member [46] which engages the soil, while the proximal end of the arm is coupled to an angular displacement detector. The detector determines the angular

> displacement of the arm as it is pivotally displaced upon encountering terrain irregularities or an obstacle in the field for providing the height control signal to the combine's height controller. A coil spring [42] in the sensor arm provides the arm with the flexibility necessary to avoid damage or breakage to the sensor upon impact with obstructions during operation or when the combine is reversed in direction. The height sensor is particularly adapted for use with head housings comprised of polyurethane and may be retrofit on existing header assemblies by mounting it to existing structure on the head housing.

*Id.* at 6:65–7:17.

### *G. Illustrative Claims*

Claims 1 and 27 are the independent claims challenged in this proceeding. Independent claims 1 and 27 are illustrative of the claimed subject matter and are reproduced below:

> 1. Apparatus for maintaining a non-cut crop header disposed on a forward portion of a combine a designated height above the soil as the combine traverses a field, said apparatus comprising:
>
> a pre-loaded, generally linear flexible arm coupled to a forward portion of the header and having first and second opposed ends, wherein the first end of said flexible arm engages and is displaced over the soil as the header moves above the soil;
>
> angular deflection sensing means coupled to the second end of said flexible arm for measuring a deflection of said flexible arm when the first end of said flexible arm encounters irregularities in the soil as the header moves above the soil and for providing a first signal representing the extent of deflection of said flexible and [sic]; and
>
> control means coupled to said header and said angular deflection sensing means and responsive to said first signal for raising or lowering the header in accordance with said first signal in maintaining the header a designated height above the soil, wherein said flexible arm and angular deflection sensing means are attached to a head housing disposed on a forward portion of said combine and said head housing is comprised of polyurethane and includes a metal tip and a mounting bracket for

> attaching said metal tip to a forward end of said head housing, and wherein said mounting bracket further couples said flexible arm to a forward end of said head housing.

Ex. 1001, 7:29–56.[3]

> 27. For use on a plastic non-cut crop header housing disposed on a forward portion of a combine used in the harvesting of crops, said header housing have a tip mounted to a forward end thereof by means of a mounting bracket, an arrangement for determining the height of the header housing above the soil as the combine traverses a field, said arrangement comprising:
>
> a rotation sensor disposed in a lower, forward portion of the header;
>
> an elongated, linear shaft having first and second opposed ends, wherein said first end is coupled to said rotation sensor and said second end engages the soil, and wherein said shaft rotationally displaces said rotation sensor as the second end of said shaft engages and passes over irregularities in the soil; and
>
> a flange connecting said rotation sensor to the mounting bracket for mounting said rotation sensor on a lower portion of the forward end of the plastic header housing, wherein said mounting bracket includes a strap and a bracket respectively disposed on lower and upper surfaces of the header housing and connected together by at least one nut and bolt combination.

*Id.* at 10:1–22.

## II. CLAIM CONSTRUCTION

We interpret claims of an unexpired patent using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[]." 37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016). Claim terms are generally given their ordinary and customary meaning as would be understood by a person of

[3] A Certificate of Correction at page 12 of Exhibit 1001 made a change to claim 1, which is reflected in the claim language quoted above.

ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007); *SAS Institute, Inc. v. ComplementSoft, LLC*, 825 F.3d 1341, 1347 (Fed. Cir. 2016) (citation omitted). We apply this standard to the claims of the ’395 patent. *See* Pet. 11 (proposing to construe the claims of the ’395 patent in accordance with the broadest reasonable interpretation standard); Resp. 17–18 (same). Only terms that are in controversy need to be construed, and these need be construed only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng’g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

### *A. Claim Terms*

#### *1. “flexible”*

Claim 1 recites “a pre-loaded, generally linear flexible arm.” Ex. 1001, 7:33. Claim 32, which depends indirectly from claim 27 and directly from claim 30, recites “[t]he arrangement of claim 30 wherein said elongated, linear shaft includes a rigid shaft coupled to a flexible coiled spring.” *Id.* at 10:37–39.

Patent Owner proposes that we construe the term “flexible” to mean “able to bend, deflect, or reverse in direction.” Resp. 21–23. Petitioner proposes that we construe “flexible” to mean “not rigid, made to bend.” Reply 15 n.3.

Petitioner’s challenges rely on Cleveland as teaching a flexible arm or a flexible spring for the claims that recite those features. Petitioner asserts that Cleveland discloses a flexible arm regardless of which construction is adopted, but disagrees with Patent Owner’s construction “because it

improperly includes *rigid* arms that can simply rotate relative to other components." *Id.* at 16 n.3.

We agree with Petitioner that under either party's proposed construction, Cleveland's sensor arm, including spring 38, is flexible. *See infra* pages 42–43 (Section III.B.4.a.ii.b)2.b.). Accordingly, we need not choose between either party's proposed constructions.

*2. Other Claim Terms*

The parties propose constructions for several additional claim terms, including "pre-loaded," "angular deflection sensing means," "control means," "biasing means," "first stop means," "second stop means," "guard means," and "flange." Pet. 11–15; Resp. 18–23. Although the parties have some disagreement as to the meaning of several of these terms, there is no dispute that the references upon which we instituted review disclose these elements of the claims.[4] Accordingly, there is no controversy as to these terms that requires our resolution in order to ascertain whether the claims would have been obvious to one of ordinary skill in the art as of the time of the invention in light of the references and arguments before us.

[4] Counsel for Patent Owner clarified, at the oral argument, that Patent Owner's argument, as it pertains to Cleveland's spring 38, is not "a claim construction issue" (Tr. 48:19–49:5); rather, the issue for Patent Owner is whether Cleveland's spring would function in a height control system (*id.* at 49:5–18). We address Patent Owner's arguments regarding the functionality of the combination *infra*.

# III. ANALYSIS

## *A. Obviousness Overview*

Under 35 U.S.C. § 103(a), an invention is not patentable if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and, (4) where in evidence, so-called secondary considerations, including commercial success, long-felt but unsolved needs, failure of others, and unexpected results. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### *1. Level of Ordinary Skill in the Art*

The parties' proposals for the level of ordinary skill in the art are similar. Petitioner proposes the following:

> (1) a Bachelor of Science degree in engineering, such as mechanical or agricultural engineering, whose course of study would have included mechanical design, mechanical analysis, material selection and properties, and in addition, would have had approximately three years of experience in combine or agricultural equipment design, including components thereof, such as headers and header height control systems; or (2) five or more years of hands-on experience in combine or agricultural equipment design, including components thereof, such as headers and header height control systems.

Pet. 4–5 (citing Ex. 1003 ¶ 17). Patent Owner proposes the following: "(1) a mechanical engineer having familiarity with hydraulic systems and

sensors; or (2) a person having 10 or more years of experience working with combines." Resp. 24 (citing Ex. 2117 ¶ 16). Patent Owner asserts that Petitioner's proposed level of skill exceeds the educational background and experience of Richard Gramm, the named inventor on the '395 patent. *Id.*

During the oral argument, counsel for Patent Owner clarified that, in Patent Owner's proposed second option for the level of ordinary skill in the art, the "experience working with combines" was intended to include working with combines, sensors, and hydraulic systems. Tr. 37:4–20. Patent Owner's counsel explained that Petitioner's inclusion of the term "design" in each of Petitioner's options for the level of ordinary skill would exclude Mr. Gramm and "literally eliminate farmers." *Id.* at 36:11–23. Additionally, during the oral argument, Petitioner's counsel indicated that Patent Owner's ten or more years of experience was "fine." *Id.* at 66:9–10.

The parties' statements of the level of ordinary skill are not significantly different, and the differences between their proposed levels of ordinary skill would not affect the outcome of this proceeding.[5] In light of our review of the record, including the '395 patent, the competing expert testimony, and the issues discussed during the oral argument, we agree with different aspects of the parties' proposals. First, as Petitioner notes in its Reply, a mechanical engineer having familiarity with hydraulic systems and sensors, as Patent Owner proposes, does not have experience necessarily with agricultural equipment or combines. Reply 2, n.1. Thus, Patent Owner's educational prong is overly broad. Second, Petitioner's educational prong, on the other hand, is too narrow, requiring "design" of combines or

[5] Indeed, neither party argues that any difference between the proposed levels of ordinary skill would affect the outcome of this proceeding.

agricultural equipment. Third, we find that Petitioner's experience prong also is too narrow, because it requires experience specifically in the "design" of agricultural equipment or combines. Accordingly, we find that the level of ordinary skill in the art is "a mechanical engineer having familiarity[6] with agricultural equipment, such as combines, and hydraulic systems and sensors" or "a person having 10 or more years of experience[7] working with combines."[8]

### *2. Objective Indicia of Nonobviousness*

Patent Owner's Response does not set forth any objective indicia of nonobviousness, and during oral argument, counsel for Patent Owner explained that it did not rely upon any secondary considerations or objective indicia of nonobviousness. Tr. 35:13–19. Accordingly, there is no argument regarding secondary indicia of nonobviousness before us.

---

[6] The familiarity may have been gained, as proposed by Petitioner, by "approximately three years of experience in combine or agricultural equipment design, including components thereof, such as headers and header height control systems" (Pet. 5 (citation omitted)), but also may have been gained through other experience.

[7] As argued by Patent Owner, we find that a person with 10 or more years of experience working with combines also would have experience working with sensors and hydraulic systems.

[8] As noted in the text *supra*, the difference in the parties' proposed level of ordinary skill in the art does not affect the outcome of the proceeding. Accordingly, even if we were to adopt Patent Owner's proposal as to the level of ordinary skill in the art, we would reach the same findings and conclusions as discussed herein.

*B. Obviousness of Claims 1–7, 10, 27, 28, and 34 over Lofquist, Chmielewski, and Cleveland*

Petitioner asserts that the combination of the teachings of Lofquist, Chmielewski, and Cleveland would have rendered obvious the subject matter of claims 1–7, 10, 27, 28, and 34 to one of ordinary skill in the art at the time of the invention. Pet. 15–49.

*1. Lofquist*

Lofquist is directed to a crop saving attachment for the snouts of combines. Ex. 1005, [54]. Lofquist's Figures 1 and 2 are shown below:







Lofquist's Figure 1 shows "a front perspective view of a combine having a corn header with the crop saving attachment . . . affixed to the outermost

snouts for deflecting down corn stalks inwardly into the snapping rollers of the corn head." *Id.* at 1:42–45. Lofquist's Figure 2 shows "a front fragmentary perspective view of the left corn head snout with the crop saving attachment . . . mounted thereon." *Id.* at 1:46–48. Lofquist explains that the crop saving attachment "is referred to generally in [Figures] 1 and 2 by reference numeral 10 and is shown mounted on the gathering point 12 of the left snout 14 of a corn head 16 of a JOHN DEERE combine 17." *Id.* at 2:7–10. Lofquist teaches that the gathering point includes "a wall made of plastic and has a metal tip 26 secured to it at its forward end." *Id.* at 2:24–25.

Petitioner includes an annotated version of a portion of Lofquist's Figure 8, shown below:




*Fig.8*

Pet. 16. Lofquist's Figure 8 shows "an exploded perspective view of the component parts of FIGS. 3–7 in position for being fastened to the gathering point." Ex. 1005, 1:65–67. Petitioner's annotated version shows which elements correspond to which reference numerals, including gathering

point 12, metal tip 26, bracket 28, plate 30, bolts 32, and nuts 34. Pet. 16. Lofquist teaches:

> metal tip 26 . . . include[s] a bracket 28 which extends under the plastic gathering point wall and is fastened thereto by a plate 30 positioned on top of the gathering point wall and affixed thereto by a pair of bolts 32 which extend through the plate 30, gathering point wall and bracket 28 for engagement with nuts 34.

Ex. 1005, 2:30–35.

*2. Chmielewski*

Chmielewski is directed to "the use of hydraulic control systems for regulating agricultural harvester header position and/or applied force of the header on the ground." Ex. 1006, 1:25–27. Chmielewski's Figure 1A is shown below:




FIG. 1A

Chmielewski's Figure 1A shows a schematic diagram of one embodiment of the invention. *Id.* at 3:59–60.

Chmielewski teaches that automated header control system (AHCS) "216 receives . . . a position signal 236, 237 representing the position of header 202 relative to ground 220." *Id.* at 7:47–51. Chmielewski explains: "Position signal 208 may be provided by a variety of different types of sensors. The position signal may represent the position of the header

relative to the ground, as measured by devices such as contact sensors 236, 237." *Id.* at 7:53–57.

Chmielewski's Figure 10 is shown below:




FIG. 10

Chmielewski's Figure 10 shows a front elevation view of a harvester with header height and lateral tilt functions. *Id.* at 4:16–18.

Chmielewski explains that "[s]ensors 236 and 237 include hoops connected to respective potentiometers 235*a* and 235*b* (shown in FIG. 10). This type of sensor only provides information when contacting the ground . . . ." *Id.* at 35:37–40. Ground tracking sensors 236, 237, located on opposite ends of the headers, sample the height. *Id.* at 35:59–60. A header height function is used to maintain the position of header 202 relative to the average surface of ground 220. *See id.* at 35:54–58.

*3. Cleveland*

Cleveland is directed to "a device for sensing the relative position of a moving vehicle with respect to a furrow in the ground." Ex. 1007, 1:4–6. Cleveland's Figure 1 is shown below:

FIG. I




Cleveland's Figure 1 shows a "rear elevational view of a vehicle having the sensing probe mounted thereon." *Id.* at 2:19–20. Cleveland's Figure 2 is shown below:




FIG. 2

Cleveland's Figure 2 shows "an elevational view of the sensing probe showing the bearing member in section." *Id.* at 2:21–22.

Cleveland teaches:

> sensing probe 14 includes a mounting plate 18 adapted to be mounted rigidly with respect to boom 16. Pivotally mounted on plate 18 is a swing member 20 including a collarlike hub 22, a downwardly extending stub 24 and an upwardly extending swing lever 26, all of which are welded together so that swing member 20 is a rigid member.

*Id.* at 2:44–49. Cleveland explains the following:

> After the farmer has completed one trip across the field, he aligns one probe 14 with the last furrow formed by his first trip across the field. Bearing member 44 is positioned within furrow 78 so that it is in the deepest portion thereof. The probe 14 on the opposite end of implement frame 12 is inoperative at this point, and helical spring 38 of that probe is deflected due to the fact that there is no furrow in which bearing member 44 can ride. . . . One probe 14 will be switched on during the first trip across the field and the other will be switched on during the return trip.

*Id.* at 3:54–66.

Cleveland's Figure 6 is shown below:

FIG.6




Cleveland's Figure 6 shows "a rear elevational view . . . [of] the sensing probe in the bottom of a furrow." *Id.* at 2:27–28. Cleveland teaches that "[i]f vehicle 10 moves to the left from its position shown in FIG. 1, a result

is obtained such as shown in FIG. 6." *Id.* at 4:5–6. Cleveland further explains:

> As vehicle 10 begins moving across the field, sensing probe 14 is aligned so that it is vertically disposed within furrow 78. If vehicle 10 moves laterally with respect to furrow 78, bearing member 44 remains within the deepest portion of furrow 78 as described above. This causes spring 38 and swing lever 26 to swing about hinge bolt 30 so that the longitudinal axes of spring 38 and swing lever 26 are displaced from a vertical position. Swinging of swing lever 26 causes cam shaft 58 to be rotated by means of switch link 62, thereby causing several microswitches 66 to actuate indicator lights 76 on instrument panel 74. Thus the moment that sensing probe 14 moves out of a vertically disposed attitude, the vehicle operator knows immediately from the indicator lights that he has deviated from a parallel path with respect to furrow 78. He is therefore able to take corrective steering measures.

*Id.* at 4:39–54.

#### 4. *Discussion*

Petitioner asserts that the combination of Lofquist, Chmielewski, and Cleveland would have rendered obvious the subject matter of claims 1–7, 10, 27, 28, and 34 of the '395 patent to one of ordinary skill in the art at the time of the invention. Pet. 15–49.

##### a. *Claim 1*

###### i. *"Apparatus for maintaining a non-cut crop header disposed on a forward portion of a combine a designated height above the soil as the combine traverses a field, said apparatus comprising"*

Petitioner contends that Lofquist in combination with Chmielewski meets the preamble of claim 1. Pet. 16. Petitioner begins with the non-cut crop header of Lofquist (gatherpoint point 12), which Petitioner contends is

"disposed on a forward portion of a combine." *Id.* (citing Ex. 1003 ¶ 43; Ex. 1005, 2:7–10, Fig. 1). Petitioner asserts:

> The gathering point "has a metal tip 26 secured to it at its forward end." . . . [which] include[s] a bracket 28 which extends under the plastic gathering point wall and is fastened thereto by a plate 30 positioned on top of the gathering point wall and affixed thereto by a pair of bolts 32 which extend through plate 30, gathering point wall and bracket 28 for engagement with nuts 34.

*Id.* (quoting Ex. 1003 ¶ 43 and Ex. 1005, 2:30–35) (citing Ex. 1005, Fig. 8 (version shown above with Petitioner's annotations added)).

Petitioner argues that Chmielewski "discloses an apparatus for maintaining a cut crop header disposed on a forward portion of a combine at a designated height above the soil as the combine traverses a field." *Id.* (citing Ex. 1006, 1:24–26; Ex. 1003 ¶ 44). Petitioner explains that Chmielewski's header height system "generally includes left and right ground contact sensors 236 and 237, potentiometers 235a and 235b, and an . . . ('AHCS') 216." *Id.* at 17 (citing Ex. 1006, 12:22–33, Figs. 1A, 1B, 10; Ex. 1003 ¶ 44).

Additionally, Petitioner asserts it would have been obvious to one of ordinary skill in the art to modify Lofquist's header with the automated header height system of Chmielewski for several reasons. *Id.* at 42. First, Petitioner contends that one of ordinary skill in the art would have recognized the importance of controlling the height of a header for the benefit of avoiding damage caused by uneven ground and would have been

motivated to automate the process. *Id.* (citing Ex. 1003 ¶ 130)).[9] Second, Petitioner asserts that "[t]he incorporation of the automated header height system of Chmielewski with . . . Lofquist's header is mechanical in nature and would have been accomplished according to known methods to yield the predictable result of determining and adjusting the height of a non-cut crop header." *Id.* at 43 (citing Ex. 1003 ¶ 132). Petitioner explains that it would have been within the "technical grasp" of a person of ordinary skill "to modify Chmielewski's automated header height system to fit with . . . Lofquist's header and a conventional combine." *Id.* at 44 (citing Ex. 1003 ¶ 133). In so doing, Petitioner further explains that one of ordinary skill

> would have been motivated to utilize the existing hardware found on Lofquist['s] header when attaching the potentiometers 235a and 235b of left and right ground contact sensors 236 and 237 of Chmielewski to avoid forming additional holes, which would have been understood to have an adverse effect on the structural integrity of the header housing.

*Id.* (citing Ex. 1003 ¶ 134; Ex. 1001, 4:23–30; Ex. 1005, 1:21–22). Further, Petitioner asserts that "adding other attachment fasteners would make the . . . header . . . more bulky and heavier, . . . le[ading] to undesirable performance characteristics." *Id.* (citing Ex. 1003 ¶ 134). Finally, Petitioner contends that Lofquist's preexisting hardware is "located at a forward portion of the header housing, which would have allowed for mounting the sensor on a

---

[9] Petitioner explains that even the background of the invention section of the '395 patent "recognizes that at the time of the alleged invention '[t]here [were] various approaches to maintaining the header [at] a predetermined height above the soil.'" Pet. 42 (quoting Ex. 1001, 1:40–41) (citing Ex. 1003 ¶ 130) (alterations added by Petitioner).

forward portion of the header to allow for an early detection of the distance between the header and the ground." *Id.* at 44–45 (citing Ex. 1003 ¶ 135).

Patent Owner raises several arguments with respect to the preamble of claim 1 and Petitioner's reliance upon the combination of Lofquist and Chmielewski. First, Patent Owner contends that the preamble is limiting, *inter alia*, because it recites "a non-cut crop head[er]" and "a combine" and the body of claim 1 refers back to those elements by reciting "said header" and "said combine." Resp. 32. Patent Owner relatedly contends that the patentee amended the claim to include the non-cut crop header language to distinguish the claims from Chmielewski. *Id.* (citing Ex. 1002, 142). Second, Patent Owner asserts that the preamble requires two elements, neither of which is disclosed by the combination of Lofquist and Chmielewski: "(1) a non-cut crop head and (2) maintaining the non-cut crop head a designated height above the ground." *Id.* Patent Owner asserts that "Chmielewski is specifically directed to a height control system for a cut crop and **not** a non-cut crop head" and "therefore does not disclose a non-cut crop head or maintaining such a head a designated height above the ground." *Id.* at 32–33. Patent Owner contends that "[w]hile . . . [Lofquist] does disclose a non-cut crop head, it does not disclose anything regarding maintaining the head a designated height above the ground." *Id.* at 33 (citing Ex. 2117 ¶ 33).

In the Reply, Petitioner contends that the preamble of claim 1[10] is not limiting and that the "non-cut crop header" language is an intended use, not a claim limitation. Reply 2. Petitioner contends that the use of the term

[10] Petitioner also contends that the preamble of claim 27 is not limiting. Reply 2.

"for" in the preamble phrase "apparatus for maintaining" confirms that the preambles are an intended use. *Id.* at 2–3. Petitioner also relies upon the prosecution history of the '395 patent, noting that the examiner found that the intended use is for a non-cut crop header and that the "crop header is not []part of the claimed invention." Reply 3 (quoting Ex. 1002, 153) (emphasis omitted) (alteration added by Petitioner). Additionally, Petitioner asserts that even if the preamble is limiting with respect to the two elements argued by Patent Owner above, the combination of Lofquist and Chmielewski teaches each of the elements. *Id.* at 4.

We first address the question of whether any elements recited in the preamble of claim 1 are limiting. Second, even if the preamble is limiting, we determine that Petitioner has shown that the combination of Lofquist and Chmielewski meets each of the elements recited in the preamble.

*a) Whether and to What Extent the Preamble of Claim 1 Is Limiting*

"In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mkt'g Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)). "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" *Id.* (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)). "[C]lear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to

define, in part, the claimed invention." *Id.* at 808–09 (citing *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001)). If a phrase in the preamble provides necessary structure for a claim, that "does not necessarily convert the entire preamble into a limitation, particularly one that only states the intended use of the invention." *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015).

There is no dispute that the invention at issue in the '395 patent is not a "header" or a "combine" per se; rather, it is a header height control apparatus—an "apparatus for detecting and controlling the height above the soil of an agricultural machine as it traverses a field." Ex. 1001, 1:11–13. Nonetheless, there is no prohibition on a patentee drafting his or her claim in a manner that further limits the invention if additional structure is recited in the claim. As argued by Patent Owner, the recitation of "a non-cut crop header" and "a combine" in the preamble of claim 1, provide antecedent basis for at least two terms recited in the body of the claim—"the header" and "said combine." The body of the claim reflects that the patentee chose to claim the header control apparatus in terms not limited to said apparatus standing alone, but rather the apparatus as attached (coupled) to the header of a combine. *See, e.g.*, Ex. 1001, 7:33–34 ("a pre-loaded, generally linear flexible arm *coupled to a forward portion of the header*" (emphasis added)); 7:44–45 ("control means *coupled to said header*" (emphasis added)); 7:48–51 ("wherein said flexible arm and angular deflection sensing means *are attached to a head housing* disposed on a forward portion of *said combine*" (emphases added)); 7:54–56 ("wherein said mounting bracket *further couples said flexible arm to a forward end of said head housing*" (emphasis added)).

The prosecution history reflects that the patentee at first desired the recitation of "header" in the claim to be limited to "non-cut crop" headers, in an attempt to distinguish cut crop headers. Ex. 1002, 142 (Amendment filed June 19, 2000). The examiner, however, did not accept such argument (*id.* at 152–53 (Office Action mailed Aug. 24, 2000)), and the patentee did not reiterate or maintain the argument in amending the claims following the August 24, 2000, final rejection. *Id.* at 158–63 (Amendment filed Nov. 22, 2000). Nonetheless, the prosecution history is informative on this issue.

In light of our discussion above regarding the claim language, specification, and the prosecution history, we do not construe the entire preamble as limiting. In particular, the preamble recites an apparatus *for* maintaining, and is presented clearly as reciting an intended use. That being said, we agree with the Patent Owner that the phrase "non-cut crop header" limits the terms "the header" and "said header" recited in the body of claim 1 such that "the header" and "said header" recited in the body of claim 1 are the same "non-cut crop header" recited in the preamble of the claim.[11]

[11] It is slightly less clear as to whether a combine is, in fact, a required element of claim 1. In particular, the claim body recites "wherein said flexible arm and angular deflection sensing means are attached to a head housing disposed on a forward portion of said combine," which suggests a combine is recited as a structural element of the claim. Even assuming a combine is a required element, we find that Lofquist and Chmielewski each disclose a combine. Ex. 1005, 2:7–10 ("The crop saving attachment of this invention is referred to generally in FIGS. 1 and 2 by reference numeral 10 and is shown mounted on the gathering point 12 of the left snout 14 of a corn head 16 on a JOHN DEERE combine 17."); Ex. 1006, 4:60–61 ("An agricultural harvester 200 is shown, which may be a combine . . . .").

*b) The Combination of Lofquist and Chmielewski Meets the Elements of the Preamble*

In a somewhat ironic manner, given the arguments regarding the preamble of claim 1 discussed above, Petitioner's challenge to claim 1 begins with a discussion of the preamble and identification of where the language of the preamble is disclosed or would have been obvious in light of the combination of the teachings of Lofquist and Chmielewski. Pet. 15–17. In particular, Petitioner argues (Pet. 15), and we find, that Lofquist teaches a non-cut crop header as recited in claim 1. Ex. 1005, 2:7–10, Fig. 1. Additionally, Petitioner argues (Pet. 16), and we find, that Chmielewski teaches maintaining a header a designated height above the ground. Ex. 1006, 1:24–26, 12:22–33, Abstract, Figs. 1A, 1B, 10.

Although Patent Owner asserts that "[t]he combination of Lofquist and Chmielewski does not disclose" "(1) a non-cut crop head and (2) maintaining the non-cut crop head a designated height above the ground," Patent Owner acknowledges that Chmielewski "is specifically directed to a height control system for a cut crop . . . head" and that Lofquist "does disclose a non-cut crop head." *Compare* Resp. 32 *with id.* at 32–33. Patent Owner's argument regarding the preamble of claim 1 is that Lofquist "does not disclose anything regarding maintaining the head a designated height above the ground" (*id.* at 33) and, because Chmielewski discloses "height control system for a cut crop . . . head" (*id.* at 32), "the combination of Lofquist and Chmielewski does not satisfy the requirements of the preamble of claim 1" (*id.* at 33 (citing Ex. 2117 ¶ 33)).

Patent Owner's position that "[t]he combination of Lofquist and Chmielewski does not meet the preamble of claim 1" (Resp. 32 (emphasis

omitted)) is based entirely on arguing the references' teachings individually rather than as combined by Petitioner, and, thus, does not assist in our consideration of whether the combination of Lofquist and Chmielewski discloses a non-cut crop header and a header height control system. In other words, it is inapposite that Chmielewski fails to disclose a non-cut crop header because Petitioner relies upon Lofquist for that disclosure. *See In re Keller*, 642 F.2d 413, 426 (CCPA 1981) ("one cannot show non-obviousness by attacking references individually" where the claims are challenged based on combinations of references); *In re Young*, 927 F.2d 588, 591 (Fed. Cir. 1991) ("The test for obviousness is what the combined teachings of the references would have suggested to one of ordinary skill in the art."). Similarly, it is inapposite that Lofquist fails to disclose a system for maintaining the header a designated height above the ground because Petitioner relies upon Chmielewski for that disclosure. Accordingly, we find that the teachings of Lofquist and Chmielewski, collectively, satisfy the claim limitations of a non-cut crop header disposed on a forward potion of a combine and an automated system for maintaining a header a designated height above the soil as the combine traverses a field.

*c) Reason to Combine*

Petitioner contends that it would have been obvious to combine the elements of the height control system of Chmielewski with the header disclosed by Lofquist for the reasons explained above. *See supra* pages 20–21 (Section III.B.4.a.i.).

Patent Owner raises several arguments challenging Petitioner's arguments and evidence. We address each in turn. First, Patent Owner contends that one of ordinary skill in the art "would not be motivated to

combine sensors from Chmielewski with the tip of the divider disclosed in Lofquist because the heads described in these references are substantially dissimilar in structure and function." Resp. 52–53. Patent Owner asserts that because of the structural and functional differences between the two types of headers, "height sensors are placed in a difference [sic] location for cut crops than where they must be positioned for non-cut crops." *Id.* at 54 (citing Ex. 2117 ¶ 65). Specifically, for cut crop headers, height sensors are positioned behind the cutting bar, whereas height sensors are positioned on the dividers of non-cut crop headers to prevent damage to the dividers during use. *Id.* at 54 (citing Ex. 2117 ¶ 65). Ultimately, Patent Owner argues that because Chmielewski does not disclose *how* the sensors are mounted to the header and because of the structural and functional differences between the header types, "Chmielewski would not suggest to a [person of ordinary skill in the art] a finite number of predictable solutions that would result in anticipated success for adapting the cut crop height sensor of Chmielewski to a height sensor for a non-cut crop head." *Id.* at 55 (citing Ex. 2117 ¶ 69). Patent Owner asserts that "Chmielewski certainly would not suggest to a [person of ordinary skill in the art] a finite number of predictable solutions with a reasonable expectation of success for mounting the height sensor to the forward tip of a cut crop head." *Id.* (citing Ex. 2117 ¶ 69).

Patent Owner's argument is based on an incorrect interpretation of the United States Supreme Court's decision in *KSR*. *See* Reply 11. In Patent Owner's presentation of the law pertaining to obviousness, Patent Owner states: "Moreover, an obviousness finding under *KSR* ***requires*** that there be a 'finite number' of solutions yielding predictable results, *i.e.* that there is

only a small or easily traversed number of options in the context of the art for resolving the issue." Resp. 28–29 (citing *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008) (emphasis added)). Patent Owner's argument above reflects the position that if there is not a finite number of predictable solutions, then a combination is not obvious. The Supreme Court's statement regarding a finite number of identified, predictable solutions, discussed further in *Ortho-McNeil*, pertains to *one* way in which to show obviousness, and that discussion was tied specifically to whether something that is "obvious to try" could ever be "obvious under § 103."[12] *KSR*, 550 U.S. at 421. *KSR*, however, is not limited to only this *one* way in which to show obviousness. The Court specifically addressed several of its past decisions and drew, from those cases, a variety of principles that are instructive in considering whether a patent claiming a combination of elements is obvious. Moreover, the test for obviousness is not limited to those examples. Rather, what we look for in light of *KSR* is whether "there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *Id.* at 418. In so doing, we review the arguments offered by Petitioner to determine whether Petitioner has "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Id.* (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). To that end, we determine that Petitioner has provided above sufficient articulated reasoning with rational underpinning

---

[12] Petitioner's position is not based on whether the proposed combination would have been obvious to try. *See* Reply 11 (noting that Petitioner's "articulated rationales regarding obviousness here go well beyond just 'obvious to try'").

supporting the legal conclusion of obviousness with respect to the preamble of independent claim 1.

Second, Patent Owner argues that even though cut crop height sensors were introduced in the early 1980s, and corn heads with metal dividers were available long before that, no corn head was commercially sold with a height sensor prior to 1999. Resp. 55 (citing Ex. 2117 ¶ 70–71). In other words, Patent Owner asserts that "[h]ad it been obvious to combine the height sensor of a cut crop head with a non-cut crop head, surely someone would have done so in the many years the height sensors and corn heads were available. Yet, no one did so." *Id.* at 56.

Although Patent Owner's argument regarding passage of time is more apropos to arguing an objective indicia of nonobviousness, and Patent Owner conceded during oral argument that there were no secondary considerations of nonobviousness presented in this case, we note that "absent a showing of long-felt need or the failure of others, the mere passage of time without the claimed invention is not evidence of nonobviousness." *In re Kahn*, 441 F.3d at 990. Further, even if the mere passage of time alone were reflective of long felt need, Patent Owner has not argued or put forth evidence to show that the claimed invention met such need.

Third, Patent Owner contends that Petitioner impermissibly uses hindsight to presume that a person of ordinary skill in the art could easily "create a sensor small enough to fit into the small trapezoidal area at the tip of a corn head and yet one that is sufficiently strong to withstand the abuse it would encounter during harvesting." Resp. 56 (citing Ex. 2117 ¶¶ 73–74). Patent Owner asserts that one of ordinary skill in the art "would have failed

in his or her attempts to design" such a sensor. *Id.* at 57 (citing Ex. 2117 ¶ 74).

Petitioner responds to Patent Owner's arguments regarding size and robustness in its Reply, contending that "claims 1 and 27 nowhere require any particular level of 'robustness' or 'size.'" Reply 14. Petitioner asserts that Mr. Gramm acknowledged during his deposition that the combination of Chmielewski and Lofquist would work for "*perhaps a week*," confirming that it would work, even if not very well. *Id.* at 14 (quoting Ex. 1021, 212:12–213:3). Petitioner also contends that it is within the level of ordinary skill in the art to size the components to fit a non-cut crop header as disclosed by Lofquist. *Id.* at 15.

We agree with Petitioner that claim 1 does not place explicit size or robustness limitations on the header height control system that Petitioner relies upon from Chmielewski. Further, we are persuaded by Petitioner's argument and evidence, and are persuaded, in particular, that modifying Chmielewski's header height control system to fit Lofquist's header is within the ordinary level of skill as defined above. *See KSR*, 550 U.S. at 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton); *see also* Ex. 1003 ¶¶ 132–134. In any case, "[i]t is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements." *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012).

Fourth, Patent Owner asserts that Petitioner's argument—that mounting a sensor in other places on a header by forming additional holes would have an adverse effect on the structural integrity of the header—is not

supported by the evidence presented and that there are other location options for mounting. Resp. 58–59.

We agree with Patent Owner that it is possible to mount a height control sensor to other areas of the header. Nonetheless, we are persuaded by Petitioner's argument and evidence showing that one of ordinary skill in the art would have considered, and found it attractive, to mount such sensor to the header's existing hardware, in a forward location on the header. That there may be other options for such mounting does not undermine our conclusion that it would have been obvious to mount to the existing hardware. We also are persuaded by Petitioner's argument that the existing hardware is located in a forward portion of the header and, thus, that one of ordinary skill would have mounted the height control sensor thereon because it provides an advantage for mounting in that it allows for early detection of the header height above the soil. Pet. 44–45 (citing Ex. 1003 ¶ 135).

*d) Summary*

In the context of the evidence and arguments before us, we conclude that Petitioner has set forth several reasons with rational underpinning to support the legal conclusion that it would have been obvious to one of ordinary skill in the art to combine Chmielewski's teachings of a header height control system on a combine with Lofquist's teaching of a non-cut crop header, to meet the preamble of independent claim 1. In other words, we are persuaded that one of ordinary skill in the art would have recognized the benefits of a header height control system as employed on a cut crop header of a combine, as taught by Chmielewski, and would have been prompted to apply such a header height control system to a non-cut crop header of a combine, as taught by Lofquist. Even though we agree with

Patent Owner that there are structural and functional differences between the two types of headers, the benefit of controlling either header's height above the soil when traversing a field is the same—protecting the header from damage caused by obstacles if the header is too low. *See supra* pages 20–21 (Section III.B.4.a.i.) (Petitioner's discussion of why one of ordinary skill in the art would have combined these elements of Lofquist and Chmielewski in this manner). Further, we find that it was well within the level of ordinary skill in the art to size a header height control system as disclosed by Chmielewski to fit the header and existing hardware of Lofquist at the time of the invention. Thus, on balance, Petitioner's evidence persuades us that it would have been obvious to one of ordinary skill in the art to combine Chmielewski's header height control system with the non-cut crop header of Lofquist to meet the preamble of independent claim 1.

*ii.* *"a pre-loaded, generally linear flexible arm coupled to a forward portion of the header and having first and second opposed ends, wherein the first end of said flexible arm engages and is displaced over the soil as the header moves above the soil"*

*a)* *Claim Limitations*

Petitioner contends that Chmielewski in combination with Cleveland meets the above-quoted limitation of claim 1. Pet. 17–19. In particular, Petitioner asserts that Cleveland discloses "a pre-loaded, generally linear arm that is flexible and having first and second opposed ends, wherein the first end of said flexible arm engages and is displaced over the soil as the header moves above the soil." *Id.* at 18. Petitioner relies upon Cleveland's "swing member 20, collarlike hub 22, stub 24, helical spring 38, and bearing member 44." *Id.* (citing Ex. 1003 ¶ 48; Ex. 1007). Petitioner asserts that the

"first end engages the soil, and the second end, which is opposed to the first end, is coupled to a sensor." *Id.* at 18 (citing Ex. 1007, 4:39–54; Ex. 1003 ¶ 48).

Petitioner contends that it would have been obvious to one of ordinary skill in the art at the time of the invention to "replace each of the contact sensors 236, 237 of Chmielewski with the sensor arm ["swing member 20, collarlike hub 22, stub 24, helical spring 38, and bearing member 44" (*id.* at 45)] of Cleveland." *Id.* at 18–19. Petitioner asserts that such replacement "would have amounted to nothing more than a simple substitution of one known element for another." *Id.* at 45 (citing Ex. 1003 ¶ 136). Petitioner contends that one of ordinary skill in the art would have understood that such replacement would predictably result in "improved flexibility, due to the helical spring, yet would have still been sufficiently rigid so as to allow for the accurate measurement of the header height" and have appreciated "the benefits of improved flexibility . . . for traversing over foreign objects without breaking or being damaged." *Id.* (citing Ex. 1003 ¶ 136).

Additionally, Petitioner argues that it would have been obvious to:

> utilize the hinge bolt 30 and nut 36 disclosed in Cleveland (Ex. 1007, 2:46–55) to attach the potentiometers 235a and 235b of Chmielewski to the swing member 20 of Cleveland such that the hinge bolt 30 extends through the potentiometers 235a and 235b, extends through an aperture formed within the mounting bracket 18, and is attached thereto by way of a nut 36.

Pet. 45–46 (citing Ex. 1003 ¶ 137). Petitioner contends that "[i]t would have been obvious to have the hinge bolt 30 and nut 36 disclosed in Cleveland secure the potentiometers 235a and 235b of Chmielewski so that the potentiometers could read the movement of Cleveland's swing member 20."

*Id.* at 46 (citing Ex. 1003 ¶ 137). Petitioner asserts that "[t]his connection is mechanical in nature and would have been accomplished according to known methods to yield the predictable result of sensing the angular deflection of an arm" and "within the technical grasp of a [person of ordinary skill in the art] to modify the potentiometers of Chmielewski to fit with the sensor arm of Cleveland." *Id.* (citing Ex. 1003 ¶¶ 137–38).

Patent Owner asserts that the above-recited limitation of claim 1 "refers to the arm being coupled to 'the header' which, referring to the antecedent basis, is the 'non-cut crop' head recited in the preamble." Resp. 34 (citing Ex. 2117 ¶ 39). Patent Owner contends that "Chmielewski does not meet the requirement that the arm be coupled to the non-cut crop head because, as noted above, Chmielewski does not disclose a non-cut crop head." *Id.* (citing Ex. 2117 ¶ 39). Patent Owner asserts that "Cleveland does not remedy the defect in Chmielewski because the Cleveland apparatus has nothing to do with a combine or any kind of head, non-cut or otherwise. The assembly in Cleveland is, thus, not coupled to a non-cut crop head." *Id.* (citing Ex. 2117 ¶ 39).

Patent Owner's above assertion is unpersuasive because Patent Owner, again, argues the references individually, failing to account for the fact that Petitioner relies on Lofquist as disclosing a non-cut crop header, not Chmielewski or Cleveland. This is essentially the same argument that we rejected in the context of considering Patent Owner's argument directed to the preamble of claim 1. Thus, even though we agree with Patent Owner that the recitation of "the header" in this limitation of claim 1 refers back to the non-cut crop header recited in the preamble, Patent Owner's argument

fails to respond to the combination proposed by Petitioner, which relies on Lofquist as disclosing such a header.

Additionally, Patent Owner asserts that "the arm assembly of Cleveland does not meet the requirement that 'the first end of said flexible arm engages and is displaced over the soil as the header moves above the soil.'" Resp. 34 (citing Ex. 2117 ¶ 40). Specifically, Patent Owner contends that the Cleveland apparatus "detects the lateral position of the probe and therefore is not 'displaced over the soil as the header moves above the soil.'" *Id.* (citing Ex. 2117 ¶ 40; Ex. 1007, 1:61–66, 5:17–21). Thus, Patent Owner contends that the combination of Chmielewski and Cleveland does not "meet the requirement of a flexible arm coupled to a non-cut crop header." *Id.* at 35.

In its Reply, Petitioner asserts that "Cleveland's FIGS. 6 and 7 illustrate that the arm is 'displaced over the soil' during use, regardless of whether the arm is used to detect lateral movement or some other movement." Reply 5 (citing Ex. 1007, Figs. 6–7; Pet. 17–19).

We agree with Patent Owner that Cleveland detects the lateral position of the probe, but we find that, as presented by Petitioner, Cleveland's probe is displaced over the soil during use because it is displaced (or moved out of position) over the soil during use.[13] Pet. 18;

[13] Neither party proposed a construction for the term "displaced" either before or after our Decision to Institute and we did not expressly construe the term in that Decision. We understood implicitly that Petitioner's argument and evidence relied upon the plain and ordinary meaning of "displaced" and Patent Owner agreed generally that claim terms are given their ordinary and customary meaning unless inconsistent with the specification. Resp. 17–18. The '395 patent's use of the term "displaced" (as well as the noun form—"displacement") is consistent with the term's

*see, e.g.*, Ex. 1007, 4:5–13 ("If vehicle 10 moves to the left from its position shown in FIG. 1, a result is obtained such as shown in FIG. 6. As the vehicle begins to move to the left, bearing member 44 begins to ride up on the slanted surface of furrow 78. Spring 38 exerts a downward force on bearing member 44, but the slanted side of furrow 78 causes this downward force to have a lateral component in the direction of the deepest portion of the furrow. *This lateral force causes bearing member 44 to roll towards the deepest portion of the furrow* . . . ." (emphasis added)).

In light of the evidence presented by Petitioner, we find that Cleveland discloses "a pre-loaded, generally linear flexible arm . . . having first and second opposed ends, wherein the first end of said flexible arm

---

plain and ordinary meaning of "moved out of position." *See* Ex. 3001, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (2011) *retrieved from* http://search.credoreference.com/content/entry/hmdictenglang/displace/0 (last visited Aug. 31, 2016) (defining "displace" as "[t]o move, shift, or force from the usual place or position") (Although this dictionary is dated after the '395 patent's priority date, there is no indication that the meaning of "displaced" changed during that time period.). For example, the '395 patent discloses an "angular displacement detector" that "detects angular displacement of the arm as it is pivotally *displaced* upon encountering terrain irregularities and obstacles in the soil." Ex. 1001, 2:27–30 (emphasis added); *see also id.* at 6:45–49 ("Because coiled spring 114 provides this protection for the sensor arm 96 in the event the combine is *displaced* rearwardly, elongated, linear coiled spring 98 is unnecessary in the embodiment shown in FIGS. 7 and 8 to provide this protection against damage to the sensor arm 96." (emphasis added)). Our additional explanation here does not "change theories in midstream;" rather, it explains our understanding of the term as applied in our Decision to Institute. *See SAS Institute*, 825 F.3d at 1351 ("What concerns us is not that the Board adopted a construction in its final written decision, as the Board is free to do, but that the Board 'change[d] theories in midstream.'" (quoting *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015)).

engages and is displaced over the soil as the . . . [vehicle] moves above the soil." With respect to the arm being "coupled to a forward portion of the header" and a "header mov[ing] above the soil," we are persuaded that the combination of Lofquist[14] and Chmielewski, as modified by the addition of Cleveland's teachings, meets these elements of claim 1, as explained by Petitioner.

*b) Reason to Combine*

Petitioner's arguments and evidence as to why one of ordinary skill in the art would have been prompted to combine the teachings of Lofquist, Chmielewski, and Cleveland to meet the aforementioned limitation concerning "pre-loaded, generally linear flexible arm" are discussed above. *See supra* pages 33–34 (Section III.B.4.a.ii.a)). Patent Owner raises several arguments as to why one of ordinary skill in the art would not have been prompted to combine the teachings of Chmielewski and Cleveland as proposed by Petitioner. Resp. 40–52. We address each in turn.

*1. Application of KSR*

First, Patent Owner again argues that obviousness is limited to situations where elements can *only* be combined in a finite number of ways with a reasonable expectation of success. *Id.* at 40–41. Patent Owner contends that Petitioner "has provided no argument or evidence that there were only a finite number of ways to devise a height sensor for a plastic corn head and that the combination of the Cleveland probe with Chmielewski was one such solution." *Id.* at 51–52. Rather, Patent Owner contends that

[14] Notably, the location proposed by Petitioner for mounting the sensor to Lofquist is "a forward portion of the header." Pet. 16 (showing Petitioner's annotated version of Lofquist's Figure 8).

Petitioner's expert, Mr. Lucas, testified that there are "many different ways" to attach the Cleveland arm to Chmielewski. *Id.* at 52 (citing Ex. 2115, 118–19). Thus, Patent Owner asserts that "[w]hen possible solutions are not limited to a small number in light of the art, a finding of obviousness is improper." *Id.* (citing *Ortho-McNeil*, 520 F.3d at 1364; *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1339 (Fed. Cir. 2010)).

We previously addressed Patent Owner's misinterpretation of *KSR* as applied to the evidence and arguments raised by Petitioner in the context of this case.[15] In short, Petitioner does not rely upon an "obvious to try" rationale as discussed in *KSR*, and for the additional reasons explained above, *supra* pages 28–29 (Section III.B.4.a.i.c), Patent Owner's interpretation and application of *KSR* is not persuasive.

*2. Operability*

Second, Patent Owner contends that one of ordinary skill in the art would not have had a reasonable expectation of success in combining the teachings of the references because

> the Cleveland probe 14 combined with the Chmielewski potentiometers 236, 237 could not function as 'a preloaded, generally linear flexible arm' (claim 1) or 'an elongated, linear shaft' (claim 27) coupled to a rotation sensor and mounted at the tip of a corn head crop divider using the existing hardware.

Resp. 41. Specifically, Patent Owner contends that such combination would not be operable. Patent Owner provides four reasons as to why such combination would be inoperable.

[15] As with *Ortho-McNeil*, *Rolls-Royce* addresses an argument based on an "obvious to try" rationale. *Rolls-Royce*, 603 F.3d at 1339.

*a. Cleveland as a Height Sensor*

Patent Owner contends that

> Cleveland is incapable of functioning as a vertical height sensor with respect to the direction of travel 80 because the hub 22 (to which the stub 24 and spring 38 are rigidly connected) can only pivot around the axis of bolt 30 and cannot pivot perpendicularly to the axis which it would need to do to indicate vertical position.

*Id.* at 43.

In its Reply, Petitioner agrees with Patent Owner that Cleveland's flexible arm rotates perpendicularly to the direction of travel, and that it "would need to rotate parallel to the direction of travel when combined with Lofquist/Chmielewski." Reply 9 (citation omitted). Nonetheless, Petitioner contends that this modification is "inconsequential" because it is within the level of skill possessed by one of ordinary skill in the art.[16] *Id.*

The Matousek Declaration, submitted by Patent Owner, reflects that rotating the probe assembly of Cleveland 90 degrees such that the arm rotates parallel to the direction of travel would have been well within the level of ordinary skill in the art at the time of the invention. In particular,

---

[16] Patent Owner asserts that we should not consider Petitioner's position with respect to rotating the probe assembly of Cleveland because such position should have been set forth in the Petition rather than Petitioner's Reply. Paper 33 (challenging portions of pages 9 and 10 of Petitioner's Reply). Petitioner contends that its argument responds to the position set forth in Patent Owner's Response and Mr. Matousek's Declaration. Paper 37. We discuss Patent Owner's position and Mr. Matousek's Declaration, in particular the same paragraph of which Patent Owner relies upon in its Response, *infra*. In short, Patent Owner and Mr. Matousek raised a possible concern with the combination and proposed a simple solution that we determine would have been obvious to one of ordinary level of skill in the art at the time of the invention.

paragraph 81 of the Matousek Declaration explains, in detail, precisely how such modification would be accomplished. While Mr. Matousek's level of skill is above the level of ordinary skill in the art (*see* Ex. 2117 ¶¶ 4–11 (discussing Mr. Matousek's education and experience)), we determine that the modification he proposes is not.[17] It is of little import that it was Patent Owner's Declarant, and not Petitioner's, who put forth this evidence, showing how a simple modification could be made when combining the teachings of Cleveland and Chmielewski, into the record. Once Patent Owner put the evidence into the record, Petitioner was justified in relying upon it, as are we in reaching our Decision here.[18] Thus, based on Mr. Matousek's testimony, we determine that it was a simple adjustment that was within the ordinary level of skill in the art and would have been recognized as such and performed by one of ordinary skill in the art, at the

---

[17] Neither Patent Owner nor Mr. Matousek asserts that the modification he proposes is beyond the level of ordinary skill in the art at the time of the invention.

[18] Patent Owner argues that Petitioner improperly relies upon such modification in its Reply without presenting the position in its Petition or accompanying expert declaration. Paper 33. We disagree. Petitioner's argument was properly made in response to Mr. Matousek's testimony, as discussed above, and Patent Owner's argument based thereon, explaining a simple modification to rotate the probe assembly of Cleveland 90 degrees such that the arm rotates parallel to the direction of travel when combined with the teachings of Chmielewski.

time of the invention, to detect changes in elevation in the direction of a vehicle's movement.[19]

#### *b. Cleveland's Ability to Bend*

Next, Patent Owner contends that because Cleveland is designed to bend, it cannot function as a height sensing arm. Resp. 44. Specifically, Patent Owner asserts:

> If probe 14 is designed to be bent rearwardly, the variation in the bend of spring 38 would change the amount of rotation the potentiometer measured and prevent the potentiometer from accurately detecting the height of the implement above the ground. It would be impossible to tell how much of the rotation

---

[19] Although we address this issue *infra*, the reason Mr. Matousek gives as to why one of ordinary skill in the art would not have been motivated to make this modification is because it would "destroy the intended purpose of Cleveland"—to detect the lateral position of a vehicle with respect to a furrow. Ex. 2117 ¶ 81. First, the purpose and intended use of the sensor in Cleveland, however, are not the focus of the inquiry where the teachings thereof are being applied in combination to the teachings of other prior art references. In other words, Petitioner does not propose modifying Cleveland in and of itself; rather, the proposed modification is with respect to incorporating Cleveland's teachings into the header of Lofquist and header height control system of Chmielewski. Second, we disagree that Petitioner's proposed modification would defeat Cleveland's purpose because after modification Cleveland's probe assembly would still be used to detect relative motion in the plane in which it operates. In other words, the purpose of the probe assembly in Cleveland is to detect elevation changes (i.e., from the deepest portion of the furrow (*see* Ex. 1007, 4:39–54)), and that purpose remains unchanged when the teachings of Cleveland's probe assembly are combined with those of Chmielewski and DPC because the sensor arm/probe assembly still detects elevation changes. Third, even if rotating the probe assembly of Cleveland would negate Cleveland's purpose (which we find it would not), we disagree that such result would have led one of ordinary skill in the art *not* to rotate Cleveland's probe assembly when combining those teachings with the teachings of Lofquist and Chmielewski.

> perceived by the potentiometer was due to bend in the spring versus change in elevation.

*Id.* at 44 (citing Ex. 2117 ¶ 83).

In its Reply, Petitioner asserts that claim 1 recites a "flexible" arm and that Cleveland's arm is flexible.[20] Reply 15–16 (citing Pet. 17–19). Petitioner contends that "to the extent the flexibility of the spring impacted the height calculations, the height control system would simply be calibrated to account for that impact." *Id.* at 17 (pointing to Chmielewski's disclosure that "[r]outine calibration is extremely important due to . . . variations in the combine, header and sensors that occur during and after each use in the field" (quoting Ex. 1006, 9:34–47)).

First, as discussed above, under either party's construction of "flexible," Cleveland's spring 38 is flexible because it is "able to bend" (as proposed by Patent Owner) and "made to bend" (as proposed by Petitioner). *See supra* pages 8–9 (Section II.A.1.). Patent Owner explicitly states that "Cleveland is designed to bend." Resp. 44. Accordingly, we find that Cleveland's spring 38 is "flexible."

Second, to the extent that different degrees of flexibility impact calculating the height of a header, we agree with Petitioner that Chmielewski teaches calibrating a header height control system. Ex. 1006, 9:34–47. Specifically, we agree that it was within the level of ordinary skill in the art to perform such calibrations, and one of ordinary skill in the art would have been aware that such calibrations would include consideration of the degree

[20] Petitioner notes that claim 27 does not recite a "flexible" arm, but it does not exclude one either. Reply 16.

of flexibility of the spring employed in Cleveland's flexible arm. *See* Reply 17.

*c. Mounting to Bolt 30*

Patent Owner contends that it would not have been obvious to one of ordinary skill in the art to mount Cleveland's swing member 20 to Chmielewski's potentiometers 235a and 235b using Cleveland's bolt 30 and nut 36 "because the potentiometer needs to rotate and hinge bolt 30 does not rotate. Rather than bolt 30 rotating, the hub 22 attached to spring 38 rotates around bolt 30." Resp. 44–45 (citing Ex. 2117 ¶ 84; Ex. 1007, 2:52–53). Patent Owner relies upon Cleveland's teaching that bolt 30 is "rigidly secured to plate 18 by means of a nut 36." *Id.* (citing Ex. 1007, 2:54–56). Thus, because bolt 30 does not rotate, Patent Owner asserts that attaching potentiometers to it would not result in the generation of a rotation signal, resulting in an inoperable combination. *Id.* (citing Ex. 2117 ¶ 84). Patent Owner, however, states further that "[i]n order for bolt 30 to rotate, . . . Cleveland . . . would have to be modified to have a bushing through plate 18 or a pair of bearings to allow bolt 30 to rotate independently of plate 18." *Id.* (citing Ex. 2117 ¶ 84).

In its Reply, Petitioner points to Cleveland's teaching that "[t]he particular pivotal mechanism used for swing member 20 *may vary without detracting from the invention*, but it must be sturdily constructed." Reply 18 (quoting Ex. 1007, 2:56–58). Petitioner asserts that the combination, as proposed in the Petition, did not require that the attachment via bolt 30 must be rigid. *Id.* Rather, Petitioner contends that a person of ordinary skill in the art is not an "automaton" and would understand that additional modifications may need to be made, such as adding a bushing. *Id.*

Our consideration of this issue is very similar to our consideration of Patent Owner's argument that Cleveland's probe assembly would need to be rotated 90 degrees to detect changes in height in a direction parallel to the direction of travel. Specifically, Patent Owner's Response relies upon the Matousek Declaration, as noted above. Mr. Matousek testifies that "the configuration of the Cleveland probe assembly would have to be modified to provide a bushing through the plate 18 or a pair of bearings at each end of the bolt 30 so the bolt could freely rotate with the swing member independent of the plate 18." Ex. 2117 ¶ 84. As with our discussion of rotating Cleveland's probe assembly, it is of little import that it was Patent Owner's Declarant, and not Petitioner's, who put forth this evidence, showing how a simple modification could be made when combining the teachings of Cleveland and Chmielewski, into the record.[21] Once Patent Owner put the evidence into the record, Petitioner was justified in relying upon it, as are we in reaching our Decision here. Additionally, neither Patent Owner nor Mr. Matousek asserts that this modification was outside the level of ordinary skill in the art, or that such modification posed some sort of difficulty in being performed. We determine that this modification is a simple adjustment that would have been recognized by one of ordinary skill in the art and would have been well within the level of ordinary skill in the art at the time of the invention.

[21] Patent Owner argues that Petitioner improperly relies upon such modification in its Reply without presenting the position in its Petition or accompanying expert declaration. Paper 33. We disagree. Petitioner's argument was properly made in response to Mr. Matousek's testimony, as discussed above, and Patent Owner's argument based thereon, explaining a simple modification to allow bolt 30 to freely rotate independent of plate 18.

#### d. *Robustness and Size of Cleveland's Plate and Linkages*

Patent Owner contends that "a height sensor for a corn head must withstand heavy abuse from corn stalks." Resp. 45–46 (citing Ex. 2116 ¶¶ 35, 69; Ex. 2117 ¶ 87)). Similar to the argument we addressed above, *see supra* pages 30–31 (Section III.B.4.a.i.c)), Patent Owner raises several arguments regarding the size and robustness of Cleveland's plates and linkages. *Id.* at 46–48. Petitioner raises the same arguments in response. *See* Reply 13–15.

As we previously concluded, Patent Owner has not identified any limitation in claim 1 that requires an explicit size or robustness for the plate and linkages. Further, we are persuaded by Petitioner's argument and evidence, and determine that modifying the size of Cleveland's plate and linkages to fit Lofquist's header was within the ordinary level of skill as defined above. *See KSR*, 550 U.S. at 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton); *see also* Ex. 1003 ¶¶ 132–35.

### 3. *The Combination of Chmielewski and Cleveland Would Render Each Reference Inoperable*

Patent Owner's third argument as to why one of ordinary skill in the art would not have been prompted to combine the teachings of Chmielewski and Cleveland is because each reference would be rendered inoperable for its intended purpose. Resp. 48–51. With respect to Cleveland, Patent Owner contends that the probe assembly "would need to be rotated 90 degrees . . . . [to] allow swing member 20 to rotate with change in

elevation." *Id.* at 49–50 (citing Ex. 2117 ¶ 81; Ex. 2115, 130–32). Patent Owner contends that, once rotated, Cleveland would be "unable to function for its intended purpose which is sensing lateral position." *Id.* at 50 (citing Ex. 2117 ¶ 81). With respect to Chmielewski, Patent Owner asserts that "[i]f Cleveland's probe 14 was attached to Chmielewski with plate 18 perpendicular to the direction of travel as intended by Cleveland, Chmielewski's sensors 236 and 237 would necessarily only detect the lateral position of the header instead of changes in elevation." *Id.* at 51 (citing Ex. 2117[22] ¶ 81). Patent Owner contends that this would "destroy the intent, purpose and function of Chmielewski which is to control head height in response to elevation changes." *Id.* (citing Ex. 2117 ¶ 81).

Patent Owner's arguments are inapposite. With respect to Cleveland, we addressed this argument, in footnote 19 *supra*, as raised in the context of Mr. Matousek's Declaration. We reiterate, first, that the inquiry isn't whether applying a modification of Cleveland's teachings (by rotating the probe assembly 90 degrees) when combining with those of Chmielewski renders Cleveland inoperable for its intended purpose, because the structure being modified is being added to the teachings of Chmielewski, not Cleveland. Petitioner does not propose removing Cleveland's probe assembly, rotating it, and then placing it back onto Cleveland's vehicle. Thus, Patent Owner's assertion is inapposite. Second, we disagree that Petitioner's proposed modification would defeat Cleveland's purpose because after modification Cleveland's probe assembly would still be used to detect relative motion in the plane in which it operates. In other words,

[22] Patent Owner's citation is to "Exhibit 11117" (underline added) which we understand to refer to Exhibit 1117."

the purpose of the probe assembly in Cleveland is to detect elevation changes (i.e., from the deepest portion of the furrow (*see* Ex. 1007, 4:39–54)), and that purpose remains unchanged when the teachings of Cleveland's probe assembly are combined with those of Chmielewski and DPC because the sensor arm/probe assembly still detects elevation changes. Third, even if rotating the probe assembly of Cleveland would negate Cleveland's purpose (which we find it would not), we disagree that such result would have led one of ordinary skill in the art *not* to rotate Cleveland's probe assembly when combining those teachings with the teachings of DPC and Chmielewski.

With respect to Chmielewski, Patent Owner's argument directed to Chmielewski is also inapposite because Petitioner acknowledges that Cleveland's probe assembly would have been rotated by one of ordinary skill in the art when combining the teachings of these references, and Petitioner does not propose mounting Cleveland's probe assembly so that it detects the lateral position (as opposed to the height) of Chmielewski's header.

Accordingly, Patent Owner's arguments with respect to this issue are unpersuasive to show that one of ordinary skill in the art would not have been prompted to combine the teachings of Cleveland and Chmielewski, *as proposed by Petitioner*.

*c) Summary*

In the context of the evidence and arguments before us, we determine that the combination of Cleveland's teachings with those of the Lofquist/Chmielewski combination, discussed in considering the preamble of claim 1, discloses "a pre-loaded, generally linear flexible arm coupled to a

forward portion of the header and having first and second opposed ends, wherein the first end of said flexible arm engages and is displaced over the soil as the header moves above the soil," as recited in claim 1. Further, we are persuaded that one of ordinary skill in the art would have been prompted to modify the Lofquist/Chmielewski combination to incorporate the teachings of Cleveland for the reasons explained by Petitioner (*see supra* pages 33–34 (Section III.B.4.a.ii.a)), thus, meeting the aforementioned limitation of independent claim 1. In particular, we agree with Petitioner that one of ordinary skill in the art would have been prompted to replace each of Chmielewski's contact sensors with Cleveland's sensor arm (1) as it was known to be a simple substitution of one known element for another, and (2) to achieve the predictable result of improved flexibility provided by Cleveland's sensor arm, the benefits of which permit traversing foreign objects without breaking or being damaged. Additionally, we are persuaded by Petitioner's assertions that one of ordinary skill would have modified Cleveland's assembly by rotating it 90 degrees, when combining with Lofquist/Chmielewski, as well as modifying bolt 30 such that it would rotate with swing member 20, as explained by Mr. Matousek.

*iii.* *"angular deflection sensing means coupled to the second end of said flexible arm for measuring a deflection of said flexible arm when the first end of said flexible arm encounters irregularities in the soil as the header moves above the soil and for providing a first signal representing the extent of deflection of said flexible and" [sic]*[23]

Petitioner contends that Chmielewski's potentiometers 235a and 235b disclose an angular deflection sensing means. Pet. 19 (citing Ex. 1006, 12:25–26; Ex. 1003 ¶ 51). In particular Petitioner explains that the potentiometers are a type of rotation sensor, and that they "measure the deflection of the ground contact sensors 236, 237 and send 'a position signal 236, 237 [sic] representing the position of header 202 relative to ground 220.'" *Id.* (citing Ex. 1003 ¶ 51) (quoting Ex. 1006, 7:46–50) (other citations omitted).

Patent Owner contends that "[t]his limitation requires an angular deflection sensing means coupled to a flexible arm. 'Flexible arm' is repeated four times. . . . [but] Chmielewski does not disclose the required flexible arm." Resp. 35 (citing Ex. 2117 ¶ 45).[24] Additionally, Patent Owner asserts that this limitation refers to "the header," which means the "non-cut crop header," and Chmielewski does not disclose a non-cut crop

[23] Patent Owner explains that "flexible and" is a typographical error that should read "flexible arm." Resp. 35 n.3. Petitioner agrees that "flexible and" is a typographical error. Pet. 19 n.3.

[24] It is unclear why Patent Owner asserts that Chmielewski fails to disclose a flexible arm when Patent Owner recognizes that Petitioner relies explicitly on Cleveland, not Chmielewski, for such teaching. Resp. 36 (citing Ex. 1003 ¶ 49; Pet. 17–18).

header. *Id.* at 35–36 (citations omitted). Accordingly, Patent Owner asserts that "Chmielewski therefore does not meet the requirement of an angular deflection sensing means coupled to a flexible arm that deflects as the non-cut crop head moves above the soil." *Id.* (citing Ex. 2117 ¶ 45).

Patent Owner's argument reflects a misunderstanding of Petitioner's position. The discussions above, and at pages 19 to 20 of the Petition, address Chmielewski's teaching of potentiometers, which Petitioner argues, and we agree, discloses an angular deflection sensing means. Patent Owner does not contest this point. As Patent Owner recognizes (*see* Resp. 35), Petitioner does not rely upon Chmielewski as disclosing a flexible arm. Petitioner's combination proposes replacing Chmielewski's ground contact sensors 236, 237 with the flexible arm of Cleveland. Pet. 18–19. We are persuaded by those arguments and reasons to combine, as discussed previously. Specifically, Petitioner explained that with respect to Cleveland's flexible arm, the "first end engages the soil, and the second end, which is opposed to the first end, is coupled to a sensor." *Id.* at 18. The point here simply is that Petitioner was not arguing that Chmielewski discloses the flexible arm or an angular deflection sensing means *coupled to* a flexible arm; rather, Petitioner argues that Chmielewski discloses an angular deflection sensing means and that the *combination* of Cleveland and Chmielewski's teachings discloses an angular deflection sensing means *coupled to* a flexible arm. Patent Owner's arguments are not commensurate in scope with the combination as proposed by Petitioner and, therefore, are unpersuasive.

In light of the discussion above, we find that Chmielewski's potentiometers are a type of rotation sensor and disclose an angular

deflection sensing means. Additionally, we are persuaded that one of ordinary skill in the art would have been prompted to combine the teachings of Lofquist, Chmielewski, and Cleveland for the reasons presented previously by Petitioner (*see supra* pages 33–34 (Section III.B.4.a.ii.a))), and as reiterated in our summary above (*see supra* pages 47–48 (Section III.B.4.a.iic))). Further, we determine that the combination of the teachings of Lofquist, Chmielewski, and Cleveland, discussed *supra*, meets the

> angular deflection sensing means coupled to the second end of said flexible arm for measuring a deflection of said flexible arm when the first end of said flexible arm encounters irregularities in the soil as the header moves above the soil and for providing a first signal representing the extent of deflection of said flexible [arm]

limitation of claim 1.

*iv. "control means coupled to said header and said angular deflection sensing means and responsive to said first signal for raising or lowering the header in accordance with said first signal in maintaining the header a designated height above the soil,"*

Petitioner contends that "Chmielewski's automated header height system includes a 'control means' by way of the AHCS 216 and a hydraulic system that includes a hydraulic cylinder 206 that is connected to a member 230 that is coupled to the header as shown in Figures 1A, 1B." Pet. 20 (citing Ex. 1003 ¶ 53; Ex. 1006, 1:24–26, 5:1–5). Petitioner explains the operation of AHCS 216 and its function to control the hydraulic system to maintain a desired header position. *Id.* at 20 (citations omitted). Petitioner asserts that "[t]he 'control means' includes the hydraulic cylinder 206, member 230, and AHCS 216, where the member 230 and

hydraulic cylinder 206 are coupled to the header and the AHCS 216 is electronically coupled to the potentiometers 235a and 235b ('angular deflection sensing means')." *Id.* (citing Ex. 1003 ¶ 53; Ex. 1006, 7:46–50, 12:22–33).

Patent Owner argues that the above-quoted limitation of claim 1 "refers to 'said header'" and therefore "requires a control means coupled to a non-cut crop header as recited in the preamble." Resp. 36 (citing Ex. 2117 ¶ 47). Patent Owner contends that because Chmielewski discloses a cut crop header and not a non-cut crop header, "Chmielewski alone does not meet the requirement of a control means coupled to a non-cut crop header." *Id.* (citing Ex. 2117 ¶ 47). Patent Owner does not assert that Chmielewski fails to disclose a "control means," as recited in claim 1.

We find that Chmielewski discloses a control means, as recited in claim 1, for the reasons explained by Petitioner. Additionally, as we discussed with previous limitations, Petitioner does not rely upon Chmielewski as disclosing a non-cut crop header; rather, Petitioner relies upon Lofquist. Thus, Patent Owner's argument that Chmielewski fails to disclose the above-quoted limitation, because Chmielewski does not disclose a non-cut crop header, is inapposite as it is not responsive to the combination of elements upon which Petitioner relies.

*v.* *"wherein said flexible arm and angular deflection sensing means are attached to a head housing disposed on a forward portion of said combine and said head housing is comprised of polyurethane and includes a metal tip and a mounting bracket for attaching said metal tip to a forward end of said head housing, and wherein said mounting bracket further couples said flexible arm to a forward end of said head housing"*

Petitioner asserts that Lofquist discloses a head housing disposed on a forward portion of a combine, said head housing including a metal tip and a mounting bracket for attaching said metal tip to a forward end of said head housing. Pet. 21. Petitioner contends that Lofquist discloses that the head housing is made out of plastic. *Id.* Petitioner asserts that "[a] person of ordinary skill in the art . . . would have understood that polyurethane is a plastic, and any plastic would have provided the same structural characteristics to the head housing, and therefore would have been interchangeable based on design choice." *Id.* (citing Ex. 1003 ¶ 56).

Patent Owner contends that "[t]his limitation requires a flexible arm attached to a polyurethane divider ('head housing')." Resp. 37 (citing Ex. 2117 ¶ 49). Patent Owner "does not dispute that . . . Lofquist discloses dividers made of plastic and that polyethylene and polyurethane are types of plastic." *Id.* (citations omitted). Patent Owner, however, contends that Lofquist "does not disclose a 'flexible arm' at all, let alone one that is coupled to the forward end of a divider as required by the claim." *Id.* at 37 (citing Ex. 2117 ¶ 49). Patent Owner does not contest Petitioner's position that polyurethane would have been interchangeable based on design choice.

Petitioner does not rely upon Lofquist as disclosing a flexible arm; Petitioner relies upon Cleveland for this teaching, as discussed *supra*. Thus, Patent Owner's argument is inapposite. With respect to the header housing material, Patent Owner does not contest Petitioner's position. We agree with Petitioner, and we are persuaded that it would have been an obvious matter of design choice to use polyurethane for the head housing. Accordingly, we determine that the teachings of Lofquist, Chmielewski, and Cleveland, combined for the reasons asserted by Petitioner (which we already have found persuasive), meet the above-recited limitation of claim 1.

*vi. Summary*

As reflected in the detailed discussion above, we have reviewed Petitioner's arguments and evidence and Patent Owner's arguments and evidence directed to claim 1. We are persuaded that the elements of the claim are met by the combination of the teachings of Lofquist, Chmielewski, and Cleveland, and one of ordinary skill in the art would have been prompted to combine the teachings of these references in the manner recited in independent claim 1 at the time of the invention.

*b. Claims 2–7 and 10*

Petitioner contends that the combined teachings of Lofquist, Chmielewski, and Cleveland disclose the elements of claims 2–7 and 10, and also contends that one of ordinary skill in the art would have been prompted to combine them in the manner claimed. *See* Pet. 21–26.

Patent Owner does not raise a separate argument contesting the obviousness of dependent claims 2–7 and 10. *See generally* Resp.

Claims 2–7 and 10 depend from claim 1. We have reviewed Petitioner's arguments and evidence directed to claims 2–7 and 10. We are

persuaded that the elements of the claims are met by the combination of the teachings identified by Petitioner on pages 21 to 26 of the Petition, and, for the reasons articulated by and evidence presented by Petitioner (pages 41 to 49 of the Petition), that the combination of Lofquist, Chmielewski, and Cleveland would have rendered the subject matter of these claims obvious to one of ordinary skill in the art at the time of the invention.

*c. Claim 27*

*i. "For use on a plastic non-cut crop header housing disposed on a forward portion of a combine used in the harvesting of crops, said header housing have a tip mounted to a forward end thereof by means of a mounting bracket, an arrangement for determining the height of the header housing above the soil as the combine traverses a field, said arrangement comprising"*

Petitioner contends that Lofquist and Chmielewski disclose the elements of claim 27's preamble "through the disclosure of a plastic gathering point, metal tip, and bracket as disclosed in Lofquist and the automated header height system disclosed in Chmielewski" and for the reasons explained at pages 15 to 17 and 21 of the Petition. Pet. 38 (citing Ex. 1003 ¶ 116).

Patent Owner contends that "there is no disclosure between the three references[25] of an apparatus capable of determining the height of a non-cut crop head above the soil." Resp. 38 (citing Ex. 2117 ¶¶ 32–35, 52). In particular, Patent Owner argues that Chmielewski discloses a "cut crop head,

[25] Patent Owner refers to "DA" as one of the "three references" mentioned in its discussion of the above limitation of claim 27. Resp. 27 (heading). "DA" is a reference in IPR2015-00898, but is not at issue in this proceeding.

not a non-cut crop head," and Lofquist "does not disclose anything about determining the height of the divider above the soil." *Id.* (citations omitted).

In its Reply, Petitioner contends that the preamble of claim 27 is non-limiting, for the same reasons discussed in the context of addressing the preamble of claim 1. *See* Reply 2–4 (addressing claims 1 and 27). Petitioner asserts that even if the preamble is limiting, the elements recited therein are disclosed by the references relied upon. *Id.* at 4.

The same reasoning and analysis we discussed in the context of the preamble of claim 1 applies to the preamble of claim 27, and we incorporate our discussion thereof here. In summary, the preamble "[f]or use on" recites an intended use, albeit a very narrow intended use because of the structural details provided for the header. The body of claim 27, like the body of claim 1, recites "the header" in several instances. *See id.* at 10:1–22 (including the recitation of "the plastic header housing"). Each of these instances relies upon the "plastic non-cut crop header housing" recited in the preamble for antecedent basis. Accordingly, for the same reasons we explained in the context of considering the preamble of claim 1, the recitation of "the header," "the header housing," and "the plastic header housing" in the body of claim 27 each refer to the "plastic non-cut crop header housing" recited in the preamble of the claim, and are, thus, limited thereto.

Nonetheless, we determine that Petitioner has shown that each of the elements of the preamble are met by the proffered combination of the teachings of Lofquist and Chmielewski. Additionally, Patent Owner's argument that none of these references teaches all of the elements *in combination* is essentially an argument that none of the references

*anticipates* the claimed invention. The ground upon which we instituted, however, is obviousness in light of a combination of the teachings of these references. Thus, that none of the references *individually* discloses each of the elements is inapposite. *See In re Keller*, 642 F.2d at 426; *In re Young*, 927 F.2d at 591.

*ii. "a rotation sensor disposed in a lower, forward portion of the header;"*

Petitioner asserts that Chmielewski teaches a rotation sensor "through the disclosure of potentiometers 235a and 235b" and for the reasons explained at pages 19 and 20 of the Petition. Pet. 38. As discussed previously, Petitioner contends, and we find, that a potentiometer is a type of rotation sensor. Pet. 18 (citing Ex. 1003 ¶ 51).

Patent Owner asserts that Chmielewski alone does not disclose a rotation sensor coupled to a non-cut crop header and that Chmielewski's potentiometers are not "disposed in a 'lower, forward portion of the header.'" Resp. 38.

The arguments presented on this limitation are essentially the same as those presented with respect to the "angular deflection sensing means" limitation of claim 1. *See supra* pages 48–50 (Section III.B.4.a.iii.). The point we made there is that Petitioner relies upon a combination of the teachings of Lofquist, Chmielewski, and Cleveland for the entirety of this limitation, including the phrase "disposed in a lower, forward portion of the header."[26] Petitioner relies on Chmielewski specifically for the "rotation

[26] Notably, the location proposed by Petitioner for mounting the sensor to Lofquist is "a lower, forward portion of the header." Pet. 16 (showing Petitioner's annotated version of Lofquist's Figure 8).

sensor" portion of this limitation. Thus, in light of the discussion with respect to "angular deflection sensing means" as recited in claim 1, and the arguments and evidence presented by Petitioner with respect to claim 27, we determine that Petitioner's combination of the teachings of Lofquist, Chmielewski, and Cleveland corresponds properly to "a rotation sensor disposed in a lower, forward portion of the header," as recited in claim 27.

*iii. "an elongated, linear shaft having first and second opposed ends, wherein said first end is coupled to said rotation sensor and said second end engages the soil, and wherein said shaft rotationally displaces said rotation sensor as the second end of said shaft engages and passes over irregularities in the soil; and"*

Petitioner asserts that Cleveland discloses this limitation "by way of its swing member 20, collarlike hub 22, stub 24, helical spring 38, and bearing member 44." Pet. 38. Petitioner contends that

> "a [s]pring 38 and swing member 20 together form an elongated member," as shown in Figure 2. The elongated member is elongated, linear and has first and second ends. The second end of the elongated member is a bearing member 44. When combined with the potentiometers 235a and 235b of Chmielewski, the first end of the elongate member is coupled to the potentiometers 235a and 235b and the bearing member 44 end engages the soil. The elongate member rotationally displaces the potentiometers 235a and 235b of Chmielewski when the bearing member 44 of the elongate member passes over the irregularities in the soil.

*Id.* at 39 (citing Ex. 1007, 2:46–49, 2:62–63, 2:67–74, 4:39–54; Ex. 1003 ¶ 119). Petitioner further explains that it would have been obvious to replace each contact sensor 236, 237 of Chmielewski with the sensor arm of Cleveland, for the reasons discussed previously. *Id.*

Patent Owner asserts that this limitation requires "a linear shaft having a first end coupled to a rotation sensor which it rotationally displaces as the opposite end of the shaft engages the soil." Resp. 39. Patent Owner contends that because Cleveland is configured to detect lateral position only, "the arm of Cleveland does not rotationally displace a rotation sensor to which it is coupled." *Id.* (citing Ex. 2117 ¶¶ 56, 78).

We determine that the combination of teachings proposed by Petitioner meet this element as explained by Petitioner. Patent Owner's argument is directed toward Cleveland in an unmodified state and does not address the combination of Cleveland's teachings with those of Chmielewski. Accordingly, we determine that Petitioner's combination of the teachings of Chmielewski and Cleveland discloses

> an elongated, linear shaft having first and second opposed ends, wherein said first end is coupled to said rotation sensor and said second end engages the soil, and wherein said shaft rotationally displaces said rotation sensor as the second end of said shaft engages and passes over irregularities in the soil[,]

as recited in claim 27.

*iv. "a flange connecting said rotation sensor to the mounting bracket for mounting said rotation sensor on a lower portion of the forward end of the plastic header housing, wherein said mounting bracket includes a strap and a bracket respectively disposed on lower and upper surfaces of the header housing and connected together by at least one nut and bolt combination."*

Petitioner contends that Loquist discloses a "mounting bracket including a strap and a bracket respectively disposed on lower and upper surfaces of the header housing and connected together by at least one nut

and bolt combination through the disclosure of a bracket, plate, nuts, and bolts" for the reasons explained at page 16 of the Petition. Pet. 40. Petitioner asserts that Cleveland "meets the limitation of a flange by way of a mounting plate 18" for the reasons explained at pages 31 to 32 of the Petition. *Id.*

Patent Owner contends that this limitation "requires that the flange connect 'said rotation sensor' to the mounting bracket" but "Cleveland does not disclose a rotation sensor, only an apparatus capable of detecting lateral position." Resp. 40 (citing Ex. 2117 ¶¶ 56, 78). Patent Owner also asserts that Lofquist does not disclose a rotation sensor. *Id.*

Petitioner's discussion of this limitation focuses on the "mounting bracket," and its components, as well as the "flange." Pertinent to Patent Owner's contention, however, Petitioner does not contend that Lofquist or Cleveland discloses a "rotation sensor." Rather, Petitioner relies upon Chmielewski for this teaching as explained repeatedly above. Thus, Patent Owner's argument that neither Lofquist nor Cleveland discloses a rotation sensor is inapposite. For the reasons explained by Petitioner, we determine that the proffered combination of Lofquist and Cleveland corresponds properly to a mounting bracket, and its components, as well as a flange, as recited in the above limitation of claim 27.

*d. Claims 28 and 34*

Petitioner contends that the combined teachings of Lofquist, Chmielewski, and Cleveland meet the elements of claims 28 and 34, and also contends that one of ordinary skill in the art would have been prompted to combine them in the manner claimed. *See* Pet. 40–41.

Patent Owner does not raise a separate argument contesting the obviousness of dependent claims 28 and 34. *See generally* Resp.

Claims 28 and 34 depend from claim 27. We have reviewed Petitioner's arguments and evidence directed to claims 28 and 34 and determine, for the reasons articulated and evidence presented by Petitioner, that the combination of Lofquist, Chmielewski, and Cleveland would have rendered the subject matter of these claims obvious to one of ordinary skill in the art at the time of the invention.

##### *e. Conclusion of Obviousness*

We have considered Petitioner's evidence and argument and determine that the combination of Lofquist, Chmielewski, and Cleveland meets the limitations of claims 1–7, 10, 27, 28, and 34, and that one of ordinary skill in the art would have had reason, with rational underpinning, for combining the teachings of these references. We have considered Patent Owner's arguments to the contrary and determine that they are unpersuasive. The parties do not introduce or rely on objective indicia of nonobviousness. After weighing the evidence, we conclude that Petitioner has shown, by a preponderance of the evidence, that claims 1–7, 10, 27, 28, and 34 would have been obvious over Lofquist, Chmielewski, and Cleveland.

### *C. Obviousness of Claims 8, 9, and 29–33 over Lofquist, Chmielewski, Cleveland, and Agness*

Petitioner asserts that the combination of the teachings of Lofquist, Chmielewski, Cleveland, and Agness would have rendered obvious the subject matter of claims 8, 9, and 29–33 to one of ordinary skill in the art at the time of the invention. Pet. 49–56.

*1. Agness*

Agness teaches "an automatic height control system for a crop harvester having a vertically moveable crop-gathering unit." Ex. 1008, 1:12–14. Agness explains that each of its height sensing units includes reed switches 70. *See id.* at 4:31–32. Agness's Figure 3 is reproduced below:




Agness's Figure 3 "is an enlarged side elevational view of a height sensor . . . attached to [a] crop-gathering unit of [a] combine[.]" *Id.* at 2:59–62. Agness teaches:

> Each of the height sensing units includes a short shaft 52 which is pivotally secured in a position directly below the horizontal leg of the right-angle member 44 by a pair of spaced straps 54 . . . . A plurality of reed switches 70 are clamped between the legs of an aluminum switch mounting clip 72 which is bolted to the bottom of the guard 48 . . . . [T]he reed switches 70 are each enclosed in an envelope which protects them from dust, moisture or any other elements which may affect their operation.

*Id.* at 3:59–4:30.

*2. Discussion*

Claims 8 and 9 each depend, directly or indirectly, from independent claim 1. Ex. 1001, 8:8–13. Claims 29–33 each depend, directly or indirectly, from independent claim 27. *Id.* at 10:28–42. Petitioner identifies where the elements of these claims are disclosed by the references, and why such elements would have been obvious to combine to one of ordinary skill

in the art at the time of the invention. Pet. 49–56. In particular, Petitioner relies upon Agness for its teaching of switch mounting clip 72, which Agness describes, at least in-part, as an "envelope," that encloses reed switches 70 to protect the switches from elements that may affect their operation. *See, e.g.*, *id.* at 50. Petitioner asserts several reasons as to why one of ordinary skill in the art would have sought to combine the teachings of Agness's switch mounting clip and plate for attaching said clip with the teachings of Lofquist, Chmielewski, and Cleveland, including "to protect the sensors disclosed in Chmielewski from the dirt, dust, and other debris that may affect the performance of the sensor." *Id.* at 55.

Patent Owner does not raise a separate argument contesting the obviousness of dependent claims 8, 9, and 29–33. *See generally* Resp.

*3. Conclusion of Obviousness*

We have considered Petitioner's evidence and argument and determine that Petitioner's proffered combination of Lofquist, Chmielewski, Cleveland, and Agness meets the limitations of claims 8, 9, and 29–33, and that one of ordinary skill in the art would have had reason, with rational underpinning, for combining the teachings of these references. Specifically, we agree with Petitioner's identification of the factual teachings of the references and reasons as to why one of ordinary skill in the art would have combined the teachings as proposed by Petitioner. Patent Owner has not raised any argument directed to these dependent claims, aside from the arguments directed to claims 1 and 27, which arguments we considered, and rejected as unpersuasive, above. The parties do not introduce or rely on objective indicia of nonobviousness. After weighing the evidence, we conclude that Petitioner has shown, by a preponderance of the evidence, that

claims 8, 9, and 29–33 would have been obvious over Lofquist, Chmielewski, Cleveland, and Agness.

### *D. Obviousness of Claim 11 over Lofquist, Chmielewski, Cleveland, and McMurtry*

Petitioner asserts that the combination of the teachings of Lofquist, Chmielewski, Cleveland, and McMurtry would have rendered obvious the subject matter of claim 11 to one of ordinary skill in the art at the time of the invention. Pet. 56–59.

#### *1. McMurtry*

McMurtry teaches "a method of and apparatus for scanning the surface of a workpiece." Ex. 1009, 1:9–10. McMurtry's Figure 15 is reproduced below:

Fig.15.




McMurtry's Figure 15 shows "a further scanning operation with a mechanical stylus in which strain gauges are used on the stylus to determine stylus bending." *Id.* at 6:1–4. McMurtry explains:

> the probe head PH is positioned so that point 28 lies on the axis of the bore 60, and the motors M1 and M2 are driven so as to bring the stylus 26 into contact with the surface of the bore 60. A force $F_D$ is determined as the desired resultant force on the stylus. The torque applied to the stylus by each of the motors M1

> and M2, which will move the stylus around the surface of the bore, and will cause a force $F_D$ to act on the stylus, is estimated, and the current fed to the motors are then varied to as to [sic] generate this torque.

*Id.* at 14:12–22.

*2. Discussion*

Claim 11 depends from dependent claim 10, and further recites "wherein said calibration means includes an adjustable mounting arrangement for rotationally displacing said angular deflection sensing means so that said flexible arm engages the soil when in said full down position." Ex. 1001, 8:17–21.

Petitioner identifies where the elements of claim 11 are disclosed by the references or why such elements would have been obvious to one of ordinary skill in the art. Pet. 57–59. In particular, Petitioner asserts that Chmielewski teaches generally "calibration means." *Id.* at 57. Petitioner also relies upon McMurtry as teaching "an adjustable mounting relationship." *Id.* Petitioner asserts that one of ordinary skill in the art would have sought to combine McMurtry's teaching of an adjustable mounting arrangement with Chmielewski's "calibration means," because it "is an obvious design choice for calibration once a mounting bracket is used to couple a height sensor to a crop header." *Id.* at 58 (citing Ex. 1003 ¶ 179). Petitioner contends that "[a] sensing arm calibration means in a workpiece scanning device, as disclosed in McMurtry, would have led to the predictable variation of a sensing arm calibration means in a header height control system." *Id.* at 58–59 (citing Ex. 1003 ¶ 179).

Patent Owner's Response does not raise any argument directed to dependent claim 11. *See generally* Resp.

### *3. Conclusion of Obviousness*

We have considered Petitioner's evidence and argument and determine that the combination of Lofquist, Chmielewski, Cleveland, and McMurtry meets the limitations of claim 11, and that one of ordinary skill in the art would have had reason, with rational underpinning, for combining the teachings of these references. Specifically, we agree with Petitioner's identification of the factual teachings of the references and reasons as to why one of ordinary skill in the art would have combined the teachings as proposed by Petitioner. Patent Owner has not raised any argument directed to dependent claim 11, aside from the arguments directed to claim 1, which arguments we considered, and rejected as unpersuasive, above. The parties do not introduce or rely on objective indicia of nonobviousness. After weighing the evidence, we conclude that Petitioner has shown, by a preponderance of the evidence, that claim 11 would have been obvious over Lofquist, Chmielewski, Cleveland, and McMurtry.

## *E. Patent Owner's Motions to Exclude*

Patent Owner filed two motions to exclude. Patent Owner's first Motion to Exclude Evidence (Paper 14) seeks to exclude from the record the claim charts appended to Mr. Lucas's Declaration. Paper 14, 1. Patent Owner requested, in its Preliminary Response, that we exclude all of Mr. Lucas's claim charts. Prelim. Resp. 15. In our Decision to Institute we discussed Patent Owner's argument and "disregarded the claim charts for the purposes of [the Decision to Institute] to the extent that a position is taken in the claim charts that is not expressly reiterated in the Petition." Dec. 34. Additionally, we stated that "[i]f Patent Owner chooses to object to the claim

charts . . . beyond this stage of the proceeding, Patent Owner should proceed in accordance with 37 C.F.R. § 42.64." *Id.*

37 C.F.R. § 42.64(b)(1) states: "Any objection to evidence submitted during a preliminary proceeding must be filed within ten business days of the institution of the trial." A "preliminary proceeding" "begins with the filing of a petition for instituting a trial and ends with a written decision as to whether a trial will be instituted." 37 C.F.R. § 42.2.

Petitioner contends that any objection to Mr. Lucas's claim charts was waived because Patent Owner did not file and serve objections within ten business days of the institution of trial. Paper 19, 2–3.

In its Reply in support of its first Motion to Exclude Evidence, Patent Owner asserts that "Gramm did not waive his objection to the claim charts because he objected on the record in his Patent Owner Preliminary Response ("POPR") before the expiration of the period set forth in 37 C.F.R. § 42.64." Paper 21, 1.

The time period set forth in § 42.64(b)(1) is "within ten business days of the institution of the trial." An objection raised in a preliminary response nearly three months prior to the institution of the trial is not "within ten business days of the institution of the trial." Thus, we agree with Petitioner that Patent Owner did not object to Mr. Lucas's claim charts within the time period set forth in § 42.64(b)(1).

The parties raise additional arguments regarding potential prejudice. In particular, Patent Owner asserts, in its Reply in support of its first Motion to Exclude Evidence, that "[t]he Petition does not cite to the claim charts, the paragraphs of the Lucas Declaration cross referencing the claim charts, or

the passages from the purported prior art references included solely in the claim charts (Paper 2).” Paper 21, 5.

We have considered the parties’ arguments and find that Patent Owner waived any objection to the claim charts submitted with Mr. Lucas’s Declaration by not filing such objection “within ten business days of the institution of the trial” in accordance with 37 C.F.R. § 42.64(b)(1). Accordingly, we deny Patent Owner’s first Motion to Exclude Evidence (Paper 14). Nonetheless, the parties do not rely to any great extent, if at all (according to Patent Owner’s representation), on Mr. Lucas’s claim charts, and, in rendering the factual findings and conclusions of law reached in this Decision, we do not rely on any argument or evidence raised in the claim charts that is not expressly reiterated in the Petition.

Patent Owner’s second Motion to Exclude Evidence (Paper 31) seeks to exclude Exhibits 1022, 1023, 1025, and 1026 in their entirety, as well as portions of Exhibit 2115, the deposition transcript of Mr. Lucas. Petitioner opposes Patent Owner’s Motion. Paper 36.

The parties agree that none of Exhibits 1022, 1023, 1025, and 1026 is relied upon in the Petition, Patent Owner’s Response, or Petitioner’s Reply. Paper 31, 1; Paper 36, 5–6; Tr. 78:9–15. Additionally, neither party relies upon the deposition testimony of Exhibit 2115 that is the subject of Patent Owner’s second Motion. Paper 36, 11–12. Because neither party relies on the materials in dispute, and because we do not rely on any of those materials in reaching our Decision here, we deny as moot Patent Owner’s second Motion to Exclude Evidence (Paper 31).

## IV. CONCLUSION

Petitioner has demonstrated, by a preponderance of the evidence, that: (1) claims 1–7, 10, 27, 28, and 34 would have been obvious over Lofquist, Chmielewski, and Cleveland; (2) claims 8, 9, and 29–33 would have been obvious over Lofquist, Chmielewski, Cleveland, and Agness; and (3) claim 11 would have been obvious over Lofquist, Chmielewski, Cleveland, and McMurtry.

## V. ORDER

For the reasons given, it is:

ORDERED that, based on a preponderance of the evidence, claims 1–11 and 27–34 of U.S. Patent No. 6,202,395 B1 are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude Evidence (Paper 14) is *denied*;

FUTHER ORDERED that Patent Owner's Motion to Exclude Evidence (Paper 31) is *denied* as moot; and

FURTHER ORDERED, because this is a Final Written Decision, the parties to this proceeding seeking judicial review of it must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

Gary M. Ropski
Kelly J. Eberspecher
Manish K. Mehta
Joshua James
Jeffry Nichols
BRINKS GILSON & LIONE
gropski@brinksgilson.com
keberspecher@brinksgilson.com
mmehta@brinksgilson.com
jjames@brinksgilson.com
jnichols@brinksgilson.com

For PATENT OWNER:

Thomas J. Oppold
Glenna L. Gilbert
LARKIN HOFFMAN DALY & LINDGREN LTD.
toppold@larkinhoffman.com
ggilbert@larkinhoffman.com

US006202395B1

(12) **United States Patent**
**Gramm**

(10) **Patent No.: US 6,202,395 B1**
(45) **Date of Patent: Mar. 20, 2001**

(54) **COMBINE HEADER HEIGHT CONTROL**

(76) Inventor: **Richard Gramm**, 10209 Iris Rd., Plymouth, IN (US) 46563

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/223,921**

(22) Filed: **Dec. 31, 1998**

**Related U.S. Application Data**

(60) Provisional application No. 60/070,165, filed on Dec. 31, 1997.

(51) **Int. Cl.**[7] .................... **A01D 75/28**

(52) **U.S. Cl.** .................... **56/10.2 E**; 172/4

(58) **Field of Search** .................... 56/119, 17.1, 17.2, 56/121.46, 10.2 D, 10.2 E, DIG. 3, DIG. 10, 51, 94, 73, 84; 172/2, 4; 33/501.02, 501.03, 553, 554, 555

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,611,286 | * | 10/1971 | Cleveland | 340/61 |
| 3,886,718 | * | 6/1975 | Talbot | 56/208 |
| 3,896,899 | * | 7/1975 | Scholl | 172/4.5 |
| 4,064,945 | | 12/1977 | Haney | 172/4 |
| 4,171,606 | * | 10/1979 | Zeigler et al. | 56/10.2 |
| 4,180,133 | * | 12/1979 | Collogan et al. | 172/26 |
| 4,199,925 | * | 4/1980 | Quick et al. | 56/208 |
| 4,211,057 | * | 7/1980 | Dougherty et al. | 56/10.2 |
| 4,332,126 | * | 6/1982 | Van Auwelaer et al. | 56/10.2 |
| 4,437,295 | * | 3/1984 | Rock | 56/10.2 |
| 4,567,719 | * | 2/1986 | Soots et al. | 56/10.2 |
| 4,594,940 | * | 6/1986 | D'Almeida et al. | 56/11.2 |
| 4,607,716 | * | 8/1986 | Beck | 180/131 |
| 4,776,153 | | 10/1988 | DePauw et al. | 56/10.2 |
| 4,928,890 | * | 5/1990 | Swisher, Jr. | 241/24 |
| 5,090,184 | | 2/1992 | Garter et al. | 56/10.2 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

704545 * of 1965 (CA) .................... 56/10.2 E

OTHER PUBLICATIONS

M & W Robot Header Control, author unknown, M & W Gear Company, pp. 1–4, Nov. 1964.*

*Primary Examiner*—Robert E. Pezzuto
*Assistant Examiner*—Nathan Mammen
(74) *Attorney, Agent, or Firm*—Emrich & Dithmar

(57) **ABSTRACT**

An arrangement for controlling the height above or depth below an irregular surface of a body moving over or below the surface includes a rotation sensor coupled to a controller responsive to an angular deflection signal output by the rotation sensor. The rotation sensor and controller are mounted to a vehicle moving over the surface such as an agricultural vehicle traversing a field. A semi-rigid, flexible arm has a first end coupled to the rotation sensor with a ground engaging member attached to a second opposed end of the arm. In one embodiment, the flexible arm includes an elongated coil spring attached to a rigid shaft and the ground engaging member is a spherical ball attached to the shaft's distal end. The coil spring is pre-loaded to a selected bending or flexure force and permits the ground engaging member to impact obstructions in the field without damage to the rotation sensor. The coil spring also prevents damage to the rotation sensor when the vehicle is reversed in direction. The flexible arm may be urged downwardly to ensure that the ground engaging member contacts the soil and upward and downward rotation stops may be provided to limit rotation of the rotation sensor and flexible arm combination. When a plurality of rotation sensors and flexible arms are employed such as along the length of a combine header, each rotation sensor may be individually calibrated by rotating the sensor relative to the head unit to which it is mounted to permit all sensors to uniformly measure the height above or depth below the soil surface.

**34 Claims, 4 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,115,628 | | 5/1992 | Garter et al. | 56/10.2 |
| 5,189,806 | * | 3/1993 | McMurtry et al. | 33/553 |
| 5,195,309 | * | 3/1993 | Mossman | 56/119 |
| 5,463,854 | * | 11/1995 | Chmielewski, Jr. et al. | 56/10.2 E |
| 5,471,823 | * | 12/1995 | Panoushek et al. | 56/10.2 E |
| 5,471,825 | * | 12/1995 | Panoushek et al. | 56/10.2 E |
| 5,473,870 | * | 12/1995 | Panuoushek et al. | 56/10.2 E |
| 5,535,577 | * | 7/1996 | Chmielewski et al. | 56/10.2 E |
| 5,549,166 | * | 8/1996 | Orbach et al. | 172/4 |
| 5,713,190 | * | 2/1998 | Vermeulen et al. | 56/10.2 E |
| 5,957,218 | * | 9/1999 | Noonan et al. | 172/239 |
| 6,041,583 | * | 3/2000 | Goering et al. | 56/10.2 E |

* cited by examiner


10
18
20
CONTROLLER INTERFACE
HEAD CONTROLLER
56
12
16
14
38

FIG. 1


12
22
34
48
28
32
24
26
30
74a
90
42
40
14
44
46
16

FIG. 2




FIG. 3




FIG. 4


26
74a
52
32
48
48a
26c
60
26b
26d
74b
72
82
62
42
14
76
40
44
84
46
52
48
48b
48c
48a
14
32
80b
26
74a
26b
26a
26f
26c
74b
26e
26d
78
80a
77
72
54b
75
66
54a
64a
64
62
60
82
42
68
70

FIG. 5

FIG. 6


74a
26d
92a
48
26
90
120
74b
92b
104
118
98
96
100
102

FIG. 7

106
108
110a
110
110b
112
114
98
64
100
62
120
62a
116

FIG. 8

# COMBINE HEADER HEIGHT CONTROL

## RELATED APPLICATION

This application claims the benefit of copending U.S. Provisional Application No. 60/070,165, filed Dec. 31, 1997.

## FIELD OF THE INVENTION

This invention relates generally to agricultural machinery and is particularly directed to apparatus for detecting and controlling the height above the soil of an agricultural machine as it traverses a field.

## BACKGROUND OF THE INVENTION

In many agricultural applications it is important to control the depth of a ground engaging implement. In other agricultural applications, it is important to maintain an agricultural machine component above the soil a predetermined, fixed height. One example of the latter application is in a combine header used in the harvesting of crops. The individual heads must be maintained for a given height above the soil to avoid damage to the head caused by impact with the soil or other obstruction such as a rock. Positioning the header too close to the soil may also result in ingestion of non-crop debris which reduces harvesting efficiency and may also cause damage to the combine. The head must also not be raised too high to avoid missing down plants which do not extend upwardly a sufficient distance. The trend today is toward the use of larger headers having increased numbers of individual heads mailing it more difficult to monitor and adjust head height to avoid damage. A prime objective in crop harvesting is to cover as much ground as possible by operating at high speeds which increases the possibility of header damage caused by irregular terrain or hazards in the field. With increased combine operating speeds, monitoring and adjusting head height is made even more difficult. Header repairs are costly and time consuming.

There are various approaches to maintaining the header a predetermined height above the soil. One such approach employs a curved bar attached to an intermediate, lower portion of the head which engages the soil as the combine traverses a field. A chain couples a distal end of the bar to the head for preventing breakage of the bar in the event the bar engages a hazard in the field when the combine is put in reverse. The curved bar functions as a sensor, detecting the height of the head above the soil, and provides a feedback signal to a height controller in the combine for adjusting header height. This sensor mechanism is adapted for attachment to a head having a metal housing and is not easily mounted to current polyurethane head housings which are gaining increasing acceptance because of their light weight. In addition, the curved bar is attached to an intermediate portion of the head housing and thus sometimes provides a height adjustment signal too late to protect the forward end of the housing as it traverses a field. Another approach to header height control employs a pulsed ultrasonic system for determining and adjusting header height as the combine moves through a field. This latter approach is expensive and of limited reliability.

The present invention addresses the aforementioned limitations of the prior art by providing the combine header height detector and control which is particularly adapted for mounting to the leading end of a polyurethane head housing, is highly reliable and resistant to breakage, and is easily retrofit on existing headers.



## OBJECTS AND SUMMARY OF THE INVENTION

Accordingly, it is an object of the present invention to provide a sensor for determining the height above the ground of an agricultural apparatus as it traverses a field.

It is another object of the present invention to provide a height sensor for an agricultural header such as on a combine which is mounted to a forward end of the header for more accurate height positioning of the header to reduce combine ingestion and header impact damage.

It is yet another object of the present invention to provide a height sensor for an agricultural header which is particularly adapted for use with non-metal headers and may be easily retrofit in existing header installations.

This invention is directed to a height sensor for detecting the height of a combine header above the soil as the combine traverses a field. The height sensor provides a control signal to a conventional height controller in the combine for controlling header height above the soil to prevent impact damage to the header, while maintaining the header a predetermined height above the soil. The height sensor includes a pre-loaded flexible arm attached to the forward end of the head housing. The distal end of the flexible arm is provided with a ball-like member which engages the soil, while the proximal end of the arm is connected to an angular displacement detector. The angular displacement detector detects angular displacement of the arm as it is pivotally displaced upon encountering terrain irregularities and obstacles in the soil for providing a height control signal to the combine's height controller. Flexibility in the sensor arm is provided by a coiled spring which connects a rigid shaft of the arm to the angular displacement detector. The height sensor is mounted to an existing bracket in the head housing, which bracket is used for attaching a steel tip to the leading edge of the head housing.

More generally, this invention contemplates apparatus for maintaining an elevated moving body a designated height above an irregular support surface, the apparatus comprising: a pre-loaded flexible arm coupled to the moving body and having first and second opposed ends, wherein the first end of the flexible arm engages and is displaced over the support surface as the moving body moves above the support surface; an angular deflection sensor coupled to the second end of the flexible arm for measuring a deflection of the flexible arm when the first end of the arm encounters an irregularity in the support surface as the body moves above the support surface and for providing a signal representing the extent of deflection of the flexible arm; and a controller coupled to the moving body and to the angular deflection sensor and responsive to the signal for raising or lowering the moving body in accordance with the signal and maintaining the moving body a designated height above the support surface.

## BRIEF DESCRIPTION OF THE DRAWINGS

The appended claims set forth those novel features which characterize the invention. However, the invention itself, as well as further objects and advantages thereof, will best be understood by reference to the following detailed description of a preferred embodiment taken in conjunction with the accompanying drawings, where like reference characters identify like elements throughout the various figures, in which:

FIG. **1** is a simplified combined schematic and block diagram of a combine illustrating the location of the height sensor in the combine header;

FIG. **2** is a side elevation view shown partially in phantom of a height sensor mounted to a corn head in accordance with the present invention;

FIG. **3** is a perspective view of the underside of a forward portion of a corn head incorporating a height sensor in accordance with the present invention;

FIG. **4** is a perspective view of the forward upper portion of a corn head to which a height sensor in accordance with the present invention is attached;

FIG. **5** is a partial perspective view of an assembled header height sensor in accordance with the present invention;

FIG. **6** is a partial exploded perspective view of the header height sensor of the present invention;

FIG. **7** is a partial perspective view of an assembled header height sensor in accordance with another embodiment of the present invention; and

FIG. **8** is a partial exploded perspective view of the header height sensor shown in FIG. **7**.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENT

Referring to FIG. **1**, there is shown in simplified schematic and block diagram form a combine **10** having attached to a forward, or leading, portion thereof a corn header **12**. Corn header **12** is attached to the combine **10** by conventional means such as mounting brackets and bolts (not shown for simplicity) and includes a plurality of spaced head units adapted to pass between adjacent crop rows during harvesting of the crop. Disposed on a forward portion of one or more head units is a corn head height sensor **14** in accordance with the present invention. The corn head height sensor **14** is connected by suitable electrical means to a controller interface **18** and a head controller **20** within combine **10**. In response to the detected height of the corn header **12**, head controller **20** provides suitable electrical control signals to an electrically actuated, hydraulic control system **38** for controlling the lateral position of the corn header **12** as well as its height above the ground, or soil, **16** as the combine **10** traverses a field in the direction of arrow **56**. Head controller **20** is conventional in design and operation and, in general, receives an analog electrical signal from the controller interface **18** and outputs an analog signal to the hydraulic control system **38**. Controller interface **18** is also conventional in design and operation and converts five angular sensor inputs from the height sensor **14** to a continuous output that changes in magnitude with the angle of displacement of the height sensor as described below. In a specific embodiment of the present invention, head controller **20** is as incorporated in a Deere combine, while controller interface **18** is available from May-Wes. While the present invention is disclosed primarily for use with a corn header **12**, this invention is not limited to use with this type of head assembly, but will operate equally as well with virtually any type of header assembly used in the harvesting of various crops. In addition, while the inventive height sensor **14** is particularly adapted for use with polyurethane head housings and can be easily retrofit on these types of head housings, the invention is equally well suited for use with head housings of the sheet metal type. Finally, the present invention will also operate equally as well in maintaining virtually any type of agricultural mechanism a predetermined height above the soil surface as the mechanism traverses a field as described in the following paragraphs.

Referring to FIGS. **2** and **3**, there are respectively shown side elevation and lower perspective views of the height



sensor **14** of the present invention. FIG. **4** is a perspective view of the upper end portion of the corn head housing **22** to which the height sensor is attached, while FIGS. **5** and **6** are partial perspective views of the inventive height sensor **14** respectively shown assembled and in exploded form.

Disposed on the forward, or leading, end of the corn head housing **22** is a metal tip **24** which protects the housing as it moves through a field. Disposed immediately aft of metal tip **24** on a lower portion of the corn head housing **22** is a metal bracket, or strap, **26**. Bracket **26** assists in maintaining the metal tip **24** on the forward end of the corn head housing **22** and includes a loop **26*b*** through which a metal rod (not shown for simplicity) may be inserted for storing the housing in a generally vertical, suspended manner. Metal tip **24** and bracket **26** are conventional head components and can be found on corn heads manufactured and sold by John Deere Co. of Moline, Ill. Bracket **26** is securely attached to the forward end of corn head housing **22** by means of a mounting bracket **36** and a first bolt **28** and nut **30** combination and a second bolt **32** and nut **34** combination. Mounting bracket **36** is disposed on an upper surface of the head housing **22**, while bracket **26** is disposed on a lower surface of the housing. Corn head housing **22** is preferably comprised of a lightweight polyurethane plastic, but may also be comprised of sheet metal. By employing structure already incorporated in the corn head housing **22**, i.e., bracket **26** and mounting bracket **36**, additional holes or attachment structure need not be incorporated in the corn head housing in mounting the height sensor **14** of the present invention. This is a primary advantage of the present invention because of the difficulty and structure-weakening tendency of incorporating additional holes in the polyurethane head housing. Another important advantage of the inventive height sensor **14** is in its position at the forward end of the corn head housing **22**, rather than in a position adjacent an intermediate portion of the housing, so as to provide an early indication of a high point in the terrain or an obstruction in the soil requiring the raising of the corn header to prevent damage.

Attached to an aft portion of bracket **26** is the combination of a flange **26*c*** and a plate **26*d*** as more clearly shown in FIGS. **5** and **6**. Extending through plate **26*d*** are first and second mounting bolts **74*a*** and **74*b*** for attaching a guard or shield plate **90** as shown in FIG. **2** to the height sensor **14** for shielding the sensor and associated electrical wiring from dust and debris in the field. Flange **26*c*** includes an aperture **26*a*** therein. Positioned on opposing sides of flange **26*c*** are a nylon bushing **72** and a rotation sensor **48**. Bushing **72** and rotation sensor **48** have aligned apertures, which apertures are further aligned with aperture **26*a*** in flange **26*c***. First and second O-rings **80*a*** and **80*b*** are disposed in respective facing circular slots in bushing **72** and rotation sensor **48** and engage opposed surfaces of flange **26*c*** to provide a seal between the bushing and rotation sensor and the flange. Inserted through the aligned apertures of bushing **72** and rotation sensor **48** and extending through the aperture **26*a*** and flange **26*c*** is a shaft **64** which is attached to a bracket **62**. A distal end of shaft **64** is inserted in the rotation sensor **48** and includes a detente, or slot, **66** which is keyed to a complementary aperture and projection arrangement (not shown) within the rotation sensor **48**. The keyed mating of shaft **64** and rotation sensor **48** is conventional and well known to those skilled in the relevant arts. Shaft **64** has a first annular slot, or groove, **64*a*** disposed about the periphery thereof which is adapted to receive a e-clip **78** which retains the shaft on bushing **72**. Shaft **64** also has a second annular slot disposed about its periphery which is adapted to

receive a rubber O-ring **77** which provide a seal between the shaft and bushing **72** for protecting the electrical components within the rotation sensor **48** from dust and debris. Also in a conventional manner, rotation sensor **48** provides an electrical output signal via connector **48***a* and an electrical lead **50** as shown in FIG. **3**. The electrical output from rotation sensor **48** indicating the rotational position of shaft **64** and bracket **62** is provided to the head controller **20** in combine **10** as shown in FIG. **1** and as described above.

Bushing **72** is placed in contact with a first lateral surface of flange **26***c*, while rotation sensor **48** is placed in contact with a second, opposed surface of the flange. Bushing **72** and rotation sensor **48** are securely coupled together and attached to flange **26***c* by means of the combination of first and second bolts **68** and **70** and a plurality of washers **54***a* and **54***b* and nuts and lock washers **52**. The first and second bolts **68**,**70** are inserted through aligned apertures in the rotation sensor **48** and bushing **72**. It is in this manner that bracket **62** and shaft **64** extending therefrom are securely connected to bracket **26** as well as to the rotation sensor **48**. Rotation of bracket **62** relative to the rotation sensor **48** results in the output of an appropriate electrical signal by the rotation sensor indicating the extent of relative rotation between the bracket and the fixed rotation sensor. A pair of apertures **48***b* and **48***c* within the rotation sensor **48** are each aligned with a respective aperture **26***e* and **26***f* within flange **26***c* for receiving the aforementioned first and second bolts **68** and **70**. Each of the apertures **48***b*,**48***c* and **26***e*,**26***f* is elongated permitting the rotational position of rotation sensor **48** about shaft **64** to be adjusted as desired. Allowing for the rotational adjustment of rotation sensor **48** about shaft **64** permits each of a plurality of height sensors on a header to be adjusted so that the height above the soil is measured uniformly along the length of the header for more accurate header height measurement and control. An annular member **75** is disposed on bolt **68** and serves as a rotation stop for the height sensor **14** by engaging bracket **62** when sensor arm **40** is in the full down position when in use in a field. Calibration of each of a plurality of height sensors **14** mounted to a header in the full down position is accomplished by appropriate rotation of each rotation sensor **48** about its associated shaft **64** using the aforementioned elongated slots **48***b* and **48***c* in the sensor and **26***e* and **26***f* in flange **26***c*.

Attached to bracket **62** by means of a weldment **82** is a spring mounting bolt **60**. The threaded end portion of spring mounting bolt **60** is adapted to receive a proximal end of a coil spring **42**. A distal end of coil spring **42** is attached to a first end of a rigid shaft **44**. Coil spring **42** and shaft **44** are preferably comprised of a high strength steel and are securely coupled together by means of a plurality of weldments **76** disposed about their juncture. Attached to a distal end of shaft **44** by means of a nut and bolt combination **84** is a ball **46** preferably comprised of a high strength plastic. Coil spring **42** is preferably pre-loaded so that a force of at least 15 pounds is required to bend, or flex, the spring. The flexibility of spring **42** allows the ball **46** disposed on its distal end to impact obstructions in a field without damage or breakage and also prevents damage to the height sensor in the event the ball engages an obstruction when the combine is reversed in direction.

Referring to FIG. **7**, details of the manner in which guard plate **90** is mounted to bracket **26** are shown. Included in a first end of the curved guard plate **90** is an aperture (not shown for simplicity) through which bolt **74***a* is inserted for attaching the guard plate to plate **26***d* of bracket **26**. Attached to the first end of guard plate **90** is a mounting washer **104** also including an aperture (not shown) through which a



second bolt **74***b* is inserted. Nuts **92***a* and **92***b* threadably engage bolts **74***a* and **74***b*, respectively, for securely attaching guard plate **90** to plate **26***d* of bracket **26**. Mounting washer **104** is attached to the first end of the guard plate **90** by conventional means such as a weldment. Guard plate **90** protects the rotation sensor **90** and other components of the corn head height sensor from plant debris, loose soil, rocks and other hazards as the combine traverses a field.

Also shown in FIG. **7** is a second embodiment of a sensor arm **96** for use in the present invention. FIG. **8** is in an exploded perspective view showing the manner in which sensor arm **96** is connected to the rotating bracket **62** which, as previously described, is connected to rotation sensor **48** by means of shaft **64**. The embodiment of the sensor arm **96** shown in FIGS. **7** and **8** includes a linear, elongated coiled spring **98** connected at its distal end by means of weldments to a rigid, elongated shaft **100**. Attached to the distal end of shaft **100** is a ball **102** in the shape of an ellipsoid which engages the soil as the combine traverses a field. A shaft **110***b* extending from a bracket **110** is inserted in and attached to the proximal end of coil spring **98** by means of weldments. Bracket **110** is pivotally coupled to bracket **62** which, in turn, is pivotally coupled to bracket **26** as previously described.

Attached to bracket **62** is a cylindrical shaft **64** which is inserted in and coupled to rotation sensor **48** as in the previously described embodiment. Bracket **62** further includes a circular aperture **62***a*. Circular aperture **62***a* is adapted for receiving a mounting bolt **106** which is inserted through an aperture **110***a* in bracket **110** as well as through a coiled spring **114**. Nuts **108**, **112** and **116** securely connect the combination of bracket **110** and coiled spring **114** to bracket **62**. With bracket **62** freely rotatable with respect to bracket **26** and rotation sensor **48**, the rotational position of bracket **62** will change as ball **102** engages irregular terrain as the combine traverses a field. Coiled spring **114** urges sensor arm **96** in a counterclockwise direction of rotation about the motion sensor **48** as shown by the direction of arrow **118** in FIG. **7**. Coiled spring **114** thus maintains the sensor arm **96** at an inclined angle, with the ball **102** trailing the bracket **26** as the ball engages the soil as the combine traverses a field. If the direction of the combine is reversed, coiled spring **114** allows for the rotation of sensor arm **96** in a direction opposite to arrow **118** to prevent damage to the sensor arm. Because coiled spring **114** provides this protection for the sensor arm **96** in the event the combine is displaced rearwardly, elongated, linear coiled spring **98** is unnecessary in the embodiment shown in FIGS. **7** and **8** to provide this protection against damage to the sensor arm **96**. Inserted through and connected to bracket **62** is a bolt **120**. Bolt **120** limits rotational displacement of sensor arm **96** in the direction of arrow **118** shown in FIG. **7** by engaging shaft **110***b* extending from bracket **110**. Bolt **120** thus also limits rotation of sensor arm **96** in the direction of arrow **118** and ensures that rotational displacement of sensor arm **96** and bracket **62** is the same. This ensures that the rotation of shaft **64** connected to bracket **62** provides an accurate indication of rotational displacement of sensor arm **96** and the height of the terrain traversed by ball **102**.

There has thus been shown a height sensor for detecting the height above the soil of an agricultural apparatus such as a combine header as it traverses a field. The height sensor provides an electrical signal to a height controller in the combine for maintaining the header a predetermined height above the soil. The height sensor includes a pre-loaded flexible arm attached to a forward end of the head housing for providing an early height control signal to allow for

header height adjustment at high operating speeds so that terrain irregularities and obstructions such as rocks in the field are avoided. The distal end of the flexible arm is provided with a ball-like member which engages the soil, while the proximal end of the arm is coupled to an angular displacement detector. The detector determines the angular displacement of the arm as it is pivotally displaced upon encountering terrain irregularities or an obstacle in the field for providing the height control signal to the combine's height controller. A coil spring in the sensor arm provides the arm with the flexibility necessary to avoid damage or breakage to the sensor upon impact with obstructions during operation or when the combine is reversed in direction. The height sensor is particularly adapted for use with head housings comprised of polyurethane and may be retrofit on existing header assemblies by mounting it to existing structure on the head housing.

While particular embodiments of the present invention have been shown and described, it will be obvious to those skilled in the art that changes and modifications may be made without departing from the invention in its broader aspects. Therefore, the aim in the claims is to cover all such changes and modifications as fall within the true spirit and scope of the invention. The matter set forth in the foregoing description and accompanying drawings is offered by way of illustration only and not as a limitation. The actual scope of the invention is intended to be defined in the claims when viewed in their proper perspective based on the prior art.

I claim:

**1**. Apparatus for maintaining a non-cut crop header disposed on a forward portion of a combine a designated height above the soil as the combine traverses a field, said apparatus comprising:

a pre-loaded, generally linear flexible arm coupled to a forward portion of the header and having first and second opposed ends, wherein the first end of said flexible arm engages and is displaced over the soil as the header moves above the soil;

angular deflection sensing means coupled to the second end of said flexible arm for measuring a deflection of said flexible arm when the first end of said flexible arm encounters irregularities in the soil as the header moves above the soil and for providing a first signal representing the extent of deflection of said flexible and; and

control means coupled to said header and said angular deflection sensing means and responsive to said first signal for raising or lowering the header in accordance with said first signal in maintaining the header a designated height above the soil, wherein said flexible arm and angular deflection sensing means are attached to a head housing disposed on a forward portion of said combine and said head housing is comprised of polyurethane and includes a metal tip and am mounting bracket for attaching said metal tip to a forward end of said head housing, and wherein said mounting bracket further couples said flexible arm to a forward end of said head housing.

**2**. The apparatus of claim **1** wherein said flexible arm includes, in combination, a coil spring coupled to a rigid shaft, and wherein said coil spring is coupled to said angular defection sensing means and said rigid shaft is displaced over the soil.

**3**. The apparatus of claim **2** further comprising a spherical member attached to a distal end of said rigid so for engaging the soil.

**4**. The apparatus of claim **1** further comprising biasing means for urging said flexible arm downward into engagement with the soil.

**5**. The apparatus of claim **4** wherein said biasing means includes a coil spring.

**6**. The apparatus of claim **1** further comprising first stop means for limiting upward deflection of said flexible arm.

**7**. The apparatus of claim **6** further comprising second stop means for limiting downward deflection of said flexible arm.

**8**. The apparatus of claim **1** further comprising guard means for shielding said angular deflection sensing means from debris in or on the soil.

**9**. The apparatus of claim **8** wherein said guard means includes a curved bar disposed adjacent said angular deflection sensing means.

**10**. The apparatus of claim **1** further comprising calibration means for adjusting a position of said flexible arm when engaging the soil in a full down position.

**11**. The apparatus of claim **10** wherein said calibration means includes an adjustable mounting arrangement for rotationally displacing said angular deflection sensing means so that said flexible arm engages the soil when in said full down position.

**12**. Apparatus for maintaining a non-cut crop header in a crop harvester a designated height above the soil as the crop harvester traverses a field, said apparatus comprising:

a generally linear arm coupled to the header and having first and second opposed ends, wherein the first end of said arm engages and is displaced over the soil as the header moves above the soil;

angular deflection sensing means coupled to the second end of said arm for measuring a deflection of said arm when the first end of said arm encounters irregularities in the soil as the header moves above the soil and for providing a first signal representing the extent of deflection of said arm;

biasing means for urging said arm to a selected inclined orientation relative to vertical, wherein said arm in said selected inclined orientation extends below and aft of said angular deflection sensing means as the crop harvester moves in a forward direction, said biasing means allowing for forward displacement of the first end of said arm beyond vertical when the crop harvester is moved rearwardly while the first end of said arm engages the soil without damaging said arm, with said biasing means again urging said aim to said selected inclined orientation when the crop harvester is again moved in the forward direction or when the second end of said arm is removed from contact with the soil; and

control means coupled to said header and said angular deflection sensing means and responsive to said first signal for raising or lowering the header in accordance with said first signal in maintaining the header a designated height above the soil, wherein said flexible arm and angular deflection sensing means are attached to a head housing disposed on a forward portion of said combine and said head housing is comprised of polyurethane and includes a metal tip and a mounting bracket for attaching said metal tip to a forward end of said head housing, and wherein said mounting bracket further couples said flexible arm to a forward end of said head housing.

**13**. The apparatus of claim **12** further comprising a mounting bolt for connecting the second end of said arm to said angular deflection sensing means, wherein said biasing means includes a first coiled spring connected between said angular deflection means and said arm and disposed about said mounting bolt.

**14**. The apparatus of claim **13** further comprising first and second pivotally coupled brackets for connecting the second end of said arm to said angular deflection sensing means.

**15**. The apparatus of claim **14** wherein said angular deflection sensing means is a rotation sensor and said first bracket includes an elongated shaft connected to said rotation sensor.

**16**. The apparatus of claim **15** wherein said mounting bolt pivotally couples said first and second brackets, and wherein said coiled spring is disposed about said mounting bolt and engages said first and second brackets.

**17**. The apparatus of claim **16** further comprising first rotation stop means for limiting upward deflection of said arm relative to said second bracket so that rotation of said elongated shaft provides an accurate indication of rotational displacement of said arm and the height of the soil.

**18**. The apparatus of claim **12** wherein said arm is pre-loaded and flexible and includes, in combination, a coil spring coupled to a rigid shaft, and wherein said coil spring is coupled to said angular deflection sensing means and said rigid shaft is displaced over the soil.

**19**. The apparatus of claim **18** further comprising a spherical member attached to a distal end of said rigid shaft for engaging the soil.

**20**. The apparatus of claim **18** further comprising second rotation stop means for limiting downward deflection of said arm.

**21**. The apparatus of claim **12** further comprising guard means for shielding said angular deflection sensing means from debris in or on the soil.

**22**. The apparatus of claim **21** wherein said guard means includes a curved bar disposed adjacent said angular deflection sensing means.

**23**. The apparatus of claim **12** further comprising calibration means for adjusting a position of said flexible arm when engaging the soil in a full down position.

**24**. The apparatus of claim **23** wherein said calibration means includes an adjustable mounting arrangement for rotationally displacing said angular deflection sensing means so that said flexible arm engages the soil when in said full down position.

**25**. The apparatus of claim **12** wherein said arm is an elongated, linear, rigid shaft.

**26**. The apparatus of claim **25** further comprising a bulbous member attached to the first end of said rigid shaft for engaging and being displaced over the soil.

**27**. For use on a plastic non-cut crop header housing disposed on a forward portion of a combine used in the harvesting of crops, said header housing have a tip mounted to a forward end thereof by means of a mounting bracket, an arrangement for determining the height of the header housing above the soil as the combine traverses a field, said arrangement comprising:

a rotation sensor disposed in a lower, forward portion of the header;

an elongated, linear shaft having first and second opposed ends, wherein said first end is coupled to said rotation sensor and said second end engages the soil, and wherein said shaft rotationally displaces said rotation sensor as the second end of said shaft engages and passes over irregularities in the soil; and

a flange connecting said rotation sensor to the mounting bracket for mounting said rotation sensor on a lower portion of the forward end of the plastic header housing, wherein said mounting bracket includes a strap and a bracket respectively disposed on lower and upper surfaces of the header housing and connected together by at least one nut and bolt combination.

**28**. The arrangement of claim **27** wherein said flange includes an aperture therein and wherein the first end of said elongated, linear shaft includes a rod member extending through the aperture in said flange and coupled to said rotation sensor.

**29**. The arrangement of claim **28** further comprising a plate mounted to a forward portion of said flange for attaching guard means for shielding said rotation sensor from dirt and debris in the field.

**30**. The arrangement of claim **29** wherein said guard means includes a curved metal member disposed beneath said rotation sensor.

**31**. The arrangement of claim **30** wherein said elongated, linear shaft is rigid.

**32**. The arrangement of claim **30** wherein said elongated, linear shaft includes a rigid shaft coupled to a flexible coiled spring.

**33**. The arrangement of claim **31** further comprising a bulbous member disposed on the second end of said elongated, linear shaft.

**34**. The arrangement of claim **27** wherein the header housing is comprised of polyurethane.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,202,395 B1
DATED : March 20, 2001
INVENTOR(S) : Richard Gramm



It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page,
Item [76], Inventor Richard Gramm, 3529 Fir Road, Bremen, IN (US) 46506

Column 7,
Line 52, after "and" before "mounting" delete "am" insert -- a --
Line 63, after "rigid" before "for" delete "so" insert -- shaft --

Signed and Sealed this

Twenty-seventh Day of November, 2001

*Attest:*

Nicholas P. Godici

NICHOLAS P. GODICI

*Attesting Officer* *Acting Director of the United States Patent and Trademark Office*

**CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing Brief for Patent Owner-Appellant Richard Gramm with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system this 6th day of March, 2017, and served a copy on counsel of record by the CM/ECF to counsel for Petitioner-Appellee Deere on the service list below.

Gary M. Ropski
Joshua H. James
Jeffry M. Nichols
Laura A. Lydigsen
Jafon L. Fearson
**BRINKS GILSON & LIONE**
NBC Tower – Suite 3600
455 N. Cityfront Plaza Dr.
Chicago, Illinois 60611-5599
Tel.: 312.321.4200
Fax: 312.321.4299
Email: gropski@brinksgilson.com
jnichols@brinksgilson.com
jjames@brinksgilson.com
llydigsen@brinksgilson.com
jfearson@brinksgilson.com

/s/ John A. Cotter
John A. Cotter

*Attorney for Appellant Richard Gramm*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). This brief contains 13,375 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 pt. Times New Roman font.

/s/ John A. Cotter
John A. Cotter

*Attorneys for Appellant Richard Gramm*